# EXHIBIT 1

ano 3|7

**STATE OF TENNESSEE**
**Department of Commerce and Insurance**
**500 James Robertson Parkway**
**Nashville, TN 37243-1131**
**PH - 615.532.5260, FX - 615.532.2788**
**Jerald.E.Gilbert@tn.gov**

February 05, 2014

REC'D FEB 1 0 2014

Continental Casualty Company
333 South Wabash, 43S
Chicago, IL  60604
NAIC # 20443

Certified Mail
Return Receipt Requested
7012 3460 0002 8941 9213
Cashier # 14083

Re:    Fiancial Strategy Group, Plc  V.   Continental Casualty Company

         Docket # Ch14-0164-1

To Whom It May Concern:

Pursuant to Tennessee Code Annotated § 56-2-504 or § 56-2-506, the Department of Commerce and Insurance was served February 05, 2014, on your behalf in connection with the above-styled proceeding.  Documentation relating to the subject is herein enclosed.

Jerald E. Gilbert
Designated Agent
Service of Process

Enclosures

cc: Chancery Court Clerk
     Shelby County
     140 Adams Street, Rm 308
     Memphis, Tn  38103

**(CIRCUIT/CHANCERY) COURT OF TENNESSEE**
**140 ADAMS AVENUE, MEMPHIS, TENNESSEE 38103**
**FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

ELECTRONICALLY FILED
2014 Jan 31 PM 12:22
CLERK OF COURT - CHANCERY

## SUMMONS IN CIVIL ACTION

Docket No. CH-14-0164-1

☑ Lawsuit
☐ Divorce

Ad Damnum $ _____

| | | |
|---|---|---|
| FINANCIAL STRATEGY GROUP, PLC | VS | CONTINENTAL CASUALTY COMPANY |
| Plaintiff(s) | | Defendant(s) |

TO: (Name and Address of Defendant (One defendant per summons))

TENNESSEE COMMISIONER OF INSURANCE AS DESIGNATED AGENT FOR SERVICE OF PROCESS
PURSUANT TO T.C.A. 56-2-503 AND 504:

CONTINENTAL CASUALTY COMPANY
c/o Tennessee Commissioner of Insurance
Department of Commerce & Insurance
500 James Robertson Parkway
Davy Crockett Tower
Nashville, Tennessee 37243-0565

Method of Service:
☐ Certified Mail
☐ Shelby County Sheriff
☑ Commissioner of Insurance ($)
☐ Secretary of State ($)
☐ Other TN County Sheriff ($)
☐ Private Process Server
☐ Other

($) Attach Required Fees

You are hereby summoned and required to defend a civil action by filing your answer with the Clerk of the Court and serving a copy of your answer to the Complaint on   Charles W. Hill, GLANKLER BROWN, PLLLC   Plaintiff's attorney, whose address is 6000 Poplar Avenue, Suite 400, Memphis, TN 38119   , telephone   +1 (901) 525-1322   within THIRTY (30) DAYS after this summons has been served upon you, not including the day of service. If you fail to do so, a judgment by default may be taken against you for the relief demanded in the Complaint.

JIMMY MOORE, Clerk / DONNA RUSSELL, Clerk and Master

TESTED AND ISSUED _____   By _____, D.C.

TO THE DEFENDANT:

NOTICE; Pursuant to Chapter 919 of the Public Acts of 1980, you are hereby given the following notice:
Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed. These include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

FOR AMERICANS WITH DISABILITIES ACT (ADA) ASSISTANCE ONLY, CALL (901) 222-2341

I,  JIMMY MOORE / DONNA RUSSELL ,  Clerk of the Court,
Shelby County, Tennessee, certify this to be a true and
accurate copy as filed this

_____

JIMMY MOORE , Clerk /  DONNA RUSSELL, Clerk and Master

By: _____, D.C.

RETURN OF SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I **HAVE** SERVED THE WITHIN SUMMONS:

By delivering on the _____ day of _____, 20_____ at _____ M. a copy of the summons

and a copy of the Complaint to the following Defendant _____

at _____

_____          By: _____
Signature of person accepting service                                    Sheriff or other authorized person to serve process

RETURN OF NON-SERVICE OF SUMMONS

I HEREBY CERTIFY THAT I **HAVE NOT** SERVED THE WITHIN SUMMONS:

To the named Defendant _____

because _____ is (are) not to be found in this County after diligent search and inquiry for the following

reason(s): _____

This _____ day of _____, 20_____.

By: _____
Sheriff or other authorized person to serve process



**The Shelby County, Tennessee Chancery Court**

**Case Style:**      FINANCIAL STRATEGY GROUP V CONTINENTAL CASUALTY CO

**Case Number:**     CH-14-0164

**Type:**            Process issued other (T)

JENNIFER HALL, DC

Electronically signed on 01/31/2014 03:29:41 PM

ELECTRONICALLY FILED
2014 Jan 31 PM 12:22
CLERK OF COURT - CHANCERY

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

FINANCIAL STRATEGY GROUP, PLC,

      Plaintiff,

v.

                              Case No. CH - 14 - 0164 - 1

CONTINENTAL CASUALTY COMPANY,          JURY DEMANDED

      Defendant.

## COMPLAINT FOR DECLARATORY RELIEF, MONETARY DAMAGES, AND OTHER RELIEF

TO THE HONORABLE CHANCELLORS OF THE CHANCERY COURT OF THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS:

      The Plaintiff, Financial Strategy Group, PLC, sues Continental Casualty Company and for cause of action states as follows:

### PARTIES

      1.     Financial Strategy Group, PLC ("FSG") is a Tennessee professional limited liability company with its principal place of business located in Memphis, Shelby County, Tennessee.

      2.     Continental Casualty Company ("CNA") is a stock insurance company incorporated under Illinois law. CNA issued an Accountants Professional Liability Policy providing professional liability protection and coverage for FSG. The policy was negotiated in and issued in Tennessee. CNA may be served with process through its designated agent, the Tennessee Insurance Commissioner.

3.     FSG provides accounting services and offers comprehensive financial and tax planning services for its clients. It is headquartered in Memphis, Tennessee.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction of this cause pursuant to T.C.A. § 29-14-102 and pursuant to T.C.A. §§ 16-11-101 and 102 and personal jurisdiction pursuant to T.C.A. §§ 20-2-201, 214(4), 223(6), and 225.

5.     Venue is appropriate in Shelby County, Tennessee pursuant to T.C.A. §§ 16-11-114, 115 and T.C.A. 20-4-101. Venue is appropriate because the insurance contract that is the subject of this litigation was issued to the Plaintiff in Shelby County, Tennessee and because the underlying facts supporting this Complaint occurred in whole or in part in Shelby County, Tennessee.

## FACTS

6.     CNA issued its Accountants Professional Liability Policy Number 188103279 (the "Policy") to FSG. The Policy provides the Plaintiff with Accountants Professional Liability Coverage and it expressly includes the duty to defend any claims brought against the Plaintiff even though groundless, false, or fraudulent.   A copy of Continental Casualty Company Accountants Professional Liability Policy Number 188103279 is attached to this Complaint as Exhibit A and incorporated as if specifically recited word for word. The Policy was issued as a claims made policy covering claims first made against the insured (FSG) during the policy period.  Its policy period ran from September 17, 2008 to September 17, 2009.  The Policy provides liability protection for and a defense for FSG for claims alleging an act or omission in the rendering of professional services, including services performed in the practice of public accountancy and related consulting services. The Policy obligates CNA to provide a defense to

2

FSG for claims alleging acts or omissions in the rendering of professional services even though such claims may be groundless, false, or fraudulent.

7.      On May 19, 2009, R. K. Lowry, Jr. and other plaintiffs filed a Second Amended Original Petition in the District Court for the Eightieth Judicial District of Harris County, Texas ("Lowry Petition") naming FSG as a party defendant. The Petition was served on FSG on June 4, 2009. A copy of the Lowry Petition and service of process letter is attached to and incorporated into this Complaint as Exhibit B as if specifically recited here.

8.      On July 6, 2009, Shahid R. Khan and others filed a complaint against FSG in the Circuit Court of Champaign County, Illinois ("Khan Complaint"). FSG was served with the complaint on August 6, 2009. A copy of the Khan Complaint and summons is attached and incorporated into this Complaint as Exhibit C as if specifically recited here.

9.      The Lowry Petition and the Khan Complaint were tendered by FSG to CNA for defense of and coverage for the claims asserted against FSG in the two lawsuits. By letter dated August 31, 2009, CNA advised FSG that it would neither defend nor provide coverage for the claims stated in the two lawsuits. A copy of CNA's coverage and defense denial is attached to and incorporated into this Complaint as Exhibit D as if specifically recited here.

10.     The Lowry Petition is one hundred and six (106) pages long and the Khan Complaint is seventy nine (79) pages long. Among other numerous and expansive allegations, the Lowry Petition asserts claims that FSG committed acts of negligence, professional negligence, negligent misrepresentation, and fraud with respect to its provision of professional services. The Lowry Petition is replete with allegations that FSG "knew or should have known" that its tax advice was in error and its tax return preparation improper. The Lowry Petition alleges that FSG failed to meet the standard of professional care required of it in the performance

of services for the plaintiffs, negligently made numerous affirmative misrepresentations, and negligently gave improper tax advice. (Lowry Petition, ¶¶ 38, 39, 44, 46, 142, 143, 154, 160, 161, 175, 177, 239, 240, 244-247, 250, 255, and 256).

11.   The Khan Complaint includes allegations that are almost a mirror image of the allegations of the Lowry Petition.  The Khan Complaint alleges that FSG committed acts of negligence, negligent misrepresentation, and fraud with respect to its rendering of professional services to the Khan plaintiffs.  The Khan Complaint is likewise replete with allegations asserting that FSG "knew or should have known" that its tax advice was in error and its preparation of federal tax returns improper. The Khan Complaint charges FSG with commission of acts of negligence and professional malpractice by failing to render professional services that met applicable standards of care.  The Khan Complaint alleges FSG to have made negligent misrepresentations in the provision of professional services to the plaintiffs. (Khan Complaint, ¶¶ 20, 21, 29, 45, 69, 70, 76, 100, 101, 103, 125, 126, 130-133, 139-141, and 161).

12.   FSG alleges that the terms of the CNA Accountants Professional Liability Policy provide it with coverage for and a defense for the claims made in the both the Lowry Petition and Khan Complaint.  FSG alleges that it is entitled to be fully indemnified by CNA for all amounts awarded against FSG and in favor of the Lowry and Khan plaintiffs, if any.  FSG alleges that it is entitled to be fully reimbursed for all costs, fees, and expenses incurred in the defense of the Lowry and Khan lawsuits.  To date, FSG has expended in excess of $250,000.00 in defending the Lowry and Khan lawsuits.  FSG alleges that CNA has materially breached the terms of the Accountants Professional Liability Policy it issued to FSG by failing to provide coverage for and a defense for the claims made in the Lowry Petition and Khan Complaint.

4

13.    This Complaint presents an actual justiciable controversy between the parties over the terms of a written instrument executed by the parties.  FSG paid a substantial premium to CNA for provision of coverage and a defense under the terms of the Accountants Professional Liability Policy it issued for FSG's protection.  FSG alleges that it is entitled to declaratory relief and a determination that CNA has an obligation to defend and provide coverage for the claims stated in the Lowry Petition and Khan Complaint.  FSG seeks a declaratory judgment pursuant to Rule 57 of the Tennessee Rules of Civil Procedure and T.C.A. § 29-14-102.

14.    FSG alleges that CNA has breached the terms of the Accountants Professional Liability Policy at issue causing FSG to suffer money damages represented by costs and fees expended in the defense of the Lowry Petition and the Khan Complaint so far and continuing.

15.    FSG alleges that CNA has breached implied covenants of good faith and fair dealing by failing to provide coverage for and a defense to the claims stated in the Lowry Petition and the Khan Complaint.  FSG alleges that it has suffered monetary damages for breach of these implied covenants represented by the defense costs and fees incurred so far and continuing.

WHEREFORE, the Plaintiff, Financial Strategy Group, PLC, prays for an award of a judgment against the Defendant, Continental Casualty Company, as follows:

1.    For a judgment declaring that CNA has the duty to provide coverage for and a defense for the claims stated in the Lowry Petition;

2.    For a judgment declaring that CNA has the duty to provide coverage for and a defense for the claims stated in the Khan Complaint;

3.   For a judgment against CNA for breach of contract in amounts to be proven at trial, but now currently exceeding $250,000.00 for all costs, fees, expenses, and monies expended in the defense of the Lowry Petition and Khan Complaint;

4.   For a judgment against CNA for breach of implied covenants of good faith and fair dealing in amounts to be proven at trial, but now currently exceeding $250,000.00 for all costs, fees, expenses, and monies expended in the defense of the Lowry Petition and Khan Complaint

5.   For an award against and recovery from CNA of full indemnity for any sums of money awarded in favor of the Lowry plaintiffs against FSG;

6.   For an award against and recovery from CNA of full indemnity for any sums of money awarded in favor of the Khan plaintiffs against FSG;

7.   For an award of all attorneys' fees expended in the pursuit of this lawsuit and all litigation costs including discretionary costs, expert fees, and statutory court costs;

8.   For prejudgment interest on all monetary amounts awarded FSG; and

9.   For such other and further relief to which the Plaintiff shows itself entitled.


PLAINTIFF DEMANDS A JURY TRIAL.

GLANKLER BROWN, PLLC

_____

Charles W. Hill, #5452
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
Phone: (901) 525.1322
Fax:    (901) 525.2389
chill@glankler.com

6

A

# DECLARATIONS
## ACCOUNTANTS PROFESSIONAL LIABILITY POLICY

| PRODUCER – BRANCH | PREFIX | POLICY NUMBER |
|---|---|---|
| **003613**      **970** | **APL** | **188103279** |

INSURANCE IS PROVIDED BY
CONTINENTAL CASUALTY COMPANY
CNA PLAZA, CHICAGO, IL 60685
A STOCK INSURANCE COMPANY
REFERRED TO AS WE, US, OR OUR.

1. Named Insured and Mailing Address

   Financial Strategy Group,, PLC
   700 Colonial Road, Suite: 120
   Memphis, TN 38117

* * * NOTICE * * * *

THIS IS A CLAIMS-MADE POLICY AND COVERS
ONLY CLAIMS FIRST MADE AGAINST THE INSURED
DURING THE POLICY PERIOD. PLEASE READ
THIS POLICY CAREFULLY AND DISCUSS THE
COVERAGE WITH YOUR INSURANCE AGENT.

2. POLICY PERIOD:       FROM:  9/17/08   TO:   9/17/09     at 12:01 A.M. Standard time at your address shown above.

3. PRIOR ACTS DATE:      9/17/99

4.       $50,000   PROFESSIONAL LIABILITY PER CLAIM DEDUCTIBLE

5. LIMITS OF LIABILITY:      (INCLUDES CLAIM EXPENSES UNLESS AMENDED BY ENDORSEMENT)

   $1,000,000  PER CLAIM
   $1,000,000  AGGREGATE

6. FOR NON-RENEWAL :     60 days notice will be given you in accordance with policy conditions.

7. PRINTED ENDORSEMENTS ATTACHED AT POLICY ISSUANCE INCLUDE:

G-127136-A(1/08) Policy
G-127137-A(5/00) Declarations Page
G-127157-A(6/97) Nuclear Energy & Pollution Excl.
G-127164-A41(6/97) Amend. Termination Provisions - TN
G-127165-A41(5/00) Amend. Endorsement - TN
G-141584-A(6/03) Policyholder Notice
GSL2656XX(5/08) Network Risk & Privacy Claim
G-127139-A Excl Named Individuals or Entities
G-127139-A Excl Named Individuals or Entities

G-127139-A Excl Named Individuals or Entities
G-127139-A Excl Named Individuals or Entities
G-127139-A Excl Named Individuals or Entities
G-127139-A Excl Named Individuals or Entities
G-127139-A Excl Named Individuals or Entities
G-127139-A Excl Named Individuals or Entities
G-127145-A Definition of You and Your
G-138268-A Employee Dishonesty
G-147092-A Specific Investment Exclusion
G-147092-A Specific Investment Exclusion

**EXHIBIT**

**A**

8.          $15,907.00          ANNUAL PREMIUM

THIS POLICY IS NOT VALID UNTIL SIGNED BY OUR AUTHORIZED REPRESENTATIVE.

Authorized Representative

G-127137-A (Ed.5/00)

## ACCOUNTANTS PROFESSIONAL LIABILITY POLICY

**YOUR ACCOUNTANTS PROFESSIONAL LIABILITY INSURANCE IS WRITTEN ON A "CLAIMS-MADE" BASIS. IT PROVIDES COVERAGE FOR THOSE CLAIMS WHICH ARE BOTH FIRST MADE AGAINST YOU AND REPORTED TO US IN WRITING DURING THE POLICY PERIOD.**

Throughout this Policy, the terms "we", "us" and "our" refer to the Stock Insurance Company, named on the Declarations, providing this insurance.

**I.     DEFINITIONS**

The following terms, shown in **bold** face type in this Policy will have only the meaning indicated below:

**Advertising injury** means injury that arises in the course of advertising your **professional services** by reason of:

A.     the oral or written publication of material that slanders or libels an individual or entity or disparages its goods, products or services;

B.     misappropriation of advertising ideas or style of doing business; or

C.     infringement of copyright, title or slogan.

**Bodily injury** means injury to the body, including sickness or disease sustained by any person and death resulting from such injuries; emotional distress or mental anguish sustained by any person whether or not resulting from such injury; and all injuries that are a consequence of the foregoing. However, **bodily injury** does not include emotional distress or mental anguish arising from **personal injury**.

**Claim** means a demand received by **you** for money or services naming **you** and alleging an act or omission, including **personal injury** or **advertising injury**, in the rendering of **professional services**. A demand shall include the service of suit or the institution of arbitration proceedings against **you**.

**Claim expenses** are those fees charged by an attorney **we** designate or consent to, and all other fees, costs and expenses resulting from the investigation, adjustment, expert analysis, defense and appeal of a **claim**, if incurred by us or by **you** with our written consent. **Claim expenses** do not include salaries of our employees or officers, or fees and expenses of independent adjusters retained by us.

**Damages** are monetary judgments, awards and settlements, **you** are legally obligated to pay because of a **claim**, provided any settlement is negotiated by or with our assistance and approval. **Damages** also include prejudgment or post-judgment interest awarded against **you** on such judgments or awards. **Damages** do not include:

A.     civil or criminal fines, penalties, sanctions or forfeitures, imposed on you whether pursuant to law, statute, regulation or court rule;

B.     punitive or exemplary amounts, and the multiplied portion of multiplied awards on **claims** otherwise payable under this Policy;

G-127136-A
Ed. 1/08

1



C.     amounts for which you are not financially liable or that are without legal recourse to you;

D.     amounts owed by you to your client by reason of money loaned to or invested with you in your individual capacity for your personal use or investment in your own venture;

E.     Injunctive or declaratory relief.

**Dissolution** means:

A.     the termination of the legal existence of an organization, regardless of structure, whether by legislation, surrender, expiration or forfeiture of charter for any cause, bankruptcy; or

B.     loss of all of an entity's partners, principals, officers or directors; or

C.     the cessation of the rendering of **professional services.**

**Interrelated claims** are all claims arising out of a single act or omission or arising out of **interrelated acts or omissions** in the rendering of **professional services.**

**Interrelated acts or omissions** mean all acts or omissions in the rendering of **professional** services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.

**Investment advisory services** means:

A.     giving financial, economic or investment advice, including personal financial planning or

B.     performing investment management services with respect to investments in securities or insurance products. However, this does not include the barter, purchase or sale of securities or insurance products.

**Named Insured** means the individual or entity named on the Declarations as the **Named Insured.**

**Personal fiduciary** is an executor, administrator or representative of an estate or a trustee of a **personal trust.**

**Personal injury** means libel, slander, disparagement, false arrest, wrongful detention, false imprisonment, wrongful entry or eviction or other invasion of the right of private occupancy, malicious prosecution or violation of an individual's or entity's right of privacy. **Personal injury** also includes emotional distress and mental anguish arising from any of the above.

**Personal trust** trust means an individual or family trust established for the sole benefit of the individual or family or a charitable remainder trust as defined under Internal Revenue Code Section 664.

**Policy period** means the period of time from the effective date and time shown in the Declarations and the date and time of termination, expiration or cancellation of this Policy.

**Predecessor firm** means:

A.     a partnership, professional corporation, professional association, limited liability corporation or limited liability partnership engaged in **professional**



services which has undergone **dissolution** and from which 50% or more of the owners, partners, or officers have joined the **Named Insured** as an owner, partner, officer, associate or employee;

B.    a sole proprietor engaged in **professional services** which has joined the **Named Insured** as an owner, partner, officer, associate or employee unless otherwise excluded by endorsement; or

C.    any individual or entity identified as a **predecessor firm** by endorsement to this Policy.

**Prior acts date,** if any, is indicated on the Declaration. This Policy excludes from coverage all **claims** by reason of acts or omissions that happened before the **prior acts date.**

**Prior insurer** means an insurer, including us and any subsidiary or affiliate of ours, who has issued prior accountants professional liability insurance coverage.

**Professional services** mean those services:

A.    performed in the practice of public accountancy by you for others for remuneration that inures to the benefit of the **Named Insured,** including but not limited to consulting services and **investment advisory services;**

B.    pro bono services rendered by those of you specified in paragraph A. and B. of the definition of **You,** if at the time such services were undertaken, a partner, officer or director of the **Named Insured** approved the rendering of such services without compensation; or

C.    performed by you for others:
   1.    as a **personal fiduciary;**
   2.    as a member of a formal accreditation, standards review or similar professional board or committee related only to the accounting profession; or
   3.    as an arbitrator, mediator or notary public.

**You and your** means the **Named Insured** and any **predecessor firm** and:

A.    any person who is or becomes a partner, officer, director, associate, or employee of the **Named Insured** but only for **professional services** performed on behalf of the **Named Insured;**

B.    any person previously affiliated with the **Named Insured** or a **predecessor firm** as a partner, officer, director, associate, or employee but only for **professional services** performed on behalf of the **Named Insured** or a **predecessor firm** at the time of such affiliation;

C.    any person or entity that is an independent contractor to the **Named Insured** provided that such person or entity is not:
   1.    employed by the **Named Insured** or **predecessor firm** or by any entity controlled, owned, managed or operated by the **Named Insured** or **predecessor firm;**
   2.    controlled, owned, managed or operated by the **Named Insured** or **predecessor firm** or by any entity that is controlled, owned, managed or operated by the **Named Insured** or **predecessor firm;** but only for **professional services** performed on behalf of the **Named Insured** and only to the extent that remuneration for such services inures to the benefit of the **Named Insured.**



## II.   COVERAGE AGREEMENTS

A.   In accordance with all the terms and conditions of this policy, we will pay on your behalf all sums in excess of the deductible, up to our limits of liability, that **you** become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against **you** and reported in writing to us during the **policy period** by reason of an act or omission in the performance of **professional services** by **you** or by any person for whom you are legally liable provided that:

   1.   **you** did not give notice to a **prior insurer** of any such act or omission or **interrelated act or omission**;

   2.   prior to the effective date of this Policy, none of **you** had a basis to believe that any such act or omission, or **interrelated act or omission**, might reasonably be expected to be the basis of a **claim**;

   3.   such act or omission happened subsequent to the **prior acts date**;

   4.   **you** did not give notice to a **prior insurer** of an **interrelated claim**.

B.   We have the right and duty to defend any **claim** seeking **damages**, even if any of the allegations of the **claim** are groundless, false or fraudulent. We will investigate any such **claim** as we deem appropriate. We will not settle any **claim** without **your** written consent, which shall not be unreasonably withheld. **You** and we agree to consult with each other, and, if **you** are a member, with the American Institute of Certified Public Accountants, to resolve any differences relating to such settlement.

C.   We are not obligated to investigate, defend, pay or settle a **claim** after the applicable limit of our liability has been exhausted by payment of **damages** or **claim expenses** or by any combination thereof, or after we have tendered the remaining available limits of liability into a court of competent jurisdiction. In such case, we shall have the right to withdraw from the further investigation, defense or settlement of any **claim** by tendering control of said investigation, defense or settlement to **you**. We will initiate, and cooperate in, the transfer of control to **you** of any **claims** that were reported to us prior to the exhaustion of such limit. **You** must cooperate in the transfer of control of such **claims**. We agree to take the necessary steps, as we deem appropriate, to avoid a default in such **claims** until such transfer has been completed, provided **you** cooperate in completing such transfer. **You** must reimburse us for expenses we incur in taking those steps we deem appropriate to avoid a default.

D.   If we conclude that the limit of liability applicable to any **claim** may become exhausted prior to the conclusion of the **claim**, we will notify the **Named Insured**, in writing, as soon as practicable, to that effect. When the limit of liability applicable to any **claim** has actually been exhausted prior to the conclusion of the **claim**, we will notify the **Named Insured**, in writing, as soon as practicable, that such limit has been exhausted.



### III.   LIMITS OF LIABILITY

#### A.   Each Claim

Subject to B. below, the limit of liability for damages and claim expenses for each claim shall not exceed the amount stated in the Declarations as "Per claim."

#### B.   Aggregate

Subject to A. above, the limit of our liability for damages, and claim expenses for all claims shall not exceed the amount stated in the Declarations as "Aggregate."

#### C.   Deductible

Our obligation to pay damages and claim·expenses as a result of a claim is in excess of the applicable amount of the deductible. The Named Insured agrees to pay all damages and claim expenses up to the amount of such deductible. The deductible amount applies either on a per claim or on an aggregate basis as is indicated on the Declarations. Payment of the deductible or portions thereof shall be made by the Named Insured as claim expenses are incurred or damages are paid.

#### D.   Multiple insureds, claims and claimants

The limits of liability shown in the Declarations and subject to the provisions of this Policy is the amount we will pay as damages and claim expenses regardless of the number of you, claims made or persons or entities making claims. If interrelated claims are subsequently made against you and reported to us, all such interrelated claims, whenever made, shall be considered a single claim first made and reported to us within the policy period in which the earliest of the interrelated claims was first made and reported to us.

#### E.   Risk Management Incentives

1. Mediation

With respect to a claim, your deductible applying to the claim will be reduced by 50%, provided that:

a. the claim is mediated by an independent, disinterested third party mediator who is compensated for such services and who is appointed by us or approved by us in writing.

b. the claim is mediated either without institution of arbitration proceedings or service of suit or within 60 days of the institution of such proceedings or service of suit, and

c. such claim is ultimately resolved for an amount acceptable to you and us.



In no event shall the amount of the deductible waived hereunder exceed $50,000.

2.   Use of Engagement Letters

If you utilized an engagement letter in any engagement other than audit services or attest services:

a.   that was signed within the preceding 11 month period prior to rendering the **professional services** at issue in the **claim** and,

b.   the **claim** is otherwise covered under the Policy,

then we will reduce **your** deductible, applying to that **claim**, by 50%, up to a total amount of $5,000.

In the event that paragraphs E.1. and E.2. both apply to a **claim**, in no event shall the total amount of the deductible waived for that **claim** exceed $50,000.

## IV.   SUPPLEMENTARY BENEFITS

While not **damages**, we will make the following payments in addition to our limits of liability.   No Deductible applies to any payments made under this Supplementary Benefits Section.

1.   Defendants Reimbursement

We agree to pay **you** $75 per hour for the time **you** spend to attend a trial, court hearing, mediation or arbitration proceeding at our request in connection with a **claim**.

2.   Regulatory Inquiry

If, during the **policy period**, a state licensing board, self regulatory body, public oversight board or a governmental agency with the authority to regulate **your professional services** or any entity acting on behalf of such entities initiates an investigation of **you** arising from an act or omission in the rendering of **professional services** which occurred after the **prior acts date**, and **you** report this to us in accordance with Section VI.D. of this Policy, we agree to pay **your** attorney fees, attorney costs and court costs incurred in responding to the investigation. The maximum amount we will pay for such attorney fees and costs is $12,500 regardless of the number of investigations or the number of **you** who are subject to such investigations.

3.   Subpoena Assistance

If during the **policy period**, **you** receive a subpoena for documents or testimony as fact witness arising from an act or omission in the



rendering of **professional services** which occurred after the **prior acts date**, and **you** would like our assistance in responding to the subpoena, **you** may provide us with a copy of the subpoena and we will retain an attorney to provide advice regarding the production of documents, to prepare **you** for sworn testimony, and to represent **you** at **your** deposition, provided that:

a. the subpoena arises out of a lawsuit to which **you** are not a party; and

b. **you** have not been engaged to provide advice or testimony in connection with the lawsuit, nor have **you** provided such advice or testimony in the past.

Any notice **you** give us of such subpoena shall be deemed notification of a potential **claim** under Section VI.D. of this Policy.

4.    Defense of Third Party Discrimination Demand

If, during the **policy period**, a demand is received by **you** for money or services and

a. arises solely from **your** alleged refusal after the **prior acts date** to provide **professional services** due to discrimination, for reasons of age, race, creed, color, gender, religion, national origin, disability, marital status or sexual preference; and

b. does not arise out of **your** intentional disregard or willful failure to comply with federal or state laws governing discriminatory practices; and

c. the demand is otherwise covered under the terms and conditions of the Policy but for the absence of the rendering of **professional services**,

then we will provide **you** with a defense subject to **your** deductible and the available limits of liability in the Policy. There will be no coverage for **damages** regardless of the ultimate findings.

## V.    EXCLUSIONS

This Policy does not apply to:

A.    any **claim** for **bodily injury** regardless of cause;

B.    any **claim** for damage to, destruction of, or loss of use of tangible property.

This exclusion does not apply to client records which are in **your** care, custody or control;

C.    any **claim** based on or arising out of liability assumed under any contract or agreement unless **you** would have been liable if the contract or agreement did not exist;

D.    any **claim** based on or arising out of a dishonest, illegal, fraudulent, criminal or malicious act by any of **you**. We shall provide **you** with a



defense of such **claim** unless or until the dishonest, illegal, fraudulent, criminal or malicious act has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive any of our rights under this Policy. Criminal proceedings are not covered under this Policy regardless of the allegations made against **you**;

E.   any **claim** based on or arising out of **professional services** performed for any entity, including an entity held in a **personal trust**, if at the time of the act or omission giving rise to the **claim**, **you** or **your** spouse were a director, officer or partner of, or had management responsibilities for, such entity, or the owner of more than a 10% equity interest in such entity;

F.   any **claim** based on or arising out of **professional services** rendered by **you** as an executor, administrator or personal representative of an estate or as a trustee if **you** or **your** spouse are a beneficiary or distributee of said estate or trust;

G.   any **claim** based on or arising out of **your** capacity as:
1.   an officer, director, trustee, partner or other member of a governing body of an entity, other than the Named Insured;
2.   a guardian or conservator of an individual;
3.   a conservator of an entity;
4.   a trustee for an investment fund established for the benefit of any entity or group of unrelated individuals. This exclusion shall not apply to an accountant when acting as a trustee for a **personal trust**;
5.   a plan administrator of an employee benefit plan, or the trustee of any trust established to fund such plan, or any other fiduciary of such plans, regardless of whether the **claim** is brought against **you** under the Employee Retirement Income Security Act of 1974, its amendments or any other similar state or local law. This exclusion does not apply if **you** are deemed to be a fiduciary solely by virtue of **professional services you** render as an accountant to the plan, including accounting, audit, attest, consulting, tax, investment advisory services, or administrative services to an employee benefit plan as an independent third party consultant.

H.   any **claim** based on or arising out of **your** capacity as a broker or dealer in securities, as those terms are defined in Sections 3(a)(4) and 3(a)(5), respectively, of the Securities Exchange Act of 1934.

I.   any **claim** based on or arising out of any anti-trust law violation or any agreement or conspiracy to restrain trade unless the allegations arise solely from **your** performance of **professional services** as a member of a formal accreditation, standards review or similar professional board or committee, related only to accountancy, and such services are within the scope of that committee or board's established guidelines;

J.   any **claim** based on or arising out of the gaining of any personal profit or advantage to which **you** are not legally entitled in the rendering of **professional services** in **your** capacity as a **personal fiduciary**.



## VI.   POLICY CONDITIONS

### A.   Coverage Territory

This Policy applies to **professional services** performed anywhere in the world.  Claim must be brought against you, however, within the United States of America, including its territories and possessions, Puerto Rico or Canada.

### B.   Sole Agent

The Named Insured shall be the sole agent of all of **you** for the purpose of effecting or accepting any notices hereunder, any amendments to or cancellation of this Policy; for the completing of any applications; for the making of any statements, representations and warranties; for the payment of any premium and the receipt of any return premium that may become due under this Policy; and for the exercising of, or declining to exercise any right under this Policy.

### C.   Duties in the event of a **claim**

1.   **You** must give us written notice as soon as reasonably possible during the **policy period** of any **claim** made against **you**.  We agree that you may have up to, but not to exceed, 60 days after the Policy expiration to report to us a **claim** made against **you** during the **policy period** if the reporting of such **claim** is as soon as reasonably possible.

2.   **You** must:
   a.   immediately forward all documents received in connection with the **claim** to us;
   b.   fully cooperate with us or our designee in the investigation, the making of settlements, the conduct of suits or other proceedings, or enforcing any right of contribution or indemnity against another who may be liable to **you** in connection with a **claim**;
   c.   attend depositions, hearings and trials;
   d.   assist in securing and giving evidence obtaining the attendance of witnesses; and,
   e.   refuse, except at **your** own cost, to admit any liability, assume any **damages**, voluntarily make any payments, or incur any **claim expenses**.

### D.   Duties in the event of a potential **claim**

If, during the **policy period**, **you** become aware of an act or omission that may reasonably be expected to be the basis of a **claim** against **you**, **you** must give written notice to us prior to the expiration of the **policy period**.  Such notice must state the reasons for anticipating a **claim**, with full particulars, including but not limited to:



1.  the specific act or omission;
2.  the dates and persons involved;
3.  the identities of anticipated or possible claimants;
4.  the circumstances by which **you** first became aware of the potential **claim**.

If such notice is given, then any **claim** that is subsequently made against **you** and reported to us shall be deemed to have been made at the time such written notice was received by us.

In the event we determine there is an opportunity to avoid a **claim** arising out of a potential **claim you** have reported to us and we incur legal or expert expenses to do so, such expense will be at our cost and not be subject to **your** deductible.

E.   Notice

Notice of any **claim** or potential **claim** should be reported to Director of Claims, Accountants Professional Liability, CNA, CNA Plaza, 333 South Wabash Street, Chicago, Illinois 60604.

F.   Changes/Transfer of Interest

Notice to any of our agents or knowledge possessed by any such agent or any other person shall not act as a waiver or change in any part of this Policy. **You** agree to first obtain our written consent to make any changes, transfers or assignments of this Policy. None of the provisions of this Policy will be waived, changed or modified except by written endorsement issued to form a part of this Policy.

G.   Entire contract

This Policy consists of the Declarations, the Policy form, all endorsements attached to the Policy, the completed and signed application and all supplementary information and statements **you** have provided to us.

By acceptance of this Policy **you** agree that all of the information and statements provided to us by **you** are true, accurate and complete. This Policy has been issued in reliance upon the truth and accuracy of those representations.

No concealment, misrepresentation or fraud shall avoid or defeat recovery under this Policy unless such concealment, misrepresentation or fraud was material. Concealment, misrepresentation or fraud in the procurement of this Policy which if known by us would have led to refusal by us to make this contract or provide coverage for a **claim** hereunder will be deemed material.

H.   Other Insurance

If **you** have other valid and collectible insurance that applies to the **claim**, this insurance shall be excess over any other insurance, self-insurance,

G-127136-A
Ed. 1/08

10



self-insured retention or similar programs, whether primary, excess, contingent or on any other basis.

If no other insurer defends a **claim** that we have an obligation to defend, we will do so, but we will be entitled to **your** rights against all those other insurers.

We will pay only our share of the amount of the loss, if any, that exceeds the sum of the total amount that all such other insurance would pay in absence of this insurance and the total of all deductible and self-insured amounts under all such other insurance or other available programs. This provision does not apply to other insurance that was purchased by you specifically to apply in excess of the limits of liability shown on the Declarations of this Policy.

I.   Legal Action Limitation

**You** agree not to bring any legal action against us concerning this Policy unless **you** have fully complied with all the provisions of this Policy, and the amount of **your** obligation to pay has been finally decided. Such amount can be decided by final judgment against **you** or by written agreement between **you**, us and the claimant. **You** agree to bring any such action within two years, or during any applicable statute of limitations for the bringing of such action, whichever is longer.

No individual or entity, or their legal representative, is entitled to recover under this Policy until they have secured such judgment or written agreement. Recovery is limited to the extent of the insurance afforded by this Policy. No individual or entity has any right under this Policy to include us in any action against **you** to determine **your** liability, nor will we be brought into such an action by **you** or **your** representative.

J.   Subrogation

In the event of any payment under this Policy, we shall be subrogated to all **your** rights of recovery thereof against any person or organization, including any rights **you** may have against any other person insured under this Policy who is involved in dishonest, fraudulent, criminal, malicious or intentional conduct. **You** shall execute and deliver instruments and papers and do whatever else is necessary to secure and collect upon such rights. **You** shall do nothing to prejudice such rights.

K.   Premium

Premiums for this Policy are payable to us in advance. They may be paid to us or our authorized representative. The first premium is due on the effective date of this Policy.



L.   Innocent insureds

If coverage under this Policy would be excluded as a result of any criminal, dishonest, illegal, fraudulent or malicious acts of any of **you**, we agree that the insurance coverage that would otherwise be afforded under this Policy will continue to apply to any of **you** who did not personally commit, have knowledge of, or participate in such criminal, dishonest, illegal, fraudulent or malicious acts or in the concealment thereof from us.

M.   Reimbursement

While we have no duty or obligation to do so, if we advance any amounts in payment of **damages** or **claim expenses** within the amount of the applicable deductible or in excess of the applicable limit of liability, **you** agree to be jointly and severally liable to us for such amounts.  Upon demand, **you** agree to immediately repay such amounts to us.

N.   Bankruptcy/Insolvency

The insolvency or bankruptcy of **you**, or the insolvency of **your** estate, shall not release us from the payment of **damages** or **claim expenses** recoverable under this Policy.

O.   Cancellation/Non-Renewal

**Your** rights and ours are stated in the attached State Provisions endorsement.

P.   Liberalization

In the event we make any filing with the insurance supervisory authorities of the state in which this Policy is issued that would broaden coverage under this Policy, and;

1.   such filing is approved or accepted by such insurance authorities to be effective while this Policy is in force; and

2.   such filing includes provisions that would extend or broaden this insurance without additional premium,

the benefit of such extended or broadened provisions shall inure to **your** benefit as though substitution of policy form had been made.  However, such benefit shall not apply to any **claim** which has been made against **you** or potential **claim** reported to us on or prior to the date such benefit is approved or accepted.

Q.   Spouses, Heirs, Legal Representatives

**Your** estates, heirs, legal representatives, assigns and spouses shall be considered insured under this policy; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns and spouses only for a **claim** arising solely out of their status as such and, in the case



of a spouse, where such **claim** seeks **damages** from marital community property, jointly held property or property transferred from **you** to the spouse. No coverage is provided for any act, or omission of an estate, heir, legal representative, assign or spouse.

R.   Economic and Trade Sanctions

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy is void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

1.   Any of **you**, or any person or entity claiming the benefits of an insured, who is or becomes a **Specially Designated National** or **Blocked Person** or who is otherwise subject to U.S. economic or trade sanctions;

2.   Any **claim** that is brought in a **Sanctioned Country** or by a **Sanctioned Country Government**, where any action in connection with such **claim** is prohibited by U.S. economic or trade sanctions;

3.   Any **claim** that is brought by any **Specially Designated National** or **Blocked Person** or any person or entity who is otherwise subject to U.S. economic or trade sanctions;

4.   Property that is located in a **Sanctioned Country** or that is owned by, rented to or in the care, custody or control of a **Sanctioned Country** Government, where any activities related to such property are prohibited by U.S. economic or trade sanctions; or

5.   Property that is owned by, rented to or in the care, custody or control of a **Specially Designated National** or **Blocked Person**, or any person or entity who is otherwise subject to U.S. economic or trade sanctions.

As used herein a **Specially Designated National** or **Blocked Person** is any person or entity that is on the list of **Specially Designated Nationals and Blocked Persons** issued by the U.S. Treasury Department's Office of Foreign Asset Control (O.F.A.C.) as it may be from time to time amended.

As used herein a **Sanctioned Country** is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States of America.

## VII.   EXTENDED CLAIM REPORTING PERIOD

As used herein, "**extended claim reporting period**" means the period of time after the end of the **policy period** for reporting **claims** to us that are made against **you** during the applicable **extended claim reporting period** by reason of an act or omission that happened prior to the end of the **policy period** and is otherwise covered by this Policy. It is understood and agreed that the **extended claim reporting period** shall not be construed to be a new policy and any **claim** submitted during such period shall otherwise be governed by this Policy.



A.     Automatic **extended claim reporting period**

If this Policy is canceled or non-renewed by either us or by the **Named Insured**, we will provide to the **Named Insured** an automatic, non-cancelable **extended claim reporting period** starting at the termination of the **policy period** if the **Named Insured** has not obtained another policy of accountants professional liability insurance. This automatic **extended claim reporting period** will terminate after sixty (60) days.

B.     Optional **extended claim reporting period**

If this Policy is canceled or non-renewed by either us or by the **Named Insured**, then the **Named Insured** shall have the right to purchase an optional **extended claim reporting period**. Once purchased, the **extended claim reporting period** can not be canceled and the premium for such optional **extended claim reporting period** shall be fully earned upon inception. Such right must be exercised by the **Named Insured** within sixty (60) days of the termination of the **policy period** by providing written notice to us.

C.     Elimination of right to any **extended claim reporting period**

There is no right to the optional **extended claim reporting period** if we cancel or refuse to renew this Policy due to non-payment of premiums or any material misrepresentations in the application for this Policy.

IN WITNESS WHEREOF, we have caused this Policy to be executed by our Chairman and Secretary, but this Policy shall not be binding upon us unless completed by the attachment of the Declarations.

_____        _____
Stephen Lilienthal, Chairman                Jonathan D. Kantor, Secretary

G-127136-A                    14
Ed. 1/08



## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY

**Amendatory Endorsement
Nuclear Energy and Pollution Exclusion**

We agree with **you** that the following EXCLUSIONS are added to **your** Policy:

We will not defend or pay under this Policy any **claim** based upon or arising out of any loss, cost or expense:

1. under any circumstances, due to nuclear reaction, radiation, or contamination, regardless of cause.

2. which would not have happened in whole or in part, but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants** at any time.

3. arising out of any:

   a. Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

   b. **Claim** or suit by or on behalf of a governmental authority for damage because of testing for, monitoring, cleaning up, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

**"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

ALL OTHER PROVISIONS OF THIS POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 001 | APL 188103279 | Financial Strategy Group,, PLC | 9/17/2008 |
| | | Countersigned by _____ | |
| | | | Authorized Representative |

G-127157-A  (6/97)

## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
### AMENDMENT OF TERMINATION PROVISIONS -
### TENNESSEE

We agree with **you** that any cancellation or non-renewal provisions contained in the Policy to which this endorsement is attached are deleted and replaced by the following:

I. Cancellation

  A. This policy can be canceled by either the **Named Insured** or us.

    1. The **Named Insured** can cancel this policy at any time. To do so, the **Named Insured** must:

      a. return the policy to us or any of our authorized representatives; or
      b. mail a written notice to us;
      stating when the cancellation is to be effective. We must receive the policy or written notice before the cancellation date.

    2. We can cancel this policy by giving written notice to the **Named Insured** at least:

      a. 10 days, if cancellation is for non-payment of premium. However, **you** may continue the coverage by payment in full at any time prior to the date the cancellation is effective; or
      b. 30 days, if cancellation is for any other reason;
      before the cancellation is effective.

  B. We will mail or deliver notice to the **Named Insured** at the last mailing address known to us.

  C. Notice of cancellation will state the date the cancellation is effective. The policy will end on that date. The grounds for such cancellation shall also be stated, and upon the **Named Insured**'s written request, we shall furnish the facts upon which the cancellation is based.

  D. If notice is mailed, proof of mailing will be sufficient proof of notice. A copy shall also be mailed to the **Named Insured**'s agent.

  E. If this Policy is canceled, we will send the **Named Insured** any premium refund due. If we cancel, the refund will be pro-rata. If the **Named Insured** cancels, the refund may be less than pro-rata. The cancellation will be effective even if we have not made or offered a refund.

  F. If this Policy has been in effect for more than 60 days, we shall not cancel this Policy except for one or more of the following conditions:

    1. non-payment of premium;
    2. any material
      a. material misrepresentation; or
      b. nondisclosure of any fact which if known would affect insurability or cause the policy not to be issued;
      by or with the knowledge of **you** or **your** representatives;
    3. any fraud relating to this Policy or to a **claim** made under this policy;
    4. a material increase in the hazard insured against having as one of its necessary elements the conviction of a crime;
    5. failure to comply with reasonable loss control or safety recommendations;
    6. violation of any terms or conditions of the policy by **you**;

7. a determination by the insurance regulatory authority that continuation of a class or block of business to which the policy belongs will jeopardize our solvency or will place us in violation of the insurance laws of the state;

8. such grounds as specified in the policy;

9. such other reasons which are approved by the insurance regulatory authority.

II. Non-Renewal

If we decide not to renew this Policy, 60 days advance written notice shall be mailed or delivered to the **Named Insured** at the address shown in this Policy.  The notice shall include the reason for such nonrenewal.   This provision shall not apply in the event if the **Named Insured** has:

A. requested or agreed to non-renewal; or

B. insured elsewhere or accepted, replacement coverage.

III. Increased Premium

If any renewal policy will be subject to a filed rate increase of more than 25% of reduced benefits, 60 days advance written notice of such change shall be  mailed or delivered to the **Named Insured** at the address shown in this Policy.

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 002 | APL 188103279 | Financial Strategy Group,, PLC | 9/17/2008 |
| | | Countersigned by _____ | Authorized Representative |

## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
### AMENDATORY ENDORSEMENT- TENNESSEE

We agree with you that Section I, the definition of **Damages** is deleted in its entirety and replaced as follows:

**Damages** are monetary judgments, awards and settlements, provided any settlement is negotiated by or with our assistance and approval.**Damages** also include prejudgment or post-judgment interest awarded against **you** on such judgments or awards.

**Damages** do not include:
A. civil or criminal fines, penalties, sanctions or forfeitures, imposed on whether **you** pursuant to law, statute, regulation or court rule;
B. amounts for which **you** are not financially liable or that are without legal recourse to **you**;
C. amounts owed by **you** to **your** client by reason of money loaned to or invested with **you** in **your** individual capacity for **your** personal use or investment in **your** own venture.

## ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This Endorsement is a part of **your** Policy and takes effect on the effective date of **your** Policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| **ENDT. NO.** | **POLICY NO.** | ISSUED TO | **EFFECTIVE DATE OF THIS ENDORSEMENT** 9/17/2008 |
| 003 | APL 188103279 | Financial Strategy Group,, PLC | |

Countersigned by _____

Authorized Representative

G-127165-A41
Ed. 5/00



## POLICYHOLDER NOTICE

Ethics and proper business conduct has been the cornerstone of CNA since 1897. While much has changed during the last century, our commitment to these core values has not wavered. We strongly believe that proper business conduct is more than the practice of avoiding wrong; it is also a matter of choosing to do right. Nowhere is this more essential than helping in the fight against terrorism. As such, we are committed to complying with U.S. Department of Treasury Office of Foreign Asset Control (OFAC) requirements.

Through a variety of laws, OFAC administers and enforces economic sanctions against countries and groups of individuals, such as terrorists and narcotics traffickers. These laws prohibit <u>all</u> United States citizens (including corporations and other entities) and permanent residents from engaging in transactions with sanctioned countries and with individuals and entities on the Specially Designated Nationals (SDN) list. Because all U.S. citizens and companies are subject to this law, we wanted to be sure you were aware of its scope and restrictions. If you haven t already done so, you may want to consider discussing this issue with your legal counsel to ensure you are in compliance.

For insurance companies, accepting premium from, issuing a policy to, insuring property of, or making a claim payment to an individual or entity that is the subject of U.S.-imposed economic sanctions or trade embargoes usually are violations of these laws and regulations. Fines for violating OFAC requirements can be substantial. CNA has established an OFAC compliance program part which includes the use of exclusionary policy language. We believe this makes good business sense for CNA and you.

Our records indicate that you have insurance coverage coming up for renewal with us. The purpose of this letter is to advise you that your renewal policy includes OFAC exclusionary policy language, which may reduce or eliminate certain coverage. Specifically, if it is determined that your policy violates certain Federal or State laws or regulations, such as the U.S. list of Specially Designated Nationals or Blocked Persons (organizations or individuals associated with terrorist groups), any term or condition of your policy will be null and void to the extent it violates the applicable laws or regulations of the United States.

We're sure you share our commitment to compliance and thank you for your cooperation.

Your policy language reads as follows:

# ECONOMIC AND TRADE SANCTIONS CONDITION

The following condition is added to the Policy:

**ECONOMIC AND TRADE SANCTIONS CONDITION**

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy is void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

1. Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to U.S. economic or trade sanctions;

2. Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country Government, where any action in connection with such claim or suit is prohibited by U.S. economic or trade sanctions;

3. Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to U.S. economic or trade sanctions;

4. Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country Government, where any activities related to such property are prohibited by U.S. economic or trade sanctions; or

5. Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to U.S. economic or trade sanctions.

As used in this endorsement a Specially Designated National or Blocked Person is any person or entity that is on the list of Specially Designated Nationals and Blocked Persons issued by the U.S. Treasury Department's Office of Foreign Asset Control (O.F.A.C.) as it may be from time to time amended.

As used in this endorsement a Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States of America.

## CONTINENTAL CASUALTY COMPANY

### NETWORK RISK AND PRIVACY CLAIM ENDORSEMENT

In consideration of the premium paid for this Policy, it is understood and agreed that the Policy is amended as follows:

1.    Section I. **DEFINITIONS,** the definition of **Claim** is amended to include the following:

     **Claim** also means:
     a)     privacy claims, and
     b)     client network damage claims.

2.    Section I. **DEFINITIONS** is amended to add the following terms:

     **Client network damage claim** means a demand received by **you** for money or services naming **you** and alleging that a **security breach** or **electronic infection** caused **network damage** to a client's **network** in the rendering of **professional services.** A demand shall include the service of suit or the institution of arbitration proceedings against **you.**

     **Computer virus** means unauthorized computer code that is designed and intended to transmit, infect and propagate itself over one or more **networks,** and cause;
     1.     computer code or programs to perform in an unintended manner;
     2.     the deletion or corruption of electronic data or software; or
     3.     the disruption or suspension of a **network.**

     **Confidential commercial information** means information that has been provided to **you** by another, or created by **you** for another where such information is subject to the terms of a confidentiality agreement or equivalent obligating **you** to protect such information on behalf of another.

     **Denial of service attack** means an attack executed over one or more **networks** or the **Internet** that is specifically designed and intended to disrupt the operation of a **network** and render a **network** inaccessible to authorized users.

     **Electronic infection** means the transmission of a **computer virus** to a **network,** including without limitation, such transmission to or from **your network.**

     **Electronic information damage** means the unauthorized access to, destruction of, addition to, deletion of or alteration to any:
     1.     third-party's information residing on **your network;**
     2.     information residing on the **network** of **your** client, if caused by **you** in the rendering of **professional services.**

     **Internet** means the worldwide public **network** of computers as it currently exists or may be manifested in the future, but **internet** does not include **your network.**

     **Network** means a party's local or wide area network owned or operated by or on behalf of or for the benefit of that party; provided, however, **network** shall not include the **internet,** telephone company **networks,** or other public infrastructure **network.**

     **Network damage** means:
     1.     the unscheduled or unplanned inability of an authorized user to gain access to a **network;**

GSL2656XX
(Ed. 05/08)
Page 1 of 3

2.      **electronic information damage**; or,

3.      the suspension or interruption of the operation of any network;

**Non-public personal information** means personal information not available to the general public from which an individual may be identified, including without limitation, an individual's name, address, telephone number, social security number, account relationships, account numbers, account balances, and account histories.

**Privacy claim** means a demand received by you for money or services naming **you** and alleging **privacy injury and identity theft** that occurred in the rendering of **professional services**. A demand shall include the service of suit or the institution of arbitration proceedings against **you**.

**Privacy injury and identity theft** means:

a.     any unauthorized disclosure of, inability to access, or inaccuracy with respect to, **non-public personal information** in violation of:

      1.     your privacy policy; or

      2.     any federal, state, foreign or other law, statute or regulation governing the confidentiality, integrity or accessibility of **non-public personal information**, including but not limited, to the Health Insurance Portability and Accountability Act of 1996, Gramm-Leach-Bliley Act, Children's Online Privacy Protection Act, or the EU Data Protection Act.

b.     **your** failure to prevent **unauthorized access** to **Confidential Commercial Information**;

**Privacy policy** means **your** policies in written or electronic form that:

1.     govern the collection, dissemination, confidentiality, integrity, accuracy or availability of **non-public personal information**; and

2.     **you** provide to **your** customers, employees or others who provide **you** with **non-public personal information.**

**Security breach** means the failure of **your** network hardware, software or firmware, the function or purpose of which is to:

1.     identify and authenticate parties prior to accessing **your** network;

2.     control access to **your** network and monitor and audit such access;

3.     protect against **computer viruses**;

4.     defend against **denial of service attacks** upon **you** or unauthorized use of **your** network to perpetrate a **denial of service attack**;

5.     ensure confidentiality, integrity and authenticity of information on **your** network.

**Privacy breach notice law** means any statute or regulation that requires an entity who is the custodian of **non-public personal information** to provide notice to individuals of any actual or potential privacy breach with respect to such **non-public personal information**. Privacy breach notice laws include Sections 1798.29 and 1798.82- 1798.84 of the California Civil Code (formerly S.B. 1386) and other similar laws in any jurisdiction.

**Unauthorized access** means any accessing of information in **your** care, custody or control by unauthorized persons or by authorized persons accessing or using such information in an unauthorized manner. **Unauthorized access** also includes:

i)     theft from **you** of any information storage device used by **you** to:

     A.     store and retrieve information on **your** network; or

     B.     transport information between **you** and authorized recipients;

ii)    any unauthorized use by **you** of information in **your** clients' care, custody or control if accessed by **you** in the course of rendering **professional services.**

3.   Section **IV. SUPPLEMENTARY BENEFITS**, Paragraph 2. Regulatory Inquiry is deleted in its entirety and replaced with the following:

2.   Regulatory Inquiry

If, during the **policy period**, a state licensing board, self regulatory body, public oversight board or a governmental agency with the authority to regulate **your professional services** or any entity acting on behalf of such entities initiates an investigation of **you** arising from an act or omission in the rendering of **professional services**, including an actual or alleged violation of a **privacy breach notice law** or any law referenced under the definition of **privacy injury and identity theft** that occurred in the rendering of **professional services**, which occurred after the **prior acts date**, and **you** report this to us in accordance with Section VI.D. of this Policy, we agree to pay **your** attorney fees, attorney costs and court costs incurred in responding to the investigation. The maximum amount we will pay for such attorney fees and costs is $12,500 regardless of the number of investigations or the number of **you** who are subject to such investigations.

This endorsement shall not be construed as to increase the Limits of Liability of this Policy.

ALL OTHER PROVISIONS OF THIS POLICY REMAIN UNCHANGED.

This endorsement is a part of **your** Policy and takes effect on the effective date of **your** Policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 004 | APL 188103279 | Financial Strategy Group,, PLC | 9/17/2008 |

Countersigned by _____

Authorized Representative

GSL2656XX
(Ed. 05/08)
Page 3 of 3

## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
### Amendatory Endorsement
### Exclusion of Named Individuals or Entities

We agree with **you** that Policy does not apply to any **claim** arising out of **professional services** rendered for, by or on behalf of the individuals or entities specifically named below:

Investment Counsel & Trust Company

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 005 | APL 188103279 | Financial Strategy Group,, PLC | 9/17/2008 |

Countersigned by  _____

Authorized Representative

## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
### Amendatory Endorsement
### Exclusion of Named Individuals or Entities

We agree with **you** that Policy does not apply to any claim arising out of **professional services** rendered for, by or on behalf of the individuals or entities specifically named below:

Derivium Capital

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT 9/17/2008 |
| 006 | APL 188103279 | Financial Strategy Group,, PLC | |

Countersigned by _____

Authorized Representative

G-127139-A  (6/97)

### CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
### Amendatory Endorsement
### Exclusion of Named Individuals or Entities

We agree with **you** that Policy does not apply to any **claim** arising out of **professional services** rendered for, by or on behalf of the individuals or entities specifically named below:

Eastview Capital, L.P.

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT 9/17/2008 |
| 007 | APL 188103279 | Financial Strategy Group,, PLC | |

Countersigned by _____
Authorized Representative

G-127139-A  (6/97)

## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
#### Amendatory Endorsement
#### Exclusion of Named Individuals or Entities

We agree with **you** that Policy does not apply to any **claim** arising out of **professional services** rendered for, by or on behalf of the individuals or entities specifically named below:

Lafayette Farms, LLC

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT 9/17/2008 |
| 008 | APL 188103279 | Financial Strategy Group,, PLC | |

Countersigned by _____

Authorized Representative

G-127139-A  (6/97)

## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
#### Amendatory Endorsement
#### Exclusion of Named Individuals or Entities

We agree with  **you** that Policy does not apply to any **claim** arising out of **professional services** rendered for, by or on behalf of the individuals or entities specifically named below:

JJACS, LLC

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT 9/17/2008 |
| 009 | APL 188103279 | Financial Strategy Group,, PLC | |

Countersigned by _____

Authorized Representative

G-127139-A  (6/97)

## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
### Amendatory Endorsement
### Exclusion of Named Individuals or Entities

We agree with **you** that Policy does not apply to any **claim** arising out of **professional services** rendered for, by or on behalf of the individuals or entities specifically named below:

Toni M. Luther, services provided as an Attorney

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 010 | APL 188103279 | Financial Strategy Group,. PLC | 9/17/2008 |

G-127139-A (6/97)

Countersigned by _____

Authorized Representative

## CONTINENTAL CASUALTY COMPANY

ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
Amendatory Endorsement
Exclusion of Named Individuals or Entities

We agree with **you** that Policy does not apply to any **claim** arising out of **professional services** rendered for, by or on behalf of the individuals or entities specifically named below:

JSAC Investment Partnership, L.P.

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 011 | APL 188103279 | Financial Strategy Group,, PLC | 9/17/2008 |

G-127139-A  (6/97)

Countersigned by _____

Authorized Representative

## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY
### Amendatory Endorsement
### Exclusion of Named Individuals or Entities

We agree with **you** that Policy does not apply to any **claim** arising out of **professional services** rendered for, by or on behalf of the individuals or entities specifically named below:

FSG Investment Management, LLC

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT 9/17/2008 |
| 012 | APL 188103279 | Financial Strategy Group,, PLC | |

G-127139-A (6/97)

Countersigned by _____

Authorized Representative

# CONTINENTAL CASUALTY COMPANY

## ACCOUNTANTS PROFESSIONAL LIABILITY POLICY

### Amendatory Endorsement
### Definition of You and Your

We agree with **you** that Section I., DEFINITIONS, **You** and **Your** is amended to include the following individual or entity listed below and:

A.  any person who is or becomes a partner, officer, director, associate, or employee of such entity but only for **professional services** performed on behalf of such entity;

B.  any person previously affiliated with such entity as a partner, officer, director, associate, or employee  but only for **professional services** performed on behalf of such entity at the time of such affiliation;

C.  the heirs, executors, administrators, assigns and legal representatives of any person or their estate as designated in A. or B. above in the event of such person s death, incapacity, insolvency or bankruptcy, but only to the extent that such person would have been provided coverage under this Policy.

Name of Individual or Entity       Paessler Shaw. LLC

For the purposes of this endorsement, we further agree with **you** that the **prior acts date** is the date set forth below.  If no date is set forth below, then the **prior acts date** is the date set forth on the Declarations, if any.

9/17/2004

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of **your** Policy and takes effect on the effective date of **your** Policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT 9/17/2008 |
| 013 | APL 188103279 | Financial Strategy Group,, PLC | |

G-127145-A
Ed.3/03

Page 1 of 1

Countersigned by _____

Authorized Representative

CONTINENTAL CASUALTY COMPANY

ACCOUNTANTS PROFESSIONAL LIABILITY POLICY

Employee Dishonesty Coverage

This Employment Dishonesty Endorsement provides coverage on a loss-sustained basis. It is not a claims-made and reported coverage. Please read the terms and conditions of this endorsement carefully.

We agree with you that in consideration of an additional premium paid, the Policy is amended as follows:

1.  SCHEDULE OF COVERAGE

Named Insured: Financial Strategy Group, PLC

Coverage Period: 9/17/2008   to   9/17/2009

| | | |
|---|---|---|
| Limit of Insurance: | $ | 500,000 |
| Deductible: | $ | 500 |
| Premium: | $ | 661.00 |

2.  For the purposes of the coverage provided by this Endorsement, Section I., DEFINITIONS, of the policy is deleted in its entirety and replaced with the following:

I.  DEFINITIONS

Client means any person or organization, while engaging for your professional services, and for which services a fee inures to you.

Covered property means that property shown specifically as Covered Property in Section 3.II. COVERAGE AGREEMENTS.

Employee means:
A.  any natural person:
  (1)  while in your service (and for 30 days after termination of service); and
  (2)  whom you compensate directly by salary, wages or commissions; or
  (3)  whom you have the right to direct and control while performing services for you; or
B.  any natural person employed by an employment contractor other than a labor leasing firm while that person is subject to your direction and control performing services for you excluding, however, any such person while having care and custody of property outside the premises.
C.  Any natural person employed by a labor leasing firm while that person is subject to your direction and control and performing services for you.

G-138268-A
Ed. 3/03

Page 1 of 9

A. tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

B. evidences of debt issued in connection with credit or charge cards, which cards are not issued by **you**; but does not include **money**.

**You** and **your** means the individual or entity named in Item 1, SCHEDULE OF COVERAGE, as the Named Insured. Further, various provisions of this endorsement refer to "knowledge" held or obtained, or "discovery" made by you. Under these provisions, "knowledge" or "discovery" by **you** means knowledge held or obtained, or discovery made, by any natural person who is:

I. an **owner** or proprietor of any proprietorship;

II. a **partner** of any partnership;

III. an officer of any corporation;

IV. an officer, official, director, trustee or administrator of any plan, trust, union, association, club or other organization;

which is listed in Item 1 of this endorsement, SCHEDULE OF COVERAGE, as a named insured under this coverage.

3.  For the purposes of the coverage provided by this Endorsement, Section II., COVERAGE AGREEMENTS, of the policy is deleted in its entirety and replaced with the following:

   **II. COVERAGE AGREEMENTS**

   We will pay for loss of, and loss from damage to, **covered property** specified below resulting directly from the Covered Cause of Loss specified below.

   | | |
   |---|---|
   | Covered Property: | **Money;** |
   | | **Securities; and** |
   | | **Property Other Than Money and Securities** |
   | Covered Cause of Loss: | **Employee Dishonesty** |

   This coverage is provided on a loss-sustained basis. Any loss must be sustained through acts committed or events occurring during the Coverage Period shown in Item 1 of this Endorsement, SCHEDULE OF COVERAGE, or during the applicable Extended Period to Discover Loss, and is subject to all provisions contained within this endorsement.

4.  For the purposes of the coverage provided by this Endorsement, Section III., LIMITS OF LIABILITY, of the policy is deleted in its entirety and replaced with the following:

   **III. LIMITS OF INSURANCE**

   A. Limit of Insurance

      The most we will pay for loss in any one **occurrence** is the applicable limit of insurance shown in Item 1 of this endorsement, SCHEDULE OF COVERAGE.

   B. Deductible

      We will not pay for loss in any one **occurrence** unless the amount of loss exceeds the applicable deductible amount shown in Item 1 of this endorsement, SCHEDULE OF COVERAGE. We will then pay the amount of loss in excess of the deductible amount, up to the limit of insurance.

**Your** rights and our rights are stated in the attached State Provisions endorsement.

B.  Cancellation as to any **employee**

This insurance is cancelled, as to any **employee:**
(1) immediately upon discovery by:
(a) **you;** or
(b) any natural person not in collusion with the **employee** who is: a **partner** of any partnership; an officer of the corporation; or an officer, official, director, trustee or administrator of any plan, trust, union, association, club or other organization which is named in item 1 of this endorsement, SCHEDULE OF COVERAGE, as a named insured under this coverage;
of any dishonest act committed by that **employee** whether before of after becoming employed **by you.**
(2) on the date specified in a notice mailed to **you.** That date will be at least 30 days after the date of mailing. The mailing of notice to **you** at the last mailing address known to us will be sufficient proof of notice. Delivery of notice is the same as mailing.

C.  Changes

This endorsement contains all of the agreements between **you** and us concerning the insurance afforded by this endorsement. The first of **you** named in Section 1, SCHEDULE OF COVERAGE, is authorized to make changes in the terms of this endorsement with our consent. This endorsement's terms can be amended or waived only by endorsement issued by us and made part of this policy.

D.  Examination of **Your** Books and Records

We may examine and audit **your** books and records as they relate to this coverage at any time during the coverage period and up to three years afterward.

E.  Inspections and Surveys

We have the right but are not obligated to:
(1) make inspections and surveys at any time;
(2) give **you** reports on the conditions we find; and
(3) recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health and safety of workers or the public. We do not warrant that conditions:
(1) are safe or healthful; or
(2) comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance product inspections, surveys, reports or recommendations.

F.  Premiums

The first of **you** named in Item 1, SCHEDULE OF COVERAGE, is responsible for the payment of all premiums and will be the payee for any return premiums we pay.

    (3)  give us a detailed, sworn proof of loss within 120 days; and
    (4)  cooperate with us in the investigation and settlement of any claim.

L.  Joint Insured

    (1)  If more than one insured is named in the Item 1, SCHEDULE OF COVERAGE, the first named insured will act for itself and for every other insured for all purposes of this insurance. If the first named insured ceases to be covered, then the next named insured will become the first named insured.
    (2)  If any insured or **partner** or officer of that insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every insured.
    (3)  An **employee** of any insured is considered to be an **employee** of every insured.
    (4)  We will not pay more for loss sustained by more than one insured than the amount we would pay if all the loss had been sustained by one insured.

M.  Legal Action Against Us

**You** may not bring any legal action against us involving loss:
    (1)  unless **you** have complied with all the terms of this insurance;
    (2)  until 90 days after **you** have filed proof of loss with us; and
    (3)  unless brought within 2 years from the date **you** discover the loss.

N.  Loss Sustained During Prior Insurance

    (1)  If **you**, or any predecessor in interest, sustained loss during the period of any prior insurance that **you** or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this insurance, provided:
        (a)  this insurance became effective at the time of cancellation or termination of the prior insurance; and
        (b)  the loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred.
    (2)  The insurance under this Condition is part of, and not in addition to, the Limits of Insurance applying to this insurance and is limited to the lesser of the amount recoverable under:
        (a)  this insurance as of its effective date; or
        (b)  the prior insurance had it remained in effect.

O.  Loss Covered Under This Insurance and Prior Insurance
    (1)  If any loss is covered:
        (a)  partly by this insurance; and
        (b)  partly by any prior cancelled or terminated insurance that we or any affiliate had issued to **you** or any predecessor in interest;
    the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.
    (2)  If any loss is covered:
        (a)  partly by this insurance; and
        (b)  partly by any prior cancelled or terminated insurance issued to **you** or any predecessor in interest by any carrier other than us or any affiliate:
            (i)  any deductible amount applicable to such loss will be reduced by any deductible amount applicable or sustained by **you** under the prior insurance; and
            (ii)  the limit of insurance applicable to such loss will be reduced by any amount paid or payable to **you** under prior insurance.

You must transfer to us all **your** rights of recovery against any person or organization for any loss **you** sustained and for which we have paid or settled. **You** must also do everything necessary to secure those rights and do nothing after loss to impair them.

W.  Valuation - Settlement

(1) Subject to the applicable Limit of Insurance provision, we will pay for:
   (a) loss of **money** but only up to and including its face value. We may, at our option, pay for loss of **money** issued by any country other than the United States of America:
      (i)  at face value in the **money** issued by that country; or
      (ii) in the United States of America dollar equivalent determined by the rate of exchange on the day the loss was discovered.
   (b) loss of **securities** but only up to and including their value at the close of business on the day the loss was discovered.  We may, at our option:
      (i)  pay the value of such **securities** or replace them in kind, in which event **you** must assign to us all **your** rights, title and interest in and to those **securities**;
      (ii) pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **securities**.  However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty no exceeding the lesser of the:
         i.   value of the **securities** at the close of business on the day the loss was discovered; or
         ii.  Limit of Insurance.
   (c) loss of, or loss from damage to, **property other than money and securities** or loss from damage to the premises for not more than the:
      (i)   actual cash value of the property on the day the loss was discovered;
      (ii)  cost of repairing the property or premises; or
      (iii) cost of replacing the property with property of like kind and quality,
   We may, at our option, pay the actual cash value of the property or repair or replace it.  If we cannot agree with **you** upon the actual cash value of the cost of repair or replacement, the value cost will be determined by arbitration.
(2) We may, at our option, pay for loss of, or loss from damage to, property other than money:
   (a) in the money of the country in which the loss occurred; or
   (b) in the United States of America dollar equivalent of the money of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered.
(3) Any property that we pay for or replace becomes our property.

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of **your** Policy and takes effect on the effective date of **your** Policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 014 | APL 188103279 | Financial Strategy Group,, PLC | 9/17/2008 |

Countersigned by _____

Authorized Representative

CONTINENTAL CASUALTY COMPANY
ACCOUNTANTS PROFESSIONAL LIABILITY POLICY

### Specific Investment Exclusion

We agree with you that the following new exclusion is added to Section V., EXCLUSIONS:

This Policy does not apply to:

any claim based on or arising out of your promotion, advice, recommendation, public offer, sale, offer to sell, solicitation or distribution of securities, real estate or other investments in the entity listed below, its parents, subsidiaries, affiliates, predecessors, successors, assigns or acquisitions.

Name of Entity

Eastview Capital, L.P.
Lafayette Farms, LLC
JJACS, LLC

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your Policy and takes effect on the effective date of your Policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. 015 | POLICY NO. APL 188103279 | ISSUED TO Financial Strategy Group,, PLC | EFFECTIVE DATE OF THIS ENDORSEMENT 9/17/2008 |

Countersigned by _____

G-147092-A
(Ed. 12/03)

Authorized Representative

CONTINENTAL CASUALTY COMPANY
ACCOUNTANTS PROFESSIONAL LIABILITY POLICY

### Specific Investment Exclusion

We agree with you that the following new exclusion is added to Section V., EXCLUSIONS:

This Policy does not apply to:

any claim based on or arising out of your promotion, advice, recommendation, public offer, sale, offer to sell, solicitation or distribution of securities, real estate or other investments in the entity listed below, its parents, subsidiaries, affiliates, predecessors, successors, assigns or acquisitions.

Name of Entity

JSAC Investment Partnership, L.P.

ALL OTHER PROVISIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement is a part of your Policy and takes effect on the effective date of your Policy, unless another effective date is shown below.

| Must Be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. 016 | POLICY NO. APL 188103279 | ISSUED TO Financial Strategy Group,, PLC | EFFECTIVE DATE OF THIS ENDORSEMENT 9/17/2008 |

Countersigned by _____

Authorized Representative

G-147092-A
(Ed. 12/03)

## CONTINENTAL CASUALTY COMPANY

### ACCOUNTANTS PROFESSIONAL LIABILITY POLICY

#### Amendatory Endorsement

Per CNA - attached G39543B1 - to exclude recommending
or referrals to Denvium Capital.

ALL OTHER PROVISIONS OF THIS POLICY REMAIN UNCHANGED.

This endorsement is a part of your policy and takes effect on the effective date of your policy, unless
another effective date is shown below.

| *Must Be Completed* | |
|---|---|
| ENDT. NO. | POLICY NO. |
| 017 | APL 188103279 |

| *Complete Only When This Endorsement Is Not Prepared with the Policy* *Or Is Not to be Effective with the Policy* | |
|---|---|
| ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| Financial Strategy Group,. PLC | 9/17/2008 |

Countersigned by _____

                                    Authorized Representative

G-39543-B1



**EXCLUSIONARY ENDORSEMENT FOR TAX SHELTER LOSSES**

In consideration of the premium paid for this Policy, it is understood and agreed that Section **V. EXCLUSIONS**, is amended to include the following new Exclusion:

- based on, arising out of or in connection with the design, recommendation, referral, sale or promotion of any transactions which:

    a.   are determined by the IRS or state tax authorities to be a tax avoidance transaction or is substantially similar to abusive tax shelters or listed transactions or are identified as such by notice, regulation, or other guidance under the tax law; or

    b.   any tax transaction that is considered to be a reportable transaction under Treasury Regulation §1.6011-4(b) or any superseding law or regulation.

All other terms and conditions of the Policy remain unchanged.

This Endorsement is a part of your Policy and takes effect on the effective date of your Policy, unless another effective date is shown below.

| Must be Completed | | Complete Only When This Endorsement Is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT. NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 018 | APL 188103279 | Financial Strategy Group,, PLC | 9/17/2008 |

Countersigned by _____

Authorized Representative

**B**

# The State of Texas



Citations Unit
P.O. Box 12079
Austin, Texas 78711-2079

Phone: 512-463-5560
Fax: 512-463-0873
TTY (800) 735-2989
www.sos.state.tx.us

## Secretary of State

June 4, 2009

Financial Strategy Group PLC
700 Colonial Rd
Ste 120
Memphis, TN 38117

> **2009-167050-6**
> Include reference number in
> all correspondence

RE:  R K Lowry Jr VS BDO Seidman LLP
     80th Judicial District Court Of Harris County, Texas
     Cause No: 200874262

Dear Sir/Madam,

Pursuant to the Laws of Texas, we forward herewith by CERTIFIED MAIL, return receipt requested, a copy of process received by the Secretary of State of the State of Texas on May 29, 2009.

CERTIFIED MAIL #71603901984812995888

Refer correspondence to:

David R. Deary
Loewinsohn Flegle Deary LLP
12377 Merit Drive
Suite 900
Dallas, TX 75251-2224

Sincerely,

*Helen Lupercio*

Helen Lupercio
Team Leader, Citations Unit
Statutory Documents Section

hl/vo
Enclosure

**EXHIBIT B**

CAUSE NO. 200874262

|  |  |  |  |
|---|---|---|---|
| RECEIPT NO. 371737 | | 0.00 | MTA |
| 05-19-2009 | | TR # 72411885 | |

PLAINTIFF: LOWRY, R K JR

   vs.

DEFENDANT: BDO SEIDMAN L L P

In The   80th
Judicial District Court
of Harris County, Texas
80TH DISTRICT COURT
Houston, TX

CITATION (SECRETARY OF STATE FOREIGN CORPORATION)

THE STATE OF TEXAS
County of Harris

TO: FINANCIAL STRATEGY GROUP PLC (FOREIGN CORPORATION) BY SERVING THE
TEXAS SECRETARY OF STATE CITATIONS UNIT 1019 BRAZOS STREET AUSTIN TX 78701
FORWARD TO:
700 COLONIAL RD STE 120   MEMPHIS TN 38117

    Attached is a copy of <u>SECOND AMENDED ORIGINAL PETITION</u>

This instrument was filed on the <u>19th day of May, 2009</u>, in the above cited cause number
and court. The instrument attached describes the claim against you.

    YOU HAVE BEEN SUED,  You may employ an attorney.  If you or your attorney do not file a
written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday
next following the expiration of 20 days after you were served this citation and petition,
a default judgment may be taken against you.

TO OFFICER SERVING:
    This citation was issued on 21st day of May, 2009, under my hand and
seal of said Court.

<u>Issued at request of:</u>
DEARY, DAVID R.
12377 MERIT DR #900
DALLAS, TX 75251
Tel: (214) 572-1700
<u>Bar No.</u>: 5624900

LOREN JACKSON, District Clerk
Harris County, Texas
201 Caroline      Houston, Texas 77002
(P.O. Box 4651, Houston, Texas 77210)

GENERATED BY: BRANTLEY, FURSHILLA   U1K/U1K/8409265

OFFICER/AUTHORIZED PERSON RETURN

RECEIVED
SECRETARY OF STATE

MAY 29 2009

11:00 AM
CITATIONS UNIT

Came to hand at _____ o'clock _____ .M., on the _____ day of _____, _____,

Executed at (address) _____ in

_____ County at _____ o'clock _____.M., on the _____ day of _____,

_____, by delivering to _____ defendant, in person, a
true copy of this Citation together with the accompanying _____   copy(ies) of the
Petition

attached thereto and I endorsed on said copy of the Citation the date of delivery.
To certify which I affix my hand officially this _____ day of _____, _____,

Fee: $_____

00167050 -6 _____ of _____ County, Texas

CAUSE NO. 200874262

RECEIPT  NO. 371737          0.00       MTA
                05-19-2009         TB # 72411885

PLAINTIFF: LOWRY, R K JR                    In The  80th
    vs.                                     Judicial District Court
DEFENDANT: BDO SEIDMAN L L P                of Harris County, Texas
                                            80TH DISTRICT COURT
                                            Houston, TX

CITATION (SECRETARY OF STATE FOREIGN CORPORATION)

THE STATE OF TEXAS
County of Harris


TO: FINANCIAL STRATEGY GROUP PLC (FOREIGN CORPORATION) BY SERVING THE
    TEXAS SECRETARY OF STATE CITATIONS UNIT 1019 BRAZOS STREET AUSTIN TX 78701
    FORWARD TO:
    700 COLONIAL RD STE 120  MEMPHIS TN 38117



    Attached is a copy of SECOND AMENDED ORIGINAL PETITION

This instrument was filed on the 19th day of May, 2009, in the above cited cause number
and court. The instrument attached describes the claim against you.

    YOU HAVE BEEN SUED.  You may employ an attorney.  If you or your attorney do not file a
written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday
next following the expiration of 20 days after you were served this citation and petition, a
default judgment may be taken against you.

TO OFFICER SERVING:
    This citation was issued on 21st day of May, 2009, under my hand and
seal of said Court.

Issued at request of:                   LOREN JACKSON, District Clerk
GEARY, DAVID R.                         Harris County, Texas
2377 MERIT DR #900                      201 Caroline     Houston, Texas 77002
DALLAS, TX 75251                        (P.O. Box 4651, Houston, Texas 77210)
Tel: (214) 572-1700
Bar No.: 5624900                        GENERATED BY: BRANTLEY, FURSHILLA   U1K/U1K/8409265

OFFICER/AUTHORIZED PERSON RETURN       **RECEIVED
                                         SECRETARY OF STATE**

Came to hand at _____ o'clock _____ .M., on the _____ day of _____, _____.
                                         MAY 29 2009
Executed at (address) _____ in
                                         11:00 AM
_____ County at _____ o'clock _____.M., on the _____ day of _____,
                                         CITATIONS UNIT
_____, by delivering to _____ defendant, in person, a
true copy of this Citation together with the accompanying _____   copy(ies) of the
                                                                    Petition
attached thereto and I endorsed on said copy of the Citation the date of delivery.
To certify which I affix my hand officially this _____ day of _____, _____.

Fee: $_____                          _____

        00167050 -6         _____ of _____ County, Texas

_____                 By _____
       Affiant                                       Deputy

On this day, _____, known to me to be the person whose
signature appears on the foregoing return, personally appeared . After being by me duly sworn,
he/she stated that this citation was executed by him/her in the exact manner recited on the
return.

SWORN TO AND SUBSCRIBED BEFORE ME, on this _____ day of _____, _____.

                                        _____
                                                 Notary Public

N INT SECC P

Filed 09 May 19 P5:50
Loren Jackson - District Clerk
Harris County
ED101J015413042
By: Furshilla Brantley

CAUSE NO. 2008-74262

| | | |
|---|---|---|
| R. K. LOWRY, JR., L-FALLING CREEK LLC, RUSSELL A. CHABAUD, R-RAC WIMBLEDON, LLC, JOHN P. MOFFITT, J-JASON LLC, RUSSELL A. CHABAUD, TRUSTEE OF THE RUSSELL G. CHABAUD 1999 INVESTMENT TRUST, R-RUSSELL WIMBLEDON, LLC, RUSSELL A. CHABUAD, TRUSTEE OF THE ASHLEY CHABAUD 1999 INVESTMENT TRUST, R-ASHLEY WIMBLEDON, LLC, RUSSELL A. CHAUBAUD, TRUSTEE OF THE AUDREY CHABAUD 1999 INVESTMENT TRUST, R-AUDREY WIMBLEDON, LLC, LMC RECOVERY FUND, LLC, UNION GAS FUNDING I, L.P., RANA HOLDINGS, LLC, WESTY I LLC,  AND MOGI, LLC, | § § § § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § § § | 80th JUDICIAL DISTRICT |
| vs. | § § § | |
| BDO SEIDMAN, L.L.P., RANDY L. MOORMAN, ROBERT GREISMAN, PAUL SHANBROM, LAWRENCE COHEN, SIDLEY AUSTIN, LLP f/k/a SIDLEY AUSTIN BROWN & WOOD, LLP, f/k/a BROWN & WOOD, LLP, RAYMOND J. RUBLE, DE CASTRO, WEST, CHODOROW, GLICKFELD & NASS, INC., GRAMERCY ADVISORS, LLC, GRAMERCY ASSET MANAGEMENT, LLC, GRAMERCY LOCAL MARKETS RECOVERY FUND LLC, GRAMERCY FINANCIAL SERVICES, LLC, STEAMBOAT CAPITAL MANAGEMENT LLC, JAY A. JOHNSTON, MARC HELIE, AND FINANCIAL STRATEGY GROUP PLC | § § § § § § § § § § § § § § § § § | OF HARRIS COUNTY, TEXAS |
| *Defendants.* | § § | |

PLAINTIFFS' SECOND AMENDED PETITION                                    Page 1

## PLAINTIFFS' SECOND AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs R. K. Lowry, Jr. ("Lowry"), L-Falling Creek LLC, Russell A. Chabaud ("Chabaud"), R-RAC Wimbledon LLC, John P. Moffitt ("Moffitt"), J-Jason LLC, Russell A. Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust, R-Russell Wimbledon, LLC, Russell A. Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust, R-Ashley Wimbledon, LLC, Russell A. Chabaud, Trustee of the Audrey Chabaud 1999 Investment Trust, R-Audrey Wimbledon, LLC, LMC Recovery Fund, LLC ("LMC"), Union Gas Funding I, L.P., RanA Holdings, LLC, Westy 1 LLC, and MOGI, LLC (collectively "Plaintiffs"), bring this action against BDO Seidman, L.L.P., Randy L. Moorman ("Moorman"), Robert Greisman ("Greisman"), Paul Shanbrom ("Shanbrom"), Lawrence Cohen ("Cohen") (BDO Seidman, L.L.P., Moorman, Greisman, Shanbrom, and Cohen are collectively referred to herein as "BDO Seidman"), Sidley Austin, LLP f/k/a Sidley Austin Brown & Wood, LLP f/k/a Brown & Wood, LLP, Raymond J. Ruble ("Ruble") (Sidley Austin, LLP and Ruble are collectively referred to herein as "Sidley Austin"), De Castro, West, Chodorow, Glickfeld & Nass, Inc. ("De Castro West"), Gramercy Advisors, LLC, Gramercy Asset Management, LLC, Gramercy Local Markets Recovery Fund LLC, Gramercy Financial Services, LLC, Steamboat Capital Management LLC, Jay A. Johnston ("Johnston"), Marc Helie ("Helie") (Gramercy Advisors, LLC, Gramercy Asset Management, LLC, Gramercy Local Markets Recovery Fund LLC, Gramercy Financial Services, LLC, Steamboat Capital Management LLC, Johnston and Helie are collectively referred to herein as "Gramercy"), and Financial Strategy Group PLC ("Financial Strategy") (collectively "Defendants"), and state as follows:

## I.

### REQUEST FOR DISCLOSURE AND PRIVILEGE LOG

1.      Pursuant to Rule 194, you are hereby requested to disclose, within fifty (50) days of service of this request, the information or material described in Rule 194.2 (a)-(l). Also, pursuant to Rule 193.3, you are hereby requested to produce, within fifty (50) days of service of this request, a privilege log setting forth all documents you are withholding from production based upon privilege.

## II.

### DISCOVERY CONTROL LEVEL

2.      Plaintiffs request that discovery be conducted in accordance with a scheduling order pursuant to discovery control Level 3, as provided by TEX. R. CIV. P. 190.4.

## III.

### JURISDICTION AND VENUE

3.      Venue is proper in Harris County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a) (1), (2) and (4). Harris County, Texas is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred. Further, Harris County, Texas is a county in which BDO Seidman has a principal office in this state. Harris County, Texas is the county in which one or all of the Plaintiffs resided at the time of the accrual of the causes of action.

4.      Jurisdiction is proper because the damages sought are within the jurisdictional limits of this Court. Additionally, the Defendants have submitted to the jurisdiction of this State.

## IV.

## PARTIES

5.    Plaintiff R. K. Lowry, Jr. is an individual and a citizen of Texas.  Mr. Lowry resides in Houston, Texas.

6.    Plaintiff L-Falling Creek LLC is a Delaware limited liability company whose principal place of business is in Houston, Texas.

7.    Plaintiff Russell A. Chabaud is an individual and a citizen of Texas.  Mr. Chabaud resides in Spring, Texas.

8.    Plaintiff R-RAC Wimbledon LLC is a Delaware limited liability company whose principal place of business is in Spring, Texas.

9.    Plaintiff John P. Moffitt is an individual and citizen of Texas.  Mr. Moffitt resides in Bellaire, Texas.

10.    Plaintiff J-Jason LLC is a Delaware limited liability company whose principal place of business in is Bellaire, Texas.

11.    Plaintiff Russell A. Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust is an individual and a citizen of Texas.  Mr. Chabaud resides in Spring, Texas.

12.    Plaintiff R-Russell Wimbledon, LLC is a Delaware limited liability company whose principal place of business is in Spring, Texas.

13.    Plaintiff Russell A. Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust is an individual and a citizen of Texas.  Mr. Chabaud resides in Spring, Texas.

14.     Plaintiff R-Ashley Wimbledon, LLC is a Delaware limited liability company whose principal place of business is in Spring, Texas.

15.     Plaintiff Russell A. Chabaud, Trustee of the Audrey Chabaud 1999 Investment Trust is an individual and a citizen of Texas. Mr. Chabaud resides in Spring, Texas.

16.     Plaintiff R-Audrey Wimbledon, LLC is a Delaware limited liability company whose principal place of business is in Spring, Texas.

17.     Plaintiff LMC Recovery Fund, LLC is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut.

18.     Plaintiff Union Gas Funding I, L.P. is a Texas limited partnership whose principal place of business is in Houston, Texas.

19.     Plaintiff RanA Holdings is a Texas limited liability company whose principal place of business is in Houston, Texas. RanA Holdings is f/k/a and/or the successor-in-interest to DSAMP, LLC which was a Delaware limited liability company.

20.     Plaintiff Westy I LLC is a Texas limited liability company whose principal place of business is in Spring, Texas. Westy I LLC is f/k/a and/or the successor-in-interest to WAINKR LLC which was a Delaware limited liability company.

21.     Plaintiff MOGI, LLC is a Texas limited liability company whose principal place of business is in Bellaire, Texas. MOGI, LCC is f/k/a and/or the successor-in-interest to STKEE, LLC which was a Delaware limited liability company.

22.     Defendant BDO Seidman is a foreign limited liability partnership organized and existing under the laws of the New York with its principal place of

business in Chicago, Illinois. It has been admitted to and registered to do business in Texas. This Defendant has been served and has appeared in this case.

23.    Defendant Randy L. Moorman is an individual and, on information and belief, a citizen of Texas. Mr. Moorman was at all relevant times an employee of BDO Seidman. Mr. Moorman is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act or acts in Texas, and entered into contracts with Texas residents. This Defendant has been served and has appeared in this case.

24.    Defendant Robert Greisman is an individual and, on information and belief, a citizen of Illinois. Upon information and belief, Greisman resides at 904 Fountain View Dr., Deerfield, IL 60015. **Greisman may be served with citation on the Texas Secretary of State, Citations Unit, 1019 Brazos Street, Austin, Texas 78701 as his agent for service of process** as he engages in business in Texas, but does not maintain a regular place of business in this State nor a registered agent for service of process, and this suit arose from his business in Texas. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents.

25.    Defendant Paul Shanbrom is an individual and, on information and belief, a citizen of Michigan. Upon information and belief, Shanbrom resides at 7181 Deer Lake Ct., Clarkston, MI 48346. **Shanbrom may be served with citation on the Texas Secretary of State, Citations Unit, 1019 Brazos Street, Austin, Texas 78701 as his agent for service of process** as he engages in business in Texas, but does not

maintain a regular place of business in this State nor a registered agent for service of process, and this suit arose from his business in Texas. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents.

26.     Defendant Lawrence Cohen is an individual and, on information and belief, a citizen of New York. Upon information and belief, Cohen's principal place of business is at 330 Madison Avenue, New York, NY 10017. **Cohen may be served with citation on the Texas Secretary of State, Citations Unit, 1019 Brazos Street, Austin, Texas 78701 as his agent for service of process** as he engages in business in Texas, but does not maintain a regular place of business in this State nor a registered agent for service of process, and this suit arose from his business in Texas. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents.

27.     Defendant Sidley Austin is a foreign limited liability partnership organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois. It has been admitted to and registered to do business in Texas. This Defendant has been served and has appeared in this case.

28.     Defendant Raymond J. Ruble is an individual and, on information and belief, a citizen of North Carolina. Raymond J. Ruble resides at, on information and belief, is 511 Grand Blvd., Boone, North Carolina 28607. **Ruble may be served with citation on the Texas Secretary of State, Citations Unit, 1019 Brazos Street, Austin,**

**Texas 78701 as his agent for service of process** as he engages in business in Texas, but does not maintain a regular place of business in this State nor a registered agent for service of process, and this suit arose from his business in Texas. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents.

29.    Defendant De Castro West is a foreign corporation organized and existing under the laws of the State of California with its principal place of business at 10960 Wilshire Boulevard, Suite 1400, Los Angeles, California 90024. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents. This Defendant has been served and has appeared in this case.

30.    Defendant Gramercy Advisors, LLC is a foreign limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut 06830. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents. This Defendant has been served and has appeared in this case.

31.    Defendant Gramercy Asset Management, LLC is a foreign limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut 06830. This

Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents. This Defendant has been served and has appeared in this case.

32.     Defendant Gramercy Local Markets Recovery Fund LLC is a foreign limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 111 East 22nd Street, New York, NY 10010. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents. This Defendant has been served and has appeared in this case.

33.     Defendant Gramercy Financial Services, LLC is a foreign limited liability company organized and existing under the laws of the State of Delaware. Upon information and belief, Gramercy Financial Services, LLC's principal place of business is at 20 Dayton Avenue, Greenwich, Connecticut 06830. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents. This Defendant has been served and has appeared in this case.

34.     Defendant Steamboat Capital Management LLC is a foreign limited liability company organized and existing under the laws of the State of Delaware. Upon information and belief, Steamboat Capital Management LLC's principal place of business is at 20 Dayton Avenue, Greenwich, Connecticut 06830. This Defendant is

continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents. This Defendant has been served and has appeared in this case.

35. Defendant Jay A. Johnston is an individual and, on information and belief, a citizen of Connecticut. Mr. Johnston's principal place of business, on information and belief, is 124 Ritch Ave., W., Greenwich, CT 06830. Mr. Johnston was at all relevant times an employee of Gramercy. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents. This Defendant has been served and has appeared in this case.

36. Defendant Marc Helie is an individual and, on information and belief, a citizen of New York. Mr. Helie resides at 210 Lafayette St., Apt. 9B, New York, NY 10012-4042. Mr. Helie was at all relevant times an employee of Gramercy. **Helie may be served with citation on the Texas Secretary of State, Citations Unit, 1019 Brazos Street, Austin, Texas 78701 as his agent for service of process** as he engages in business in Texas, but does not maintain a regular place of business in this State nor a registered agent for service of process, and this suit arose from his business in Texas. This Defendant is continuously and systematically engaged in business and/or was continuously and systematically engaged in business in the State of Texas, committed a tortious act in Texas, and entered into contracts with Texas residents.

37. Defendant Financial Strategy Group PLC is a foreign corporation organized and existing under the laws of the State of Tennessee with its principal place of

business at 700 Colonial Rd., Suite 120, Memphis, TN 38117.  **Financial Strategy may**
**be served with citation on the Texas Secretary of State, Citations Unit, 1019 Brazos**
**Street, Austin, Texas 78701 as its agent for service of process** as it engages in business
in Texas, but does not maintain a regular place of business in this State nor a registered
agent for service of process, and this suit arose from its business in Texas.  This
Defendant is continuously and systematically engaged in business and/or was
continuously and systematically engaged in business in the State of Texas, committed
tortious act in Texas, and entered into contracts with Texas residents.

## V.

## NATURE OF THE CLAIMS

### A.    THE INVESTMENT STRATEGIES

38.    Plaintiffs  bring  this  action  against  Defendants  based  on  their
understanding of what the Internal Revenue Service ("IRS") has apparently concluded
during the IRS' audit of Plaintiffs' tax returns.  Plaintiffs bring claims of breach of
fiduciary  duty,  negligence/professional  malpractice,  negligent  misrepresentation,
disgorgement of unethical, excessive and illegal fees, fraudulent inducement, fraudulent
concealment, declaratory judgment, fraud, civil conspiracy, and breach of contract.
Plaintiffs seek compensatory damages against their professional advisors for damages
arising from certain investment strategies that Plaintiffs entered into and utilized on their
federal tax returns for the tax years 2000 through 2005 ("Investment Strategies") as set
forth more fully below.  Unbeknownst to Plaintiffs, the Defendants jointly and in concert
developed, promoted, sold, and implemented the Investment Strategies as part of a
conspiracy to commit fraud.  Plaintiffs further pray for a declaratory judgment seeking,

among other things, a declaration that certain purported agreements are void and unenforceable.

39.    The Defendants, pursuant to an elaborate and carefully devised common scheme, counseled and advised Plaintiffs to undertake the Investment Strategies, claiming the Investment Strategies would yield a substantial profit and minimize Plaintiffs' tax liability. At the time Defendants sold the Investment Strategies to Plaintiffs, Defendants knew or should have known that the Investment Strategies would not and could not yield the investment results or tax treatment claimed.    Importantly, Defendants' primary motive in their scheme was to exact millions of dollars in fees and commissions from Plaintiffs.

40.    Defendants knew, at the time they promoted and sold the Investment Strategies to Plaintiffs, that federal authorities were investigating the legality of similar "abusive tax shelters." Despite this knowledge, Defendants did not so inform Plaintiffs. Now, the IRS is auditing Plaintiffs' federal tax returns. The IRS has indicated it will hold that the Investment Strategies are illegal and abusive tax shelters, subjecting Plaintiffs to substantial back taxes, interest, penalties, and other damages.

41.    Plaintiffs are and were unknowledgeable and unsophisticated about tax matters, including tax law and tax shelters. Plaintiffs detrimentally relied on their trusted accounting, financial, investment, and legal advisors at BDO Seidman, Gramercy, Sidley Austin, De Castro West, and Financial Strategy Group for comprehensive financial and tax planning and upon their assertions that the Investment Strategies were legal and were not illegal and abusive tax shelters.

42.     Unbeknownst to Plaintiffs, BDO Seidman entered into undisclosed and illegal business arrangements with Defendants and others including Lehman Brothers Commercial Corporation and Lehman Brothers Commercial Corporation, New York ("Lehman" and/or the "Other Participants"). Through these arrangements, BDO Seidman and Gramercy systematically identified wealthy potential or existing clients facing substantial capital gain or income taxes. Then, playing on their position of trust, confidence, and prestige with their clients, BDO Seidman and Gramercy – in accordance with Defendants' pre-planned and fraudulent scheme – steered clients such as Plaintiffs to Defendants and others for legal, financial, investment, and tax advice and related products.[1]

43.     BDO Seidman and Gramercy advised their clients, including Plaintiffs, that their tax and investment professionals had designed proprietary tax-advantaged investment plans that would provide Plaintiffs with the potential of high returns on their investments and at the same time minimize capital gain and income tax obligations.

---

[1] Michael Kerekes, a former principal at BDO, recently plead guilty to conspiracy to defraud the United States and tax evasion on February 13, 2009. According to his plea agreement, the charges were based on Kerekes' "involvement, between in or about 1998 and 2003, in a conspiracy to defraud the United States, commit tax evasion, aid and assist the preparation of false and fraudulent income tax returns, and obstruct and impede due administration of the internal revenue laws, all in connection with the design, marketing, and implementation of tax shelter transactions while acting as a principal of BDO Seidman LLP."

Adrian Dicker, a former partner at BDO, also recently plead guilty to conspiracy to defraud the United States and tax evasion on March 17, 2009. According to the United States Department of Justice, Dicker's guilty plea resulted from his involvement in the design, marketing, sale and implementation of tax shelter transactions for BDO's clients while acting as a principal of BDO. Dicker and Kerekes were both members of BDO's Tax Solutions Group, which was the group within BDO responsible for the design, marketing, sale, and implementation of BDO's tax-reducing strategies.

According to the Criminal Information filed by the United States against Michael Kerekes (a former principal at BDO Seidman and member of the Tax Solutions Group), BDO Seidman, in furtherance of the conspiracy, developed a template consulting agreement for use in the tax shelter transactions. See *U.S. v. Kerekes*, Information at p. 11, 16. This consulting agreement was deliberately broad and vague and did not specifically refer to the tax shelter transactions. *Id.* The purpose of the consulting agreement was to conceal the actual fees paid to BDO in connection with the tax shelter transactions so that only a portion of the fees would be considered when conducting a profitability analysis of the tax shelter transaction. *Id.* Plaintiffs were fraudulently induced to enter into these consulting agreements with BDO, as well as the agreements with Gramercy, Sidley Austin, De Castro West, and the Other Participants, in connection with the Investment Strategies.

44.     Each of the participating Defendants knew or should have known that these purported tax advantaged investment strategies were, in reality, likely to be held by the IRS as nothing more than illegal and abusive tax shelters. To profit from their scheme, Defendants counted on their ability to conceal the true nature of the strategies from tax authorities and Plaintiffs.

45.     Unbeknownst to Plaintiffs, BDO, Gramercy, Sidley Austin, De Castro West, Financial Strategy Group and others (including Lehman) jointly conspired to design the Investment Strategies before BDO and Gramercy, with the assistance of others including Financial Strategy, executed their plan to promote and sell the Investment Strategies to their own clients – such as Plaintiffs. Unbeknownst to Plaintiffs, Sidley Austin and De Castro West agreed that BDO Seidman and Gramercy could promise

prospective clients, such as Plaintiffs, that they would receive tax opinion letters certifying the soundness and legality of the Investment Strategies being sold. For a substantial fee, Sidley Austin[2] and De Castro West issued tax opinions to Plaintiffs that purported to substantiate the bona fides of certain of the Investment Strategies. Unbeknownst to Plaintiffs, these opinion letters were not specifically tailored to Plaintiffs' specific financial situations, but were merely "fill in the blank" boilerplate opinions provided as part of a "pre-wired" scheme.

46.     Despite Defendants' knowledge that the IRS would likely deny the Investment Strategies, Financial Strategy and BDO prepared certain federal tax returns for an entity used to implement the Investment Strategies, and Defendants advised Plaintiffs to file individual federal tax returns implementing the Investment Strategies. Even after Defendants learned that the IRS had begun to audit and disallow capital and other losses claimed through similar tax strategies, Defendants continued to advise Plaintiffs to use the Investment Strategies to offset income and/or capital gains on their income tax returns.

---

[2]     Upon information and belief, Defendant Ruble, a former partner at Sidley, Austin, Brown & Wood, LLP, authored and issued the Sidley Austin opinion letters to Plaintiffs for the 2000 and 2001 tax years. On December 17, 2008, Ruble was convicted on 10 counts of federal tax evasion relating to his involvement in the design, marketing, sale, and implementation of tax shelters that were, on information and belief, the same or substantially similar to the Investment Strategies at issue in this case. For those keeping score, Ruble makes three (3) professional advisors who work for Defendants involved in marketing, selling, and implementing Plaintiffs' Investment Strategies who have either pled guilty or been convicted of fraud.

In May 2007, Sidley Austin reached a settlement with the IRS in which Sidley Austin agreed to pay the IRS a "promoter penalty" of $39,400,000.00. According to the IRS, "[t]he penalty stems from the firm's promotion of abusive tax shelters and a failure to comply with tax shelter registration requirements." IR-2007-103. In May 2007, Sidley Austin also issued a Statement of Responsibility with respect to its involvement in the promotion, sale and implementation of tax shelters.

47.     After BDO and/or Gramercy convinced their clients to pursue the tax-advantaged investment strategies, Gramercy and BDO jointly worked with each client to execute the technical portion of the Investment Strategies. Sidley Austin and De Castro West's efforts culminated in their prefabricated and canned legal opinions confirming the propriety of the tax-advantaged investment strategies that, unbeknownst to Plaintiffs, they helped – both directly and indirectly through BDO and Gramercy – design, market, sell, and implement. The Defendants represented to Plaintiffs that the Sidley Austin and De Castro opinion letters would confirm the propriety of the respective Investment Strategies and prevent the IRS from assessing Plaintiffs with penalties as a result of the Investment Strategies. Financial Strategy and BDO prepared certain federal tax returns for an entity that was used to implement the Investment Strategies. At no point in time did BDO, Gramercy, Sidley Austin, De Castro West, Financial Strategy, or the Other Participants ever disclose to Plaintiffs that they had fraudulently conspired together to design, promote, sell and implement the Investment Strategies, and were in no way independent from each other.

48.     Unbeknownst to Plaintiffs, the Defendants conspired to design, promote, sell, and implement the Investments Strategies for the purpose of receiving and splitting substantial fees (the "Defendants' Arrangement"). As evidenced by, among other things, the guilty pleas of Ruble, Kerekes and Dicker, and the $39.4 million promoter penalty paid by Sidley Austin along with Sidley Austin's Statement of Responsibility, the Defendants' Arrangement was a conspiracy to commit fraud. The receipt of those fees was the primary, if not sole, motive in the development and execution of the Investment Strategies. Further, the amount of fees earned by the Defendants was not tied to or

reflective of the amount of time and effort they expended in providing tax, investment, legal or accounting services, but rather was tied to the amount of capital and/or ordinary losses each client would claim on their tax returns. Indeed, unbeknownst to Plaintiffs, the Defendants designed the Investment Strategies and agreed to provide a veneer of legitimacy to each other's opinions as to the lawfulness and tax consequences of the Investment Strategies by agreeing to the representations that would be made and to issue the allegedly "independent" opinions before potential clients were solicited. Unbeknownst to Plaintiffs, these "independent" opinions were prefabricated and canned opinions used for each and every client across the United States with basic factual information inserted depending upon the client.

49.     Why were firms like BDO Seidman and Gramercy eager to participate and "rope in" their clients in this way? As BDO Seidman itself put it: **"One word sums up the strategy of the Tax Business Line.  MONEY!"**[11]  Based on information and belief, Defendants and the Other Participants entered into an arrangement where each would receive a certain portion of the fee for each Investment Strategy sold. The fee was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the Investment Strategy. In other words, the bigger the deal, the larger the fee shared by Defendants and the Other Participants. And where was the money? Again, according to BDO Seidman: **"Where is the real money? SHOW ME THE**

---

[11] Quote from p. 3 of the BDO Seidman 2000 "Imagine the Possibilities" Business Line Strategy publication, pushing its "Tax Solutions" (*i.e.*, tax shelters) services, suggesting they all work together to "change BDO into a green ocean" (*id.* at 1) and that they should all "Think Green.  Green is good!" *Id.* at 3. Apparently, BDO's group in charge of these matters was known as the "Wolfpack." Accordingly, this publication, Government Exhibit 26 in an Appendix filed in *United States v. BDO Seidman*, No. 02-C-4822 N. D. Ill., will be herein referred to as the "Wolfpack Manual."

MONEY – It's right in front of our faces. Our clients have the money."[12] Thus, BDO Seidman had a motive to sell as many Investment Strategies as possible, as large as possible. Not surprisingly, the Tax Solutions Group at BDO Seidman grew from $2.2 million in profits by 1998 to $14.8 million in profits in 1999,[13] and to in excess of $77 million of revenues in 2000.[14]

50.     The Defendants aggressively put their fraudulent scheme into action. BDO and Gramercy solicited their own clients to enter into the Investment Strategies. BDO and Gramercy, directly or through the Other Participants, identified successful individuals – such as Plaintiffs - as potential clients based on their knowledge of their finances. Their clients became "targets". And, in the end, Plaintiffs, like so many other clients, became a "victim" of corporate greed.

51.     The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' conduct; the provision of professional services to clients was merely an incidental byproduct of, not a motivating factor for, the Defendants' conduct alleged herein. Further, the Defendants' Arrangement gave each of the participating Defendants a significant pecuniary interest in the advice and professional services they would render.

52.     The Defendants had a financial, business and property interest in inducing Plaintiffs, as well as other clients, to enter into investment strategies such as the Investment Strategies, and to do so, promised, opined and assured that the Investment

---

[12]Wolfpack Manual at 6.

[13]Wolfpack Manual at 7.

[14]Government Exhibit 27 in an Appendix filed in *United States v. BDO Seidman*, No. 02-C-4822 (N. D. Ill).

Strategies would provide Plaintiffs with a reasonable opportunity to make a profit on the "investments" and at the same time legally reduce their taxes.

53.     Unbeknownst to Plaintiffs, the Defendants entered into the Defendants' Arrangement, whereby they agreed they would solicit each other's clients and split the fees to be charged clients who executed strategies such as the Investment Strategies, including Plaintiffs.   Indeed, BDO and Gramercy had an undisclosed agreement that required BDO to pay Gramercy part of the fee that the clients – including Plaintiffs – paid to BDO.   Of course, neither BDO nor Gramercy disclosed this fee splitting arrangement with Plaintiffs.   Nothing says "conspiracy" like an undisclosed fee-splitting agreement between professional advisors who represented to the Plaintiffs that they were completely independent.

## B.     BDO AND GRAMERCY "PITCH" THE INVESTMENT STRATEGIES TO PLAINTIFFS

54.     Plaintiffs are involved in the oil and gas business.  Although Plaintiffs are successful businessmen, Plaintiffs are inexperienced and unsophisticated with respect to tax law and investments outside the area of oil and gas.  In June 2000, Plaintiffs received substantial proceeds from the sale of certain oil and gas properties.  Faced with the substantial proceeds, Plaintiffs wanted to diversify their investment portfolio so that it would not be heavily concentrated in oil and gas.  Plaintiffs also desired to develop relationships with respected and experienced investment and tax advisors to increase the returns on their investments.  Plaintiffs asked their business advisors to be on the "lookout" for reputable and experienced investment companies that could potentially advise the Plaintiffs how to diversify their investment portfolio and increase their returns without taking undue risk.

55.    During a social outing, Plaintiff Russell Chabaud told a friend, who also happened to be an investment professional, that he and his partners were looking for a top quality investment and tax advisory firm to advise them how to invest their proceeds from their recent sale of certain properties.    Chabaud's friend recommended that Plaintiffs meet with BDO Seidman.    Unbeknownst to Russell Chabaud, his friend contacted BDO Seidman regarding the Plaintiffs.

56.    In September 2000, Defendant Randy Moorman, a tax partner at BDO Seidman's Houston office (who no doubt recognized Plaintiffs as targets for BDO's Tax Solutions Group), contacted Plaintiffs' personal accountant to set up a meeting between Plaintiffs and BDO Seidman.

57.    On September 26, 2000, Plaintiffs R.K. Lowry, Jr. and Russell Chabaud and Plaintiffs' personal accountant met with Defendants Randy Moorman and Paul Shanbrom (a member of BDO's Tax Solutions Group) at Plaintiffs' offices in Houston, Texas.  Plaintiffs were under the impression at this time that this meeting would be an opportunity for BDO to educate Plaintiffs on the types of services and expertise BDO had to offer Plaintiffs and for BDO to become familiar with Plaintiffs and Plaintiffs' business. Plaintiffs did not understand going into this meeting that BDO intended on pitching tax-reducing strategies to Plaintiffs.  At the beginning of the meeting, Shanbrom and Moorman required Plaintiffs to sign non-disclosure agreements with respect to the topics that were to be discussed during the meeting.  Plaintiffs then explained their financial situation to Shanbrom and Moorman, including the magnitude of Plaintiffs' income, capital gains, and anticipated tax liability.  Shanbrom and Moorman informed Plaintiffs that BDO had developed several "investment" strategies that met the criteria for

Plaintiffs' financial, investment and tax needs.  Shanbrom represented himself to be an expert with respect to these "investment" strategies.  According to Shanbrom and Moorman, in addition to the profit potential, these "investment" strategies had significant tax benefits because they took advantage of certain loopholes contained in the IRS code with respect to partnerships.  Shanbrom and Moorman assured Plaintiffs that these "investment" strategies were completely legal and valid.  In fact, Shanbrom emphasized that BDO had a special group within BDO that specialized in designing tax-advantaged investment strategies and this group performed its due diligence to ensure the propriety of any strategy before BDO is able to offer it to clients.

58.    Shanbrom described a particular investment strategy involving foreign distressed debt.  According to Shanbrom, Plaintiffs could invest in foreign distressed debt and after executing the proprietary strategy, Plaintiffs would be able to legally take a loss in the distressed debt through the application of certain partnership tax rules.  Shanbrom and Moorman reassured Plaintiffs that the distressed debt strategy was completely legal and informed Plaintiffs that all of the big accounting firms were implementing similar types of tax-advantaged investment strategies.  Shanbrom informed Plaintiffs that he had personally engaged in a distressed debt strategy and also provided Plaintiffs with information regarding the total number of BDO's clients that had implemented these types of strategies and the combined size of these clients' strategies.

59.    Pursuant to BDO's undisclosed agreement with Gramercy, Shanbrom recommended that Plaintiffs engage Gramercy to assist BDO in the implementation of the distressed debt strategy.  Shanbrom told Plaintiffs that Gramercy specialized in providing clients with investments in distressed debt. Shanbrom and Moorman presented

Plaintiffs with a magazine article written about Gramercy and one of its principals – Defendant Marc Helie – which touted Gramercy's expertise in distressed debt investments. Shanbrom and Moorman also touted Gramercy's reputation as a leader in the area of foreign distressed debt. Shanbrom and Moorman also informed Plaintiffs that Gramercy consistently received high returns on its investments and that there was a reasonable chance that Plaintiffs would actually make money on the distressed debt strategy.

60.     Shanbrom also informed Plaintiffs that if Plaintiffs decided to enter into the distressed debt strategy, Plaintiffs would be required to enter into consulting agreements with BDO Seidman.

61.     Shanbrom recommended that if Plaintiffs decided to implement the distressed debt strategy, Plaintiffs should also invest substantial amounts of money (and as much money as possible) with Gramercy unrelated to the distressed debt strategy. According to Shanbrom, these unrelated investments would provide Plaintiffs with a diversified portfolio that allowed Plaintiffs to achieve higher rates of return and would, at the same time, strengthen Plaintiffs' position in the event the IRS audited Plaintiffs' tax returns. Specifically, Shanbrom recommended that Plaintiffs invest $15,000,000.00 with Gramercy in addition to the investments made with Gramercy for the distressed debt strategy.

62.     Subsequent to the introductory meeting, Plaintiffs' accountant - on behalf of Plaintiffs - had several telephone conversations with Shanbrom and Moorman. Shanbrom and Moorman repeatedly reiterated that the distressed debt strategy was completely legal and valid. Shanbrom and Moorman stressed that if Plaintiffs wanted to

**PLAINTIFFS' SECOND AMENDED PETITION**                                    Page 22

implement a distressed debt strategy for the 2000 tax year, Plaintiffs would need to make investments with Gramercy in November 2000.

63.     Plaintiffs Lowry, Chabaud, and Moffit and Plaintiffs' personal accountant and real estate attorney attended another meeting with Shanbrom and Moorman on November 7, 2000, in Houston, Texas. Defendant Jay Johnston, a principal at Gramercy, was also present at this meeting. Plaintiffs had no prior relationship with Gramercy or Jay Johnston until BDO, pursuant to their undisclosed agreement with Gramercy, introduced Plaintiffs to Gramercy at this meeting.

64.     During the November 7 meeting, Shanbrom and Jay Johnston discussed in detail the steps of the distressed debt strategy with Plaintiffs and repeatedly reiterated that it was a completely legal tax-reducing strategy. Shanbrom and Jay Johnston again stressed that if Plaintiffs wanted to implement a distressed debt strategy for the 2000 tax year, Plaintiffs needed to make an investment with Gramercy in November 2000. Shanbrom and Johnston presented the distressed debt strategy as a take it or leave it offer and reiterated that Plaintiffs must make a decision almost immediately.

65.     Shanbrom and Johnston told Plaintiffs that if the IRS challenged the validity of the distressed debt strategy, Plaintiffs would prevail. Shanbrom emphasized that BDO felt so confident about the strategy that BDO would represent Plaintiffs in any IRS audit as part of the fee Plaintiffs paid BDO to execute the distressed debt strategy. Further, Shanbrom and Johnston told Plaintiffs that Sidley Austin, a reputable law firm, would issue "independent" opinion letters confirming the propriety of the distressed debt strategy. According to Shanbrom and Johnston, Defendant R.J. Ruble (a partner at Sidley Austin) would draft the opinion letters. Shanbrom and Johnston told Plaintiffs that

PLAINTIFFS' SECOND AMENDED PETITION

Page 23

Ruble was the recognized expert with respect to distressed debt strategies. Shanbrom and Johnston advised Plaintiffs that Sidley Austin was completely "independent" from BDO and would therefore issue "independent" opinion letters, which would provide the required legal support to confirm the propriety of the strategy and overcome any IRS challenge and, equally as important, would provide absolute penalty protection.

66.    Shanbrom and Johnston recommended that Plaintiffs undertake a distressed debt strategy that would be implemented over a 5 year period, beginning in tax year 2000. Shanbrom and Johnston told Plaintiffs that BDO and Gramercy would handle the design and implementation of the distressed debt strategy.

67.    Plaintiffs, directly and indirectly through their accountant, subsequently had a few more meetings and telephone conversations with Shanbrom and Moorman regarding the specifics of the distressed debt strategy. Based on Shanbrom, Moorman, and Johnston's representations and assurances regarding the distressed debt strategy, Plaintiffs decided to engage in the distressed debt strategy.

68.    Pursuant to BDO and Gramercy's advice and instructions, Plaintiffs entered into consulting agreements with BDO. Unbeknownst to Plaintiffs, BDO and Gramercy had an agreement that required BDO to pay Gramercy part of the fees that Plaintiffs paid to BDO. The fees paid to BDO were based on the amount of tax losses created by the distressed debt strategy. Plaintiffs also entered into investment management agreements with Gramercy with respect to the money that Plaintiffs invested with Gramercy that was unrelated to the distressed debt strategy.

69.    Pursuant to BDO and Gramercy's advice and instructions, Plaintiffs opened accounts and made investments (unrelated to the tax-reducing strategies) with Gramercy in November 2000.

## C.    THE 2000 DIGITAL OPTIONS STRATEGY

70.    In 2000, Plaintiffs R.K. Lowry, Jr., L-Falling Creek LLC, Russell A. Chabaud, R-Rac Wimbledon, LLC, John P. Moffitt, J-Jason, LLC, and LMC Recovery Fund LLC entered into tax strategies involving the purchase and sale of digital options on foreign currency (the "2000 Digital Options Strategy"). BDO Seidman, Gramercy, and Sidley Austin were the Defendants involved in the 2000 Digital Options Strategy (the "2000 Strategy Defendants"). Lehman Brothers Commercial Corporation ("Lehman") and Lehman Brothers Commercial Corporation, New York were the Other Participants involved in the 2000 Digital Options Strategy.

71.    Importantly, Plaintiffs were unaware that they engaged in a Digital Options Strategy, as opposed to a Distressed Debt Strategy, until after the Defendants had implemented the Digital Options Strategy. In January 2001, long after the digital options had been executed and expired, Shanbrom informed Plaintiffs that BDO and Gramercy did not have enough time to implement a Distressed Debt Strategy for the 2000 tax year, and instead, implemented a Digital Options Strategy for Plaintiffs. Amazingly, unbeknownst to Plaintiffs, BDO and Gramercy dipped into the money Plaintiffs had deposited in a separate Gramercy account for investments wholly unrelated to the tax-reducing strategy and used $750,000 to execute the digital options necessary to implement the 2000 Digital Options Strategy.

### 1.    **About Digital Options**

72.    An option gives a buyer the right to buy or sell something at a definite price for a definite period of time, regardless of that something's then market price on the open market. That "something" may be stock, bonds, commodities (such as coffee or pork bellies), or intangible market valuations such as the Standard & Poors composite value. Options are said to be "in the money" if the price of the underlying "something" makes exercising the option profitable. Similarly, options are said to be "out of the money" when exercising the option would result in no gain or a loss. While options were originally primarily developed as a "hedge" against declines in other investments, "plain vanilla" options have spawned a host of derivatives which sometimes hang by only a slender thread from any underlying investment or in some cases —like here— not at all.

73.    Options may be either "American-style" or "European-style," depending upon whether the option purchaser has the right to exercise the option at any time before expiration or *only upon* the designated expiration date. For example, assume an investor buys a "call" option on 1000 shares of ABC stock with a "strike price" of $100 and an expiration date of July 16, 2003. This option gives the investor the right to purchase 1000 shares of ABC for $100. Under an American-style option, the option holder can exercise the option by purchasing the shares at any time he chooses prior to July 16, 2003. Under a European-style option, the option holder can only elect to exercise the option on July 16, 2003, and perhaps, as was true in this case, only at a certain time on that date.

74.    Digital options are "digital" in the sense that the investor wins or loses a pre-determined amount in full, *but only* if the strike price is met—thus, the option is

either on or off, like a digital (binary) 1 or 0. As a result, digital options provide an investor with the same payout no matter how far above the strike price the underlying price goes. For example, a digital option may look as follows: an investor will receive $1,000 if ABC Corp. closes at or above $12 per share on June 24, 2003. If the price of ABC Corp. is at or above $12 per share on the closing date, the investor is paid $1,000. If ABC does not close at or above $12 per share, the investor gets nothing and loses what he originally paid for the option. No matter the outcome, however, stock in ABC Corp. never changes hands. Digital options are, in reality, nothing more than wagers that a certain commodity or equity price will be at or beyond (or beneath) a given price on a certain date.

75.    Digital options are ordinarily less expensive to purchase than standard options. A digital option's price is influenced by many of the same factors as any other option, such as the price of the underlying commodity, the exercise price, the time to maturity, the volatility of the underlying commodity, and short-term interest rates. A key disadvantage of digital options is a limited profit potential.

## 2.    Brief History of Foreign Exchange ("FX") Transactions

76.    A plan to market the foreign exchange digital options contracts (the "FX Contracts") was developed in the mid – to – late 90s. Upon information and belief, the participants included Paul Daugerdas, a partner at Jenkens & Gilchrist, P.C. (Jenkens), and David Parse (an employee of Deutsche Bank) and certain other individuals with Deutsche Bank. Prior to 1994, Daugerdas was employed by Arthur Anderson as *inter alia* the Partner in charge of the Futures and Options Tax Practice. From 1994 to December 28, 1998, he was a partner at the law firm of Altheimer & Gray in Chicago,

Illinois, where he was Chairman of its Tax Department. Daugerdas then joined Jenkens as a partner in the Chicago office. Upon information and belief, Parse and Daugerdas had a professional and social relationship for many years before the tax strategy using digital options was designed and marketed to individuals such as Plaintiffs.

77.     From 1991 until October 1999, Daugerdas apparently marketed a tax strategy in which a prospective client borrows a treasury security, sells the security short, and then contributes the proceeds to a partnership in exchange for a partnership interest. Although the issue is hotly contested,[3] Daugerdas contends that he independently developed the idea of substituting options in place of treasuries sometime in 1995 or 1996. He claims that after the House Ways and Means Committee of the United States Congress proposed legislation in October of 1999 that would, if passed, adversely impact the use of treasuries in the short-sale strategy, he began to employ the tax strategy using digital options for his clients.

78.     The result was a tax strategy known as the "Digital Options Strategy" where a taxpayer purchases and writes options and transfers these option positions to a partnership. As a result, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of the purchased options, but is not reduced by the taxpayer's obligation with regard to the options written. The use of European-style digital options in this transaction is essential because it permits significant leverage to be obtained at relatively modest cost and minimum risk.

---

[3] *See The Diversified Group, Inc vs. Daugerdas and Jenkens & Gilchrist*, 139 F. Supp. 2d 445 (S.D.N.Y. 2001).

### 3.    The Features of the 2000 Digital Options Strategy

79.    The features of the 2000 Digital Options Strategy - as designed, marketed, sold, and implemented by the 2000 Strategy Defendants - were as follows:

a.    First, Plaintiffs form a single member limited liability company ("LLC") for the purpose of purchasing and selling digital options on foreign currency. Then Plaintiffs, through their respective LLCs, sell digital options on foreign currency and purchase digital options on foreign currency. Certain of the options allowed Plaintiffs, depending on the values of the respective foreign currencies, to enter into one of two forward foreign currency contracts whereby Plaintiffs pay out or receive a predetermined amount in foreign currency. Each option involving forward foreign currency contracts was offset by another option, which provided for forward foreign currency contracts with almost identical (but opposite) payouts (i.e. the options were issued in offsetting pairs). Certain of the other options were standard digital options, which provided for a predetermined payout and were issued in offsetting pairs with different (but narrow) strike prices.

b.    Second, Plaintiffs (through their respective LLC) contribute their options to another newly formed limited liability company ("Fund") formed for the purpose of conducting the Digital Options Strategy. On the expiration date, the standard digital options would expire resulting in a gain or loss. With respect to the options involving forward foreign currency contracts, upon expiration, Plaintiffs exercise the their

rights/obligations on the forward foreign currency contracts, resulting in a gain or loss, depending upon the exchange rate between the U.S. dollar and the relevant foreign currency at that time;

c.     Third, Plaintiffs make a capital contribution consisting of cash or other capital assets to the partnership; if cash was contributed, it was sometimes used to purchase capital or ordinary assets (depending on whether a capital or ordinary loss was being "created");

d.     Fourth, Plaintiffs contribute their interest in the partnership to an S Corporation, causing the termination of the partnership as a matter of law; and

e.     Fifth, the S Corporation sells the capital or ordinary assets contributed by the Individual Plaintiffs. These assets have an artificially inflated basis and their sale leads to a substantial capital and/or ordinary loss.

80.     The 2000 Strategy Defendants, acting pursuant to an undisclosed arrangement with Lehman, fully planned in advance and executed Plaintiffs' digital Options Strategy.

81.     The 2000 Strategy Defendants advised Plaintiffs that the basis of Plaintiffs' interest in the Fund would be increased for tax purposes by the premium paid to purchase the options, but not decreased by the premium received by Plaintiffs on the sale of certain options. They further advised that, as a result, Plaintiffs would realize a large capital and/or ordinary loss that could be applied to substantially reduce or

eliminate the large capital gains realized by Plaintiffs, thus substantially reducing or even eliminating the Plaintiffs' tax liability.

82.    The 2000 Strategy Defendants, acting pursuant to an undisclosed arrangement with Lehman, determined the precise amount of loss to be generated by the 2000 Digital Options Strategy before Plaintiffs executed the digital options with Lehman.

83.    The 2000 Strategy Defendants informed Plaintiffs that depending on the exchange rate between the foreign currencies involved in the options transactions, there was a reasonable chance of realizing a pre-tax gain on the FX Contracts, although a pre-tax loss might also occur.

84.    The 2000 Strategy Defendants further advised the Plaintiffs that if the Internal Revenue Service ("the IRS") audited their tax returns as a result of the 2000 Digital Options Strategy, the Sidley Austin "independent" opinion letters would confirm the propriety of the 2000 Digital Options Strategy and of claiming the resulting losses on their tax returns and provide absolute protection from any IRS penalties. According to the 2000 Strategy Defendants, these "independent" opinion letters would enable the Plaintiffs to satisfy the IRS auditors as to the propriety of the tax returns. Unfortunately and unbeknownst to Plaintiffs, Sidley Austin had already prepared the "canned" and "prefabricated" opinion letters approving the 2000 Digital Options Strategy and needed only to fill in several blanks prior to issuing the opinion letters to Plaintiffs.

85.    The 2000 Strategy Defendants advised Plaintiffs that the losses created by the 2000 Digital Options Strategy were legitimate and in accordance with all applicable tax laws, rules, regulations, published court decisions, and common law doctrines. In particular, the 2000 Strategy Defendants advised the Plaintiffs that the 2000 Digital

Options Strategy was not a "sham transaction" that would be ignored or disallowed for tax purposes and that the "independent" opinion letters from Sidley Austin would confirm this.

86.    The 2000 Strategy Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose important information regarding the FX Contracts, even though such facts were available to them.

87.    As a result of and in reliance on Defendants' misrepresentations, omissions, and promises, the Plaintiffs purchased the FX Contracts and engaged in the 2000 Digital Options Strategy.

88.    Had Plaintiffs known of the material adverse information that the 2000 Strategy Defendants did not disclose, they would not have purchased the FX Contracts or engaged in the 2000 Digital Options Strategy.

89.    The 2000 Strategy Defendants owed duties to the Plaintiffs. These duties included the duty to:

a.    Exercise prudence, caution and care in recommending and entering into the FX Contracts for and with the Plaintiffs; and

b.    Exercise their responsibility to deal fairly and in good faith and fulfill their fiduciary responsibilities of care and loyalty to the Plaintiffs.

90.    It is evident that the 2000 Strategy Defendants intended to deceive and defraud the Plaintiffs for personal gain in the form of outrageous fees from their unsuspecting "clients."    This fraud was perpetrated through the 2000 Strategy Defendants' discrete acts of material omissions and misrepresentations.

### 4.    Plaintiffs Engage in the 2000 Digital Options Strategy

91.    In December 2000, in reliance on the 2000 Strategy Defendants' and the Other Participants' advice and instructions, Plaintiffs Lowry, Chabaud, and Moffit, through their respective LLCs, entered into the Digital Options Contracts to purchase and sell the various digital options on foreign currency.

92.    Pursuant to the 2000 Strategy Defendants' and the Other Participants' advice and instructions, Plaintiffs contributed their respective option positions to LMC Recovery Fund LLC ("Fund") in December 2000.

93.    As designed by the 2000 Strategy Defendants and the Other Participants, the Digital Options Contracts expired according to their terms in December 2000.

### 5.    IRS Notice 1999-59: Transactions Lacking in "Economic Substance" are Illegal and Abusive Tax Shelters

94.    On December 27, 1999, the IRS issued IRS Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property." In this Notice, the IRS stated that "[t]he Internal Revenue Service and Treasury Department have become aware of certain types of transactions as described below, that are being marketed to taxpayers for the purpose of generating tax losses. This notice is being issued to alert taxpayers and their representatives that the purported losses arising from such transactions are not properly allowable for Federal income tax purposes. . . . Through a contrived series of steps, taxpayers claimed tax losses for capital outlays that they have in fact recovered. Such artificial losses are not allowable for Federal income tax purposes." The clear message from the IRS to the 2000 Strategy Defendants was that purported losses arising from transactions wholly lacking in "economic substance" (i.e., the 2000 Digital Options Strategy) are not properly allowable for Federal income tax purposes. The 2000 Strategy

Defendants failed to discuss and analyze the effect and significance of this IRS Notice on the 2000 Digital Options Strategy with Plaintiffs. Indeed, the 2000 Strategy Defendants simply ignored this Notice to Plaintiffs' detriment.

95.     As a result of Notice 1999-59, the 2000 Strategy Defendants knew or certainly should have known that the IRS would assert that the purported losses arising from the 2000 Digital Options Strategy were improper and not allowable for tax purposes; however, the 2000 Strategy Defendants intentionally did not disclose this information to Plaintiffs and, indeed, told them the exact opposite.

6.     **IRS Notice 2000-44: The IRS Contends the 2000 Digital Options Strategy is an Illegal and Abusive Tax Shelter**

96.     In August 2000, the IRS once again clearly and unequivocally informed accountants, tax attorneys, and financial advisors across the country that it believed the 2000 Digital Options Strategy was an illegal and abusive tax shelter. Specifically, on August 11, 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis." This Notice concerned "similar transactions [to those described in Notice 1999-59] that purport to generate tax losses for taxpayers," thus indicating the IRS believed it had also addressed transactions like the 2000 Digital Options Strategy in Notice 1999-59. Amazingly, both IRS Notice 1999-59 and 2000-44 were issued before Plaintiffs implemented the 2000 Digital Options Strategy, before Sidley Austin issued its opinion letters for the 2000 Digital Options Strategy, and before Plaintiffs had, in reliance on the opinion letters and the other advice received from the 2000 Strategy Defendants, included the losses purportedly created by the 2000 Digital Option Strategy on their 2000 federal tax returns.

97.    Most importantly, Notice 2000-44 specified the precise transaction marketed by the 2000 Strategy Defendants to Plaintiffs, under which the taxpayer purchases call options and simultaneously writes offsetting call options, transfers the option positions to a partnership, and ultimately claims that the basis in his partnership interest "is increased by the cost of the purchased call options but is not reduced under [Internal Revenue Code] §752 as a result of the partnership's assumption of the taxpayer's obligation."    The IRS stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) are not allowable as deductions for Federal income tax purposes." The clear message from the IRS to the 2000 Strategy Defendants was that the purported losses arising from the 2000 Digital Options Strategy were not properly allowable for federal income tax purposes and taxpayers who used the losses from such a strategy on their tax returns would be exposed to penalties. The 2000 Strategy Defendants, however, simply ignored the IRS and this Notice to the detriment of Plaintiffs.

98.    Thus, there is no doubt that the 2000 Strategy Defendants knew or should have known as a result of IRS Notices 1999-59 and 2000-44 issued on August 11, 2000, if not earlier, that the purported losses arising from the Plaintiffs' participation in 2000 Digital Options Strategy were not properly allowable for federal or state income tax purposes and that Plaintiffs would be exposed to penalties if they used the losses generated from the 2000 Digital Options Strategy on their tax returns. However, based on information and belief, the 2000 Strategy Defendants intentionally failed to inform the Plaintiffs of this fact to their detriment. More importantly, the 2000 Strategy Defendants

failed to retract, modify, or qualify in any way their advice to Plaintiffs or the opinions expressed in the Sidley Austin opinion letters confirming the propriety of claiming as an increase in basis the cost of the options purchased on Plaintiffs' tax returns.

99.    The 2000 Strategy Defendants represented that the 2000 Digital Options Strategy was a legal tax-reducing strategy despite the fact that IRS Notices 1999-59 and 2000-44 expressly and unequivocally stated that the type of transaction the Plaintiffs undertook, based on the advice and recommendation of the 2000 Strategy Defendants, was an illegal and abusive tax shelter. The 2000 Strategy Defendants simply ignored the clearly stated implications of IRS Notices 1999-59 and 2000-44 and, therefore, knowingly deceived and misled the Plaintiffs to their detriment.

100.    The 2000 Strategy Defendants represented that the 2000 Digital Options Strategy was not required to be disclosed on Plaintiffs' 2000 federal tax returns pursuant to Treas. Reg. § 1.6011-4(a). Further, the 2000 Strategy Defendants failed to register the 2000 Digital Options Strategy as a tax shelter with the Internal Revenue Service pursuant to Treas. Reg. § 301.6111-2 and did not advise the Plaintiffs that registration of the 2000 Digital Options Strategy was required.

101.    Unbelievably, the 2000 Strategy Defendants did not fully and properly disclose the importance of Notice 1999-59 and 2000-44 to the Plaintiffs because the 2000 Strategy Defendants knew the Plaintiffs would refuse to participate in the 2000 Digital Options Strategy. Clearly, the 2000 Strategy Defendants placed their greed over the Plaintiffs' best interest.

### 7.    The Opinion Letters for Plaintiffs' 2000 Digital Options Strategy

102.    On or about April 16, 2001, Sidley Austin issued opinion letters to R.K Lowry, Jr. and L-Falling Creek LLC, John P. Moffit and J-Jason, LLC, and Russell Chabaud and R-Rac Wimbledon LLC regarding the propriety of the 2000 Digital Options Strategy. Plaintiffs were still under the mistaken belief that the opinion letters set forth "independent" opinions of an independent law firm on the propriety of the 2000 Digital Options Strategy.

103.    The Sidley Austin opinion letters were authored and prepared based, in part, on representations made by the 2000 Strategy Defendants. The Sidley Austin opinion letters advised the Plaintiffs, respectively, that:

(a)    For U.S. federal income tax purposes it is more likely than not that:

(i)    LLC (L-Falling Creek LLC, J-Jason, LLC or R-Rac Wimbledon, respectively) will be disregarded as an entity separate from Investor (Plaintiffs) and, as a result, all of the activities undertaken by LLC would be treated as undertaken directly by Investor.

(ii)    No income or loss would be recognized with respect to an Option at the time that Option was entered into.

(iii)    the Options would be treated as separate instruments.

(iv)    LLC's basis for each Option would be the amount, in US dollars, paid for the Option, including any amounts borrowed, and the basis of each Forward Currency Contract would be the amount paid for the FX Option pursuant to which it was acquired.

(v)     Fund (LMC Recovery Fund LLC) would be classified as a partnership.

(vi)    LLC would not recognize material taxable gain or any taxable loss upon the transfer of the Options to the Fund.

(vii)   The Short Options would not be considered liabilities for purposes of Code Section 752.

(viii)  LLC's tax basis in LLC's membership interest in Fund would be equal to Investor's tax basis in the FX Options and the Long Options plus the amount of cash contributed to Fund, reduced by the amount of liabilities as determined for purposes of Code Section 752 assumed by Fund and increased by Investor's share of such liabilities.

(ix)    There would be no constructive sale of Forward Foreign Currency Contract 1-A under the relevant case law or under the provisions of Code Section 1259.

(x)     The Options and the Forward Foreign Currency Contracts would not constitute section 1256 contracts.

(xi)    Any loss recognized on the termination of the Forward Foreign Currency contracts would constitute an ordinary loss under Code Section 988 and Treas. Reg. §1.988-3(a) and such loss would be treated as derived from U.S. sources.

(xii)   With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Investor in connection with the Transactions:

a. The sham transaction doctrine would not apply and, based on the representations of Investor, the Transactions would have the requisite business purpose and economic substance;

b. Based on Investor's representations, and the information available to Sidley Austin, the requisite profit motive exists to support the deduction of any loss from the Transactions under Code Section 165(c)(2);

c. The straddle rules of Code Section 1092 would not be applicable to the Forward Foreign Currency Contracts;

d. The step transaction doctrine would not apply to the Transactions;

e. The IRS would be unsuccessful were it either to assert under Treas. Reg. §1.701-2 that the Transactions are inconsistent with the intent of subchapter K or to assert that Fund should be disregarded entirely under Treas. Reg. §1.701-2 or under common law principles;

f. Any loss that Investor incurs from the Transactions would not be limited by the Code Section 465 "at risk" rules;

g. Any loss that Investor incurs from the Transactions would not be subject to the limitations under Code Section 469; and

h. Code Section 482 would not be applicable to the Transactions.

(b)     Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions would be upheld if challenged by the IRS.

(c)     Based upon the foregoing, the IRS *should not* be successful were it to assert a penalty against Investor under Code Section 6662(b)(2) or (3) for positions taken on Investor's U.S. federal income tax return with respect to the Transactions.

104.    Tellingly, the Sidley Austin opinion letters made no mention of IRS Notice 1999-59. The Sidley Austin opinion letters briefly discussed IRS Notice 2000-44 and advised Plaintiffs that "it is more likely than not that the authorities cited in Notice 2000-44 would not provide a basis for denying the deduction of a loss sustained from the Transactions." The 2000 Strategy Defendants were aware of the existence and effect of Notice 1999-59 and Notice 2000-44, but intentionally failed to fully and properly analyze and discuss the actual effect of these Notices on the 2000 Digital Options Strategy.

105.    The 2000 Strategy Defendants advised the Plaintiffs that as a result of the above-described series of steps taken by them in the 2000 Digital Options Strategy, the Plaintiffs could properly claim long-term capital losses on their tax returns for 2000.

106.    Relying on the 2000 Strategy Defendants' representations, the Plaintiffs included on their 2000 federal tax returns the premiums they paid for the options purchased, but not the premiums they received for the options sold.

### 8.     **Plaintiffs File their Tax Returns Based on Defendants' Advice**

107.    BDO Seidman prepared the 2000 federal tax return for LMC Recovery Fund LLC and provided a copy of this tax return to Plaintiffs. In reliance on the 2000 Strategy Defendants' advice, opinions, and instructions and the 2000 federal tax return

for LMC Recovery Fund LLC, Plaintiffs signed and filed their individual federal tax returns for 2000 in approximately August 2001. Based on the Defendants' advice and instructions, Plaintiffs' tax returns contained the losses purportedly generated from the 2000 Digital Options Strategy. The 2000 Strategy Defendants advised the Plaintiffs that the losses purportedly generated from the 2000 Digital Options Strategy could properly be used on Plaintiffs' tax returns. The filing of these tax returns using the 2000 Digital Options Strategy was the final step of the 2000 Digital Options Strategy.

### 9.     The 2000 Strategy Defendants Fail to Give Plaintiffs Full Disclosure

108.    At no time prior to or subsequent to their implementation of the 2000 Digital Options Strategy were the Plaintiffs informed that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the 2000 Strategy Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2000 Digital Options Strategy to the Plaintiffs. The 2000 Strategy Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary.

109.    Between the time the 2000 Strategy Defendants advised, recommended, and pressured the Plaintiffs to enter into the 2000 Digital Options Strategy and the time the Plaintiffs' respective tax returns were prepared, signed and filed, the 2000 Strategy Defendants never disclosed to Plaintiffs the significance of IRS Notices 1999-59 and 2000-44. The 2000 Strategy Defendants failed to advise Plaintiffs that the 2000 Digital Options Strategy lacked the required business purpose and economic substance and, in fact, advised Plaintiffs to the contrary. Based on information and belief, the 2000

Strategy Defendants intentionally failed to disclose this material information to the Plaintiffs.

110.    As a result of IRS Notices 1999-59 and 2000-44 (both of which were issued before Plaintiffs implemented the 2000 Digital Options Strategy, before Sidley Austin issued the opinion letters for the 2000 Digital Options Strategy, and before Plaintiffs filed their tax returns in reliance on the 2000 Strategy Defendants' representations and assurances), the 2000 Strategy Defendants knew or should have known that the IRS would contend that the purported losses arising from the 2000 Digital Options Strategy were not properly allowable for federal income tax purposes and Plaintiffs would be exposed to penalties if they executed the 2000 Digital Options Strategy. However, the 2000 Strategy Defendants intentionally failed to inform Plaintiffs of this and, indeed, informed them to the contrary.

111.    The 2000 Strategy Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the 2000 Digital Options Strategy. In addition, these Defendants failed to advise Plaintiffs to file qualified amended returns to reverse the 2000 Digital Options Strategy for their tax returns, which would have prevented the IRS from assessing penalties against Plaintiffs.

### 10.    The 2000 Strategy Defendants Fail to Advise the Plaintiffs to Enter the IRS Amnesty Program.

112.    In late 2001, the IRS offered the "Tax Amnesty Program", a voluntary disclosure program for individuals and entities who participated in tax strategies like the 2000 Digital Options Strategy. Under the Amnesty Program, taxpayers who disclosed their involvement in such strategies would avoid any liability for penalties for underpayment of taxes without conceding liability for back-taxes or interest. Each of the

2000 Strategy Defendants had knowledge of the Amnesty Program and its applicability to Plaintiffs. However, the 2000 Strategy Defendants did not advise Plaintiffs to participate in the Amnesty Program, and in fact, advised Plaintiffs not to participate in the Amnesty Program. Unfortunately, these Defendants failed to fully disclose the facts that caused serious conflicts of interest at the time of the Amnesty Program. Indeed, one of the terms of the Amnesty Program required any individual who participated in the Amnesty Program to disclose to the IRS all of the individuals and entities who were involved in any way in the marketing, sale, or implementation of the 2000 Digital Options Strategy or who received a fee. The 2000 Strategy Defendants knew that if they advised Plaintiffs to participate in the Amnesty Program, the Plaintiffs would be required to disclose the 2000 Strategy Defendants as promoters. This, no doubt, would have led to the IRS investigating the 2000 Strategy Defendants and seeking the disclosure of all of the 2000 Strategy Defendants' clients who executed a Digital Options Strategy or other similar tax strategies. In other words, the 2000 Strategy Defendants would be in the "crosshair" of the IRS.

113.    The 2000 Strategy Defendants' failure to advise the Plaintiffs to enter into the Amnesty Program has resulted in the Plaintiffs being subject to substantial penalties, which would have been waived had the Plaintiffs participated in the Amnesty Program. In connection with such advice, the 2000 Strategy Defendants again failed to fully disclose to Plaintiffs the existence and/or significance of Notices 1999-59 and 2000-44 and other important information.

## 11.    The Cost of the 2000 Digital Options Strategy

114.    The Plaintiffs lost a significant amount of money in carrying out the 2000 Digital Options Strategy. Plaintiffs paid significant fees to the 2000 Strategy Defendants and the Other Participants in connection with the 2000 Digital Options Strategy. The Plaintiffs also paid significant premiums to Lehman in connection with the purchase of the digital options.

115.    Further, the IRS has indicated it will assess Plaintiffs with back-taxes, interest, and penalties as a direct result of their participation in the 2000 Digital Options Strategy.

## D.    THE 2001 DISTRESSED DEBT STRATEGY

116.    In 2001, Plaintiffs R.K. Lowry, Jr., L-Falling Creek LLC, Russell A. Chabaud, R-Rac Wimbledon, LLC, John P. Moffitt, J-Jason, LLC, Russell Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust, R-Russell Wimbledon LLC, Russell Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust, R-Ashley Wimbledon, LLC, Russell Chabuad, Trustee of the Audrey Chabaud 1999 Investment Trust, R-Audrey Wimbledon, LLC, and LMC Recovery Fund LLC entered into tax-advantaged investment strategies involving investments in distressed debt (the "2001 Distressed Debt Strategy"). BDO Seidman, Gramercy, and Sidley Austin were the Defendants involved in the 2001 Distressed Debt Strategy (the "2001 Strategy Defendants").

## 1.    About Distressed Debt

117.    The term "distressed debt" as used herein in the context of tax strategies typically refers to debt instruments that can be purchased at a significant discount from

the face value of such debt instruments. Thus, these debt instruments have a significant "built-in" loss. Distressed debt is used as a method of shifting economic losses from a tax indifferent party to a U.S. taxpayer. This discount on the debt instruments can be attributable to a number of factors, including the prevailing economic conditions of the country in which the borrowers reside, the credit worthiness of the borrowers, and the lack of suitable collection efforts.

## 2.   **The Distressed Debt Strategy**

118.   The Distressed Debt Strategy was a tax-advantaged investment strategy designed to provide tax benefits through investments in a distressed debt fund. In a typical distressed debt strategy, a foreign party contributes a high-basis, low-value asset(s) to a partnership. The partnership then contributes the asset(s) to another partnership. The foreign party then sells its interest in the upper-tier partnership to a U.S. taxpayer. The lower-tier partnership then sells the high-basis, low-value asset for a significant loss to a third party. The U.S. taxpayer ultimately claims the significant tax loss that has passed through the partnership to offset other income or gain.

119.   The 2001 Strategy Defendants, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with Plaintiffs' execution of the 2001 Distressed Debt Strategy pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs. Further, the 2001 Strategy Defendants made various false statements of material fact and omitted to state material facts that made the statements misleading to Plaintiffs. The purpose and effect of the

2001 Strategy Defendants' plan, transaction, and course of conduct was to generate fees by promoting an alleged tax-savings strategy.

120.     The 2001 Strategy Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and/or disclose the true facts, even though such facts were available to them.

121.     As a result of and in reliance on these misrepresentations and/or omissions, the Plaintiffs engaged in the 2001 Distressed Debt Strategy. Had Plaintiffs known of the material adverse information that the 2001 Strategy Defendants did not disclose, they would not have entered into the 2001 Distressed Debt Strategy. Without doubt, the 2001 Strategy Defendants intended to deceive the Plaintiffs.

122.     Just as with the 2000 Digital Options Strategy, the fee to each of the 2001 Strategy Defendants from the 2001 Distressed Debt Strategy was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction. The bigger the deal, the larger the fee shared by the 2001 Strategy Defendants and the Other Participants.

### 3.   The Features of the 2001 Distressed Debt Strategy

123.     The features of the 2001 Distressed Debt Strategy, as outlined by the 2001 Strategy Defendants, were as follows:

      a.     First, an entity(ies) organized and existing under the laws of a foreign country contributes high-basis, low-value assets (distressed debt) to a newly created LLC ("LLC") (taxed as a partnership);

      b.     Second, the LLC contributes the distressed debt to another newly formed LLC (the "Fund"). At the time of the contribution, Plaintiffs are already members of the Fund;

c.    Third, Plaintiffs purchase additional interests in the Fund from the LLC;

d.    Fourth, additional entities organized and existing under the laws of foreign countries contribute distressed debt to the Fund;

e.    Fifth, Plaintiffs purchase additional interests in the Fund from the foreign entities;

f.    Sixth, the Fund sells the distressed debt at fair-market value and Plaintiffs claim a loss based on the difference between the face value of the distressed debt and the amount received upon the sale of the distressed debt.

4.    **Plaintiffs Engage in the 2001 Distressed Debt Strategy**

124.    Pursuant to the 2001 Strategy Defendants' instructions and advice, Plaintiffs formed LMC Recovery Fund LLC ("Fund") in December 2000. In April 2001 and July 2001, Plaintiffs made certain capital contributions to the Fund.

125.    On November 10, 2000, Globex Utilidades S.A. ("Globex"), a company organized and existing under the laws of Brazil, contributed certain distressed debt assets to Gramercy Local Markets Recovery Fund, LLC ("LLC"). On June 1, 2001, LLC contributed the distressed debt instruments to the Fund for a membership interest therein.

126.    On or about August 1, 2001, Plaintiffs purchased additional interests in the Fund from LLC.

127.    On August 1, 2001, Lojas Americanas S.A. ("Lojas"), a company organized under the laws of Brazil, contributed certain distressed debt assets to the Fund in exchange for a membership interest therein. On October 1, 2001, Plaintiffs purchased additional interests in the Fund from Lojas.

PLAINTIFFS' SECOND AMENDED PETITION

128.   On October 1, 2001, BANK DSK AD (BANK DSK), a bank organized and existing under the laws of Bulgaria, contributed certain distressed debt assets to the Fund.

129.   On October 31, 2001, Plaintiffs purchased additional interests in the Fund from BANK DSK.

130.   On December 26, 2001, the Fund sold a portion of the distressed debt instruments.

## 5.   The Sidley Austin Opinion Letters for the 2001 Distressed Debt Strategy

131.   On or about April 15, 2002, Sidley Austin issued opinion letters to R.K. Lowry, Jr. and L-Falling Creek LLC, Russell A. Chabaud and R-Rac Wimbledon, LLC, John P. Moffitt and J-Jason, LLC, Russell Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust and R-Russell Wimbledon LLC, Russell Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust and R-Ashley Wimbledon, LLC, and Russell Chabuad, Trustee of the Audrey Chabaud 1999 Investment Trust and R-Audrey Wimbledon, LLC regarding the propriety of the 2001 Distressed Debt Strategy.

132.   The opinion letters were authored and prepared based, in part, on representations made by the 2001 Strategy Defendants.  The opinion letter advised the Plaintiffs, among other things, that:

(a)   For U.S. federal income tax purposes it is more likely than not that:

(i)   Plaintiffs' LLCs and or Trusts would be disregarded as separate entities from the individual Plaintiffs.

(ii)   Fund ("LMC Recovery Fund") would be classified as a partnership, and Investor ("Plaintiffs") the other members of Fund,

PLAINTIFFS' SECOND AMENDED PETITION

including each Contributor ("Gramercy Local Markets Recovery Fund, Lojas, and BANK DSK"), would be considered partners of Fund.

(iii)    Investor's initial basis in Investor's membership interest in Fund would be equal to Investor's purchase price for the interests acquired from each Contributor plus the amount of money contributed by Investor to Fund.

(iv)    Each Contributor would recognize taxable gain, if any, but not a taxable loss upon the assignment of the Notes ("distressed debt") by each Contributor to Fund.

(v)    Fund would have a tax basis in each Contributor's Notes equal to that same tax basis in the hands of the Contributor immediately prior to their contribution to the Fund plus any gain recognized under Code section 721(b) with respect to that contribution.

(vi)    Fund would recognize a loss on the disposition of Notes 1, Notes 2, Notes 3 and Notes 4, equal to the difference between its tax basis in each of the Notes and the amount of cash received from the disposition of the Notes.  Approximately 92.781% of the loss from Notes 1 and 2, 49.407% of the loss from Notes 3 and 99.671% of the loss from Notes 4 would be treated as an ordinary loss arising from a "section 988 transaction," the remainder of such losses would be capital in nature.

(vii)    Under Code Section 704(c), 29.7% of the loss described in item (vi), above, on the sale of Notes 1 and 2, 29.69% of the loss on the sale of Notes 3, and 29.71% of the loss on the sale of Notes 4 would be allocated by the Fund to the Investor as an acquirer and holder of a portion of the membership interests of Contributor 1 ("Gramercy Local Markets Recovery Fund"), Contributor 2 ("Lojas") and Contributor 3 ("BANK DSK") for the year in which the disposition occurs.

(viii)    With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Investor in connection with the Transactions:

    a.    The sham transaction doctrine would not apply and, based on the representations of Investor, the Transactions would have the requisite business purpose and economic substance;

    b.    Although the matter cannot be entirely free from doubt because of the factual nature of the inquiry, on balance,

the requisite profit motive exists to support the deduction of any loss from the Transactions under Code Section 165(c)(2);

c.     The step transaction doctrine would not apply to the Transactions;

d.     The Investor would have sufficient tax basis in its membership interest in the Fund in order to pass through and deduct any allocation of loss described above, and Code Section 704 would not limit this deduction.

e.     The IRS would be unsuccessful were it either to assert under Treas. Reg. §1.701-2 that the Transactions are inconsistent with the intent of subchapter K or to assert that Fund should be disregarded entirely under Treas. Reg. §1.701-2 or under common law principles;

f.     Any loss that Investor incurs from the Transaction would not be limited by the Code Section 465 "at risk" rules;

g.     Any loss that Investor incurs from the Transactions would not be subject to the limitations under Code Section 469;

h.     Code Section 446 would not apply to require an allocation of loss inconsistent with Code Section 704; and

i.     Code Section 482 would not be applicable to the Transactions.

(b)     Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions would be upheld if challenged by the IRS.

(c)     Based upon the foregoing, the IRS *should not* be successful were it to assert a penalty against Investor under Code Section 6662(b)(2) or (3) for positions taken on Investor's U.S. federal income tax return with respect to the Transactions.

(d)     It is more likely than not that the Transactions would not constitute a tax shelter within the meaning of Code Section 6111(c)(1) and,

PLAINTIFFS' SECOND AMENDED PETITION

therefore, would not be required to be registered under Code Section 6111(a).

133.    The 2001 Strategy Defendants were aware of the existence and effect of the applicable portions of the Internal Revenue Code, established case law, common law doctrines, IRS notices, regulations, and IRS authorities that indicated the 2001 Distressed Debt Strategy was not a valid and legal transaction, but intentionally failed to fully analyze and discuss the effect of these authorities on the 2001 Distressed Debt Strategy with Plaintiffs.

134.    The 2001 Strategy Defendants advised the Plaintiffs that as a result of the above-described series of steps taken by Plaintiffs in the 2001 Distressed Debt Strategy, the Plaintiffs could properly claim losses on their tax returns for 2001.

135.    Relying on the 2001 Strategy Defendants' representations, Plaintiffs included the losses generated by the 2001 Distressed Debt Strategy on their federal tax returns for 2001.

### 6.    Plaintiffs File Tax Returns Based on the 2001 Strategy Defendants' Advice and Instructions

136.    BDO Seidman prepared the 2001 federal tax return for LMC Recovery Fund LLC and provided a copy of this tax return to Plaintiffs. In reliance on the 2001 Strategy Defendants' advice, opinions, and instructions and the 2001 federal tax return for LMC Recovery Fund LLC, the Plaintiffs signed and filed their federal tax returns for the year 2001 in approximately October 2002. The filing of these tax returns was the final step of the 2001 Distressed Debt Strategy.

### 7.    Defendants Fail to Give Plaintiffs Full Disclosure

137.    At no time prior to or subsequent to Plaintiffs' implementation of the 2001 Distressed Debt Strategy did the 2001 Strategy Defendants inform the Plaintiffs that the

IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the 2001 Strategy Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2001 Distressed Debt Strategy to the Plaintiffs. At this time, it was clear to the 2001 Strategy Defendants that the IRS would conclude that the 2001 Distressed Debt Strategy was an illegal and abusive tax shelter and violated, among other things, the partnership anti-abuse rules under Treas. Reg. § 1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the economic substance doctrine, and the business purpose doctrine, as well as numerous other established authorities. The 2001 Strategy Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary to Plaintiffs' detriment.

138.   Between the time the 2001 Strategy Defendants advised, recommended, and instructed the Plaintiffs to enter into the 2001 Distressed Debt Strategy and the time the Plaintiffs' tax returns were prepared, signed and filed, the 2001 Strategy Defendants never fully and properly disclosed to Plaintiffs the significance and existence of the controlling case law, common law doctrines, portions of the Internal Revenue Code, IRS notice, regulations, and other applicable authorities that clearly indicated that the IRS would conclude that the 2001 Distressed Debt Strategy was an illegal and abusive tax shelter. The 2001 Strategy Defendants failed to advise Plaintiffs that the IRS would conclude that the 2001 Distressed Debt Strategy lacked the required business purpose and economic substance and, in fact, advised Plaintiffs to the contrary to Plaintiffs' detriment. Based on information and belief, the 2001 Strategy Defendants intentionally failed to disclose this material information to the Plaintiffs.

139.   The 2001 Strategy Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the 2001 Distressed Debt Strategy.

### 8.   The Cost of the 2001 Distressed Debt Strategy

140.   The Plaintiffs lost a significant amount of money in carrying out the 2001 Distressed Debt Strategy.  Plaintiffs paid significant fees to the 2001 Strategy Defendants in connection the 2001 Distressed Debt Strategy.

141.   Further, the IRS has indicated it will assess Plaintiffs with substantial back-taxes, interest, and penalties as a direct result of their participation in the 2001 Distressed Debt Strategy.

### E.   THE 2002 DISTRESSED DEBT STRATEGY

142.   In 2002, Plaintiffs R.K. Lowry, Jr., L-Falling Creek LLC, Russell A. Chabaud, R-Rac Wimbledon, LLC, John P. Moffitt, J-Jason, LLC, Russell Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust, R-Russell Wimbledon LLC, Russell Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust, R-Ashley Wimbledon, LLC, Russell Chabuad, Trustee of the Audrey Chabaud 1999 Investment Trust, R-Audrey Wimbledon, LLC, and LMC Recovery Fund LLC entered into tax strategies involving investments in distressed debt (the "2002 Distressed Debt Strategy"). BDO Seidman, Gramercy, DeCastro West, and Financial Strategy were the Defendants involved in the 2002 Distressed Debt Strategy (the "2002 Strategy Defendants").

143.   The 2002 Strategy Defendants, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with Plaintiffs' execution of the 2002 Distressed Debt Strategy pursuant to

which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs. Further, the 2002 Strategy Defendants made various false statements of material fact and omitted to state material facts that made the statements misleading to Plaintiffs. The purpose and effect of the 2002 Strategy Defendants' plan, transaction, and course of conduct was to generate fees by promoting an alleged tax-savings strategy.

144.    The 2002 Strategy Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and/or disclose the true facts, even though such facts were available to them.

145.    As a result of and in reliance on these misrepresentations and/or omissions, the Plaintiffs engaged in the 2002 Distressed Debt Strategy. Had Plaintiffs known of the material adverse information that the 2002 Strategy Defendants did not disclose, they would not have entered into the 2002 Distressed Debt Strategy. Without doubt, the 2002 Strategy Defendants intended to deceive the Plaintiffs.

146.    Just as with the 2000 Digital Options Strategy and the 2001 Distressed Debt Strategy, the fee to each of the 2002 Strategy Defendants from the 2002 Distressed Debt Strategy was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction. The bigger the deal, the larger the fee shared by the 2002 Strategy Defendants.

1.    **The Features of the 2002 Distressed Debt Strategy**

147.    The features of the 2002 Distressed Debt Strategy, as outlined by the 2002 Strategy Defendants, were identical to the features of the 2001 Distressed Debt Strategy

(as discussed above). In fact, the 2002 Distressed Debt Strategy was merely a continuation of the 2001 Distressed Debt Strategy in that the LMC Recovery Fund LLC (Fund) simply sold additional portions of the distressed debt (which was purchased in 2001 as discussed above) thereby creating a purported loss for Plaintiffs in 2002.

### 2. Plaintiffs Engage in the 2002 Distressed Debt Strategy

148. As discussed above, the Fund acquired certain distressed debt assets in 2001, and Plaintiffs purchased additional interests in the Fund from Gramercy Local Markets Recovery Fund, Lojas, and BANK DSK in 2001. On December 26, 2002, the Fund sold additional portions of the distressed debt assets (which were acquired from Lojas in 2001 as discussed above).

### 3. The De Castro West Opinion Letter for the 2002 Distressed Debt Strategy

149. On April 22, 2003, De Castro West issued opinion letters to R.K. Lowry, Jr. and L-Falling Creek LLC, Russell A. Chabaud and R-Rac Wimbledon, LLC, John P. Moffitt and J-Jason, LLC, Russell Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust and R-Russell Wimbledon LLC, Russell Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust and R-Ashley Wimbledon, LLC, and Russell Chabuad, Trustee of the Audrey Chabaud 1999 Investment Trust and R-Audrey Wimbledon, LLC regarding the propriety of the 2002 Distressed Debt Strategy. Defendants represented to Plaintiffs that DeCastro West was an "independent" law firm and, therefore, the legal opinions would be "independent" legal opinions.

150. The DeCastro West opinion letter was authored and prepared based, in part, on representations made by the 2002 Strategy Defendants. The DeCastro West

opinion letter advised the Plaintiffs that, among other things, it was more likely than not that:

A.   The Fund (LMC Recovery Fund) will be classified as a partnership, and Investor (Plaintiffs) and each Contributor (Gramercy Local Markets Recovery Fund, Lojas, and BANK DSK) will be treated as a partner of the Fund.

B.   The Fund's tax basis in the 2002 Notes was equal to Contributor 2's (Lojas) tax basis in the 2002 Notes immediately before their contribution to the Fund, increased by any gain recognized by Contributor 2 on the contribution.

C.   The Fund recognized a loss on the disposition of the 2002 Notes equal to the difference between the Fund's tax basis in the 2002 Notes immediately prior to the disposition and the proceeds of the sale of the 2002 Notes.

D.   Under Section 724 of the Code, 100% of the loss allocated to Investor from disposition of the 2002 Notes would be ordinary.  Alternatively, under Section 988, 59.2% of such loss is ordinary and 40.8% of such loss is capital.

E.   Under Section 704(c), 2.96% of the loss from disposition of the 2002 Notes is properly allocable by the Fund to Investor as transferee and holder of a portion of the interest in the Fund of Contributor 2 for the year in which the disposition occurred.

F.   Investor's tax basis in its membership interest in the Fund prior to the allocation of any income or loss to Investor from the Fund's activities in

2002 is equal to Investor's tax basis in the Fund as of December 31, 2001, increased by any additional capital contributions made (or deemed made) by Investor to the Fund in 2002 or liabilities, if any, assumed by the Fund in 2002. Based on the SABW Opinion concerning Investor's tax basis in its membership interest in the Fund as of December 31, 2000, and the adjustments to such basis resulting from transactions that occurred in 2001 and 2002, Investor should have sufficient tax basis in its membership interest in the Fund as of December 31, 2002, to deduct the loss allocated by the Fund to Investor from the Fund's disposition of the 2002 Notes.

G.      With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Investor in connection with the Investment Transactions:

1.      The step transaction doctrine would not apply to the Investment Transactions;

2.      The requisite profit motive exists to support Investor's deduction of any loss from the Investment Transactions under Section 165(c)(2);

3.      The sham transaction doctrine would not apply and the Investment Transactions would have the requisite business purpose and economic substance;

4.      The IRS would be unsuccessful if it asserts that the Fund should be disregarded;

5.  The IRS would be unsuccessful if it asserts under Treasury Regulations Section 1.701-2 that the Investment Transactions are inconsistent with the intent of Subchapter K;

6.  Any loss that Investor incurs from the Investment Transactions would not be subject to the limitations under Section 469;

7.  Any loss that Investor incurs from the Investment Transactions would not be limited by the Section 465 "at risk" rules; and

8.  Section 482 would not be applicable to the Investment Transactions.

H.  Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Investment Transactions as described herein would be upheld if challenged by the IRS.

I.  Investor *would not* be subject to accuracy-related penalties as a result of reporting the income tax consequences of the Investment Transactions in a manner consistent with this opinion.

151.  Unbeknownst to Plaintiffs, in accordance with their pre-planned scheme, the 2002 Strategy Defendants were aware of the existence and effect of the applicable portions of the Internal Revenue Code, established case law, common law doctrines, IRS notices, regulations, and IRS authorities that indicated the IRS would conclude that the 2002 Distressed Debt Strategy was not a valid and legal transaction, but intentionally failed to fully analyze and discuss the effect of these authorities on the 2002 Distressed Debt Strategy with Plaintiffs.

152.   The 2002 Strategy Defendants advised the Plaintiffs that as a result of the above-described features of the 2002 Distressed Debt Strategy, the Plaintiffs could properly claim losses on their tax returns for 2002.

153.   Relying on the 2002 Strategy Defendants' representations, Plaintiffs included the losses generated by the 2002 Distressed Debt Strategy on their federal tax returns for 2002.

### 4.   Plaintiffs File Tax Returns Based on the 2002 Strategy Defendants' Advice and Instructions

154.   Financial Strategy prepared the 2002 federal tax return for LMC Recovery Fund LLC and provided a copy of this tax return to Plaintiffs.  In reliance on the 2002 Strategy Defendants' advice, opinions, and instructions and the 2002 federal tax return for LMC Recovery Fund LLC, the Plaintiffs signed and filed their federal tax returns for the year 2002 in approximately October 2003.  The filing of these tax returns was the final step of the 2002 Distressed Debt Strategy.

### 5.   Defendants Fail to Give Plaintiffs Full Disclosure

155.   At no time prior to or subsequent to Plaintiffs' implementation of the 2002 Distressed Debt Strategy did the 2002 Strategy Defendants inform the Plaintiffs that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the 2002 Strategy Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2002 Distressed Debt Strategy to the Plaintiffs.  At this time, it was clear to the 2002 Strategy Defendants that the IRS would conclude that the 2002 Distressed Debt Strategy was an illegal and abusive tax shelter and violated, among other things, the partnership anti-abuse rules under Treas. Reg. § 1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the

**PLAINTIFFS' SECOND AMENDED PETITION**

economic substance doctrine, and the business purpose doctrine, as well as numerous other established authorities. The 2002 Strategy Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary to Plaintiffs' detriment.

156.   Between the time the 2002 Strategy Defendants advised, recommended, and instructed the Plaintiffs to enter into the 2002 Distressed Debt Strategy and the time the Plaintiffs' tax returns were prepared, signed and filed, the 2002 Strategy Defendants never fully and properly disclosed to Plaintiffs the significance and existence of the case law, common law doctrines, applicable portions of the Internal Revenue Code, IRS notice, regulations and other applicable authorities that clearly indicated that the IRS would conclude that the 2002 Distressed Debt Strategy was an illegal and abusive tax shelter. The 2002 Strategy Defendants failed to advise Plaintiffs that the IRS would conclude that the 2002 Distressed Debt Strategy lacked the required business purpose and economic substance and, in fact, advised Plaintiffs to the contrary to Plaintiffs' detriment. Based on information and belief, the 2002 Strategy Defendants intentionally failed to disclose this material information to the Plaintiffs.

157.   The 2002 Strategy Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the 2002 Distressed Debt Strategy.

## 6.   The Cost of the 2002 Distressed Debt Strategy

158.   The Plaintiffs lost a significant amount of money in carrying out the 2002 Distressed Debt Strategy. Plaintiffs paid significant fees to the 2002 Strategy Defendants in connection the 2002 Distressed Debt Strategy.

159.   Further, the IRS has indicated it will assess Plaintiffs with substantial back-taxes, interest, and penalties as a direct result of their participation in the 2002 Distressed Debt Strategy.

## F.    THE 2003 DISTRESSED DEBT STRATEGY

160.   In 2003, Plaintiffs R.K. Lowry, Jr., L-Falling Creek LLC, Russell A. Chabaud, R-Rac Wimbledon, LLC, John P. Moffitt, J-Jason, LLC, Russell Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust, R-Russell Wimbledon LLC, Russell Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust, R-Ashley Wimbledon, LLC, Russell Chabuad, Trustee of the Audrey Chabaud 1999 Investment Trust, R-Audrey Wimbledon, LLC, and LMC Recovery Fund LLC entered into tax strategies involving investments in distressed debt (the "2003 Distressed Debt Strategy"). BDO Seidman, Gramercy, DeCastro West, and Financial Strategy were the Defendants involved in the 2003 Distressed Debt Strategy (the "2003 Strategy Defendants").

161.   The 2003 Strategy Defendants, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the Plaintiffs' execution of the 2003 Distressed Debt Strategy pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs. Further, the 2003 Strategy Defendants made numerous false statements of material fact and omitted to state material facts that made the statements misleading to Plaintiffs. The purpose and effect of the 2003 Strategy Defendants' plan, transaction, and course of conduct was to generate fees by promoting an alleged completely legal investment/tax-savings strategy.

162.    The 2003 Strategy Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and/or disclose the true facts, even though such facts were available to them.

163.    As a result of and in reliance on these misrepresentations and/or omissions, the Plaintiffs engaged in the 2003 Distressed Debt Strategy.  Had Plaintiffs known of the material adverse information that the 2003 Strategy Defendants did not disclose, they would not have entered into the 2003 Distressed Debt Strategy.  Without doubt, the 2003 Strategy Defendants intended to deceive the Plaintiffs.

164.    Just as with the 2000 Digital Options Strategy, the 2001 Distressed Debt Strategy, and the 2002 Distressed Debt Strategy, the fee to each of the 2003 Strategy Defendants from the 2003 Distressed Debt Strategy was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction.    The bigger the deal, the larger the fee shared by the 2003 Strategy Defendants and Other Participants.

## 1.    The Features of the 2003 Distressed Debt Strategy

165.    The features of the 2003 Distressed Debt Strategy, as outlined by the 2003 Strategy Defendants, were identical to the steps of the 2001 Distressed Debt Strategy and the 2002 Distressed Debt Strategy (as discussed above).  In fact, the 2003 Distressed Debt Strategy was, in part, a continuation of the 2001 Distressed Debt Strategy and the 2002 Distressed Debt Strategy.

2. <u>Plaintiffs Engage in the 2003 Distressed Debt Strategy</u>

166.     As discussed above, LMC Recovery Fund LLC (Fund) acquired certain distressed debt interests in 2001, and Plaintiffs purchased additional interests in the Fund from Gramercy Local Markets Recovery Fund, Lojas, and BANK DSK in 2001. In 2001 and 2002, the Fund sold portions of the distressed debt instruments.

167.     On June 1, 2002, Lojas Arapuã S.A. ("Arapuã"), a company organized and existing under the laws of Brazil, contributed certain distressed debt instruments to MPATRN LLC, a limited liability company formed in the State of Delaware.

168.     On November 1, 2002, MPATRN contributed the distressed debt instruments to the Fund in exchange for a membership interest therein.

169.     On February 28, 2003, Plaintiffs purchased additional interests in the Fund from MPATRN.

170.     On December 26, 2003, the Fund sold portions of the distressed debt acquired from Gramercy Local Markets Recovery Fund and Lojas (which were acquired in 2001 as discussed above). Additionally, the Fund sold portions of the newly acquired distressed debt from MPATRN.

3. <u>The De Castro West Opinion Letters for the 2003 Distressed Debt Strategy</u>

171.     On January 29, 2004, De Castro West issued opinion letters to R.K. Lowry, Jr. and L-Falling Creek LLC, Russell A. Chabaud and R-Rac Wimbledon, LLC, John P. Moffitt and J-Jason, LLC, Russell Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust and R-Russell Wimbledon LLC, Russell Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust and R-Ashley Wimbledon, LLC, and Russell Chabaud, Trustee of the Audrey Chabaud 1999 Investment Trust and R-Audrey

Wimbledon, LLC regarding the propriety of the 2003 Distressed Debt Strategy. Defendants advised Plaintiffs that DeCastro West was an "independent" law firm and, therefore, the legal opinions would be "independent" legal opinions.

172.    The DeCastro West opinion letters were authored and prepared based, in part, on representations made by the 2003 Strategy Defendants. The DeCastro West opinion letters advised the Plaintiffs that, among other things, it was more likely than not that:

A.    The Fund (LMC Recovery Fund) will be classified as a partnership, and Investor (Plaintiffs) and each Contributor (Gramercy Local Markets Recovery Fund, Lojas, BANK DSK, and MPATRN) will be treated as a partner of the Fund.

B.    The Fund's tax basis in the 2003 Notes was equal to Contributor 1's (Gramercy Local Market Recovery Fund) and Contributor 4's (MPATRN) respective tax basis in the 2003 Notes immediately before their contribution to the Fund, increased by any gain recognized by such Contributors on the contribution.

C.    The Fund recognized a loss on the disposition of the 2003 Notes equal to the difference between the Fund's tax basis in the 2003 Notes immediately prior to the disposition and the proceeds of the sale of the 2003 Notes.

D.    Under Section 724 of the Code, 100% of the loss realized by the Fund on its disposition of the 2003 Notes is ordinary. Alternatively, under Section 988, (i) 92.7% of the loss realized by the Fund on its disposition of the portion of Notes 1 and 2 (acquired from Gramercy Local Markets

Recovery Fund and Lojas, respectively) included in the 2003 Notes is ordinary and 7.3% of such loss is capital, and (ii) 65.9% of the loss realized by the Fund on its disposition of the portion of Notes 5 (acquired from MPATRN) included in the 2003 Notes is ordinary and 34.1% of such loss is capital.

E.   Under Section 704(c), (i) 30.6% of the loss from disposition of the portion of Notes 1 and 2 included in the 2003 Notes is properly allocable by the Fund to Investor as transferee and holder of a portion of the interest in the Fund of Contributor 1 for the year in which the disposition occurred, and (ii) 30.6071% of the loss from the disposition of the portion of Notes 5 included in the 2003 Notes is properly allocable by the Fund to Investor as transferee and holder of a portion of the interest in the Fund of Contributor 4 for the year in which the disposition occurred.

F.   Investor's tax basis in its membership interest in the Fund prior to the allocation of any income or loss to Investor from the Fund's activities in 2003 is equal to Investor's tax basis in the Fund as of December 31, 2002, increased by the purchase price paid by Investor to acquire the additional interest in the Fund in 2003 and by any additional capital contributions made (or deemed made) by Investor to the Fund in 2003 and reduced by the amounts distributed by the Fund to Investor in 2003 or liabilities, in any, assumed by the Fund in 2003.  Based on the SABW Opinion concerning Investor's tax basis in its membership interest in the Fund as of December 31, 2000, and the adjustments to such basis resulting from

transactions that occurred in 2001, 2002 and 2003, Investor should have sufficient tax basis in its membership interest in the Fund as of December 31, 2003, to deduct the loss allocated by the Fund to Investor from the Fund's disposition of the 2003 Notes.

G.   With respect to the application of certain loss limitations rules potentially affecting the deductibility of any loss claimed by Investor in connection with the Transactions:

1.   The step transaction doctrine would not apply to the Transactions;

2.   The requisite profit motive exists to support Investor's deduction of any loss from the Transactions under Section 165(c)(2);

3.   The sham transaction doctrine would not apply and the Transactions would have the requisite business purpose and economic substance;

4.   The IRS would be unsuccessful if it asserts that the Fund should be disregarded;

5.   The IRS would be unsuccessful if it asserts under Treasury Regulations Section 1.701-2 that the Transactions are inconsistent with the intent of Subchapter K;

6.   Any loss that Investor incurs from the Transactions would not be subject to the limitations under Section 469;

7.   Any loss that Investor incurs from the Transactions would not be limited by the Section 465 "at risk" rules; and

8.   Section 482 would not be applicable to the Transactions.

H.      Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions as described herein would be upheld if challenged by the IRS.

I.      Investor *would not* be subject to accuracy-related penalties as a result of reporting the income tax consequences of the Transactions in a manner consistent with this opinion.

173.    De Castro West also issued an opinion letter to LMC Recovery Fund, LLC on January 29, 2004, regarding the tax basis of the contributed assets. According to this opinion letter, the tax basis of the distressed debt in the hands of Gramercy Local Markets Recovery Fund, Lojas, BANK DSK, and MPATRN was equal to the "face value" of the distressed debt. This opinion letter also concluded that the tax basis of the distressed debt in the hands of LMC Recovery Fund was equal to the "face value" of the distressed debt.

174.    Unbeknownst to Plaintiffs, in accordance with their pre-planned scheme, the 2003 Strategy Defendants were aware of the existence and effect of the applicable portions of the Internal Revenue Code, established case law, common law doctrines, IRS notices, regulations, and IRS authorities that indicated that the IRS would conclude that the 2003 Distressed Debt Strategy was not a valid and legal transaction, but intentionally failed to fully analyze and discuss the effect of these authorities on the 2003 Distressed Debt Strategy with Plaintiffs.

175.    The 2003 Strategy Defendants advised the Plaintiffs that as a result of the above-described features of the 2003 Distressed Debt Strategy, the Plaintiffs could properly claim losses on their tax returns for 2003.

176.   Relying on the 2003 Strategy Defendants' representations, Plaintiffs included the losses generated by the 2003 Distressed Debt Strategy on their federal tax returns for 2003.

### 4.   Plaintiffs File Tax Returns Based on the 2003 Strategy Defendants' Advice and Instructions

177.   Financial Strategy prepared the 2003 federal tax return for LMC Recovery Fund LLC and provided a copy of this tax return to Plaintiffs.  In reliance on the 2003 Strategy Defendants' advice, opinions, and instructions and the 2003 federal tax return for LMC Recovery Fund LLC, the Plaintiffs signed and filed their federal tax returns for the year 2003 in approximately October 2004.  The filing of these tax returns was the final step of the 2003 Distressed Debt Strategy.

### 5.   Defendants Fail to Give Plaintiffs Full Disclosure

178.   At no time prior to or subsequent to Plaintiffs' implementation of the 2003 Distressed Debt Strategy did the 2003 Strategy Defendants inform the Plaintiffs that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the 2003 Strategy Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2003 Distressed Debt Strategy to the Plaintiffs.  At this time, it was clear to the 2003 Strategy Defendants that the IRS would conclude that the 2003 Distressed Debt Strategy was an illegal and abusive tax shelter and violated, among other things, the partnership anti-abuse rules under Treas. Reg. § 1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the economic substance doctrine, and the business purpose doctrine, as well as numerous other established authorities.  The 2003 Strategy Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary to Plaintiffs' detriment.

179.    Between the time the 2003 Strategy Defendants advised, recommended, and instructed the Plaintiffs to enter into the 2003 Distressed Debt Strategy and the time the Plaintiffs' tax returns were prepared, signed and filed, the 2003 Strategy Defendants never fully and properly disclosed to Plaintiffs the significance and existence of the controlling case law, common law doctrines, portions of the Internal Revenue Code, IRS notice, regulations and other applicable authorities that clearly indicated that the IRS would conclude that the 2003 Distressed Debt Strategy was an illegal and abusive tax shelter.  The 2003 Strategy Defendants failed to advise Plaintiffs that the IRS would conclude that the 2003 Distressed Debt Strategy lacked the required business purpose and economic substance and, in fact, advised Plaintiffs to the contrary to Plaintiffs' detriment. Based on information and belief, the 2003 Strategy Defendants intentionally failed to disclose this material information to the Plaintiffs.

180.    The 2003 Strategy Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the 2003 Distressed Debt Strategy.

### 6.    The Cost of the 2003 Distressed Debt Strategy

181.    The Plaintiffs lost a significant amount of money in carrying out the 2003 Distressed Debt Strategy.  Plaintiffs paid significant fees to the 2003 Strategy Defendants in connection with the 2003 Distressed Debt Strategy.

182.    Further, the IRS has indicated it will assess Plaintiffs with substantial back-taxes, interest, and penalties as a direct result of their participation in the 2003 Distressed Debt Strategy.

## G.   THE 2004 DISTRESSED DEBT STRATEGY

183.   In 2004, Plaintiffs R.K. Lowry, Jr., L-Falling Creek LLC, Rana Holdings, LLC, Russell A. Chabaud, R-Rac Wimbledon, LLC, Westy I, LLC, John P. Moffitt, J-Jason, LLC, MOGI, LLC, Russell Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust, R-Russell Wimbledon LLC, Russell Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust, R-Ashley Wimbledon, LLC, Russell Chabuad, Trustee of the Audrey Chabaud 1999 Investment Trust, R-Audrey Wimbledon, LLC, and LMC Recovery Fund LLC entered into tax strategies involving investments in distressed debt (the "2004 Distressed Debt Strategy").  BDO Seidman, Gramercy, and DeCastro West were the Defendants involved in the 2004 Distressed Debt Strategy (the "2004 Strategy Defendants").

### 1.   Defendants "Pitch" the 2004 Distressed Debt Strategy to Plaintiffs

184.   In 2003, Plaintiffs anticipated the sale of certain oil and gas properties and expected to receive significant proceeds from the sale of these properties.  Plaintiffs informed BDO and Gramercy of the anticipated sale, and BDO and Gramercy instructed and advised Plaintiffs to enter into another Distressed Debt Strategy.  In reliance on BDO and Gramercy's representations and assurances, Plaintiffs again entered into consulting agreements with BDO and invested additional funds with Gramercy.  Plaintiffs also entered into investment management agreements with Gramercy with respect to the money that Plaintiffs invested with Gramercy that was unrelated to the Investment Strategies.

185.   The 2004 Strategy Defendants, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein

## 2.   The Features of the 2004 Distressed Debt Strategy

189.   The features of the 2004 Distressed Debt Strategy, as outlined by the 2004 Strategy Defendants, were as follows:

> a.   First, an entity organized and existing under the laws of a foreign country contributed high-basis, low-value assets (distressed debt) to a newly created LLC (LLC 1) (taxed as a partnership);
>
> b.   Second, LLC 1 contributes the distressed debt to another newly formed LLC (LLC 2);
>
> c.   Third, Plaintiffs purchase an interest in LLC 2 from LLC 1;
>
> d.   Fourth, LLC 2 contributes the distressed debt to another newly formed LLC (LLC 3) in exchange for a membership interest therein;
>
> d.   Fifth, LLC 3 sells the distressed debt at fair-market value and Plaintiffs claim a loss based on the difference between the face value of the distressed debt and amount received upon the sale of the distressed debt.

## 3.   Plaintiffs Engage in the 2004 Distressed Debt Strategy

190.   On March 1, 2002, OAO SARATOV ENERGO ("OAO"), an entity organized and existing under the laws of Russia, contributed certain distressed debt instruments to EROSE LLC, a newly formed limited liability company, in exchange for a 100% interest therein.

191.   On March 2, 2002, Gramercy Advisors, LLC purchased an interest in EROSE.

192.   On April 2, 2003, EROSE contributed portions of the distressed debt instruments to other newly formed limited liability companies (WAINKR LLC – with respect the Chabaud Plaintiffs and the Trust Plaintiffs, DSAMP LLC – with respect to the

Lowry Plaintiffs, and STKEE LLC – with respect to the Moffitt Plaintiffs) (LLC 2), for an interest therein.

193.    On May 28, 2003, Plaintiffs purchased interests in LLC 2 (respectively) from EROSE.

194.    On May 28, 2003, LLC 2 contributed portions of the distressed debt to other newly formed limited liability companies (RDICTD LLC – with respect the Chabaud Plaintiffs and the Trust Plaintiffs, MPICS LLC – with respect to the Lowry Plaintiffs, and SGASSI LLC – with respect to the Moffitt Plaintiffs) (LLC 3).

195.    On December 22, 2004, LLC 3 sold the distressed debt assets to Gramercy Financial Services.

### 4.    The De Castro West Opinion Letter for the 2004 Distressed Debt Strategy

196.    On June 15, 2005, De Castro West issued opinion letters to R.K. Lowry, Jr. and L-Falling Creek LLC, Russell A. Chabaud and R-Rac Wimbledon, LLC, John P. Moffitt and J-Jason, LLC, Russell Chabaud, Trustee of the Russell G. Chabaud 1999 Investment Trust and R-Russell Wimbledon LLC, Russell Chabaud, Trustee of the Ashley Chabaud 1999 Investment Trust and R-Ashley Wimbledon, LLC, and Russell Chabuad, Trustee of the Audrey Chabaud 1999 Investment Trust and R-Audrey Wimbledon, LLC regarding the propriety of the 2004 Distressed Debt Strategy. Defendants represented to Plaintiffs that DeCastro West was an "independent" law firm and, therefore, the legal opinions would be "independent" legal opinions.

197.    The DeCastro West opinion letters were authored and prepared based, in part, on representations made by the 2004 Strategy Defendants. The DeCastro West

opinion letters advised the Plaintiffs that, among other things, it was more likely than not that:

A.   Contributor LLC (EROSE), LLC A (WAINKR, DSAMP, or SKTEE, respectively) and LLC AA (RDICTD, MPICS, or SGASSI, respectively) will each be classified as a partnership, and each member of Contributor LLC, LLC A and LLC AA will be treated as a partner of the partnership.

B.   LLC A's tax basis in the Notes was equal to Contributor LLC's tax basis in the Notes immediately before their contribution to LLC A, increased by any gain recognized by Contributor LLC on the contribution.

C.   Investor's (Plaintiffs) initial tax basis in Investor's membership interest in LLC A was equal to the aggregate amount paid by Investor to Contributor LLC to acquire its interest in LLC A, increased by the amount of cash and the tax basis of other assets contributed by Investor to LLC A, reduced by the amount of liabilities, if any, assumed by LLC A and increased by any gain, if any, recognized on the contribution of the assets.

D.   LLC A's initial tax basis in its membership interest in LLC AA was equal to the tax basis of the Notes contributed by LLC A to LLC AA, and LLC AA's tax basis in the Notes was equal to LLC A's tax basis in the Notes immediately before their contribution to LLC AA.

E.   LLC AA recognized a loss on the disposition of the Notes equal to the difference between LLC AA's tax basis in the Notes immediately prior to the disposition and the proceeds of the sale of the Notes.

F.      Under Section 724 of the Code, 100% of the loss realized by LLC AA on its disposition of the Notes is ordinary.  Alternately, under Section 988, 83.5% of the loss recognized by LLC AA on the disposition of the Notes is ordinary and 16.5% of the loss recognized by LLC AA on the disposition of the Notes is capital.

G.      Under Section 704(c), (i) 100% of the loss recognized by LLC AA on its disposition of the Notes is properly allocable to LLC A and (ii) 90% of the loss with respect to the Notes so allocated to LLC A is properly allocable to Investor as transferee and holder of a portion of Contributor LLC's interest in LLC A for the year in which the disposition occurred.

H.      With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Investor in connection with the Transactions:

   1.   The step transaction doctrine would not apply to the Transactions;

   2.   The requisite profit motive exists to support Investor's deduction of any loss from the Transactions under Section 165(c)(2);

   3.   The sham transaction doctrine would not apply and the Transactions would have the requisite business purpose and economic substance;

   4.   The IRS would be unsuccessful if it asserts that the LLCs should be disregarded;

5.   The IRS would be unsuccessful if it asserts under Treasury Regulations Section 1.701-2 that the Transactions are inconsistent with the intent of Subchapter K;

6.   Any loss that Investor incurs from the Transactions would not be subject to the limitations under Section 469;

7.   Any loss that Investor incurs from the Transactions would not be limited by the Section 465 "at risk" rules; and

8.   Section 482 would not be applicable to the Transactions.

I.   Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions as described herein would be upheld if challenged by the IRS.

J.   Investor *would not* be subject to accuracy-related penalties as a result of reporting the income tax consequences of the Transactions in a manner consistent with this opinion.

198.   De Castro West also issued opinion letters to WAINKR LLC, DSAMP LLC, and SKTEE LLC on June 15, 2005, regarding the tax basis of the contributed assets. According to these opinion letters, the tax basis of the distressed debt in the hands of EROSE LLC was equal to the "face value" of the distressed debt.  These opinion letters also concluded that the tax basis of the distressed debt in the hands of WAINKR LLC, DSAMP LLC, and SKTEE LLC was equal to the "face value" of the distressed debt.

199.   Unbeknownst to Plaintiffs, in accordance with their pre-planned scheme, the 2004 Strategy Defendants were aware of the existence and effect of the applicable

portions of the Internal Revenue Code, established case law, common law doctrines, IRS notices, regulations, and IRS authorities that indicated that the IRS would conclude that the 2004 Distressed Debt Strategy was not a valid and legal transaction, but intentionally failed to fully analyze and discuss the effect of these authorities on the 2004 Distressed Debt Strategy with Plaintiffs.

200.    The 2004 Strategy Defendants advised the Plaintiffs that as a result of the above-described features of the 2004 Distressed Debt Strategy, the Plaintiffs could properly claim losses on their tax returns for 2004.

201.    Relying on the 2004 Strategy Defendants' representations, Plaintiffs included the losses generated by the 2004 Distressed Debt Strategy on their federal tax returns for 2004.

### 5.    Plaintiffs File Tax Returns Based on the 2004 Strategy Defendants' Advice and Instructions

202.    BDO Seidman prepared the 2004 federal tax returns for WAINKR LLC, DSAMP LLC, and STKEE LLC.  BDO Seidman provided copies of the 2004 federal tax returns for WAINKR LLC, DSAMP LLC, and SKTEE LLC to Plaintiffs.  In reliance on the 2004 Strategy Defendants' advice, opinions, and instructions and the 2004 federal tax returns for WAINKR LLC, DSAMP LLC, and SKTEE LLC, the Plaintiffs signed and filed their federal tax returns for the year 2004 in approximately February 2006.  The filing of these tax returns was the final step of the 2004 Distressed Debt Strategy.

203.    Further, in reliance on the 2004 Strategy Defendants' advice and instructions, Plaintiffs also used losses purportedly created by the 2004 Distressed Debt

Strategy on their federal tax returns for 2005.[4]  Plaintiffs signed and filed their federal tax returns for 2005 in approximately October 2006.

6. **Defendants Fail to Give Plaintiffs Full Disclosure**

204.    At no time prior to or subsequent to Plaintiffs' implementation of the 2004 Distressed Debt Strategy did the 2004 Strategy Defendants inform the Plaintiffs that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the 2004 Strategy Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2004 Distressed Debt Strategy to the Plaintiffs.  At this time, it was clear to the 2004 Strategy Defendants that the IRS would conclude that the 2004 Distressed Debt Strategy was an illegal and abusive tax shelter and violated, among other things, the partnership anti-abuse rules under Treas. Reg. § 1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the economic substance doctrine, and the business purpose doctrine, as well as numerous other established authorities.  The 2004 Strategy Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary to Plaintiffs' detriment.

205.    Between the time the 2004 Strategy Defendants advised, recommended, and instructed the Plaintiffs to enter into the 2004 Distressed Debt Strategy and the time the Plaintiffs' tax returns were prepared, signed and filed, the 2004 Strategy Defendants never fully and properly disclosed to Plaintiffs the significance and existence of the controlling case law, common law doctrines, portions of the Internal Revenue Code, IRS notice, regulations and other applicable authorities that clearly indicated that the IRS would conclude that the 2004 Distressed Debt Strategy was an illegal and abusive tax

---

[4] BDO Seidman also prepared the 2005 federal tax returns for WAINKR LLC, DSAMP LLC, and SKTEE LLC.

shelter. The 2004 Strategy Defendants failed to advise Plaintiffs that the IRS would conclude that the 2004 Distressed Debt Strategy lacked the required business purpose and economic substance and, in fact, advised Plaintiffs to the contrary to Plaintiffs' detriment. Based on information and belief, the 2004 Strategy Defendants intentionally failed to disclose this material information to the Plaintiffs.

206. The 2004 Strategy Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the 2004 Distressed Debt Strategy.

### 7.   The Cost of the 2004 Distressed Debt Strategy

207. The Plaintiffs lost a significant amount of money in carrying out the 2004 Distressed Debt Strategy. Plaintiffs paid significant fees to the 2004 Strategy Defendants in connection with the 2004 Distressed Debt Strategy.

208. Further, the IRS has indicated it will assess Plaintiffs with substantial back-taxes, interest, and penalties (with respect to Plaintiffs' 2004 and 2005 federal tax returns) as a direct result of Plaintiffs' participation in the 2004 Distressed Debt Strategy.

### H.   CONSPIRACY AMONG THE DEFENDANTS

209. Each of the Defendants and the Other Participants involved in each of the respective Investment Strategies executed by Plaintiffs conspired with one another to design, promote, sell, and implement the Investments Strategies for the purpose of receiving and splitting substantial fees (the "Defendants' Arrangement"). The receipt of those fees was the primary, if not sole, motive in the development and execution of the Investment Strategies. Further, the amount of fees earned by the Defendants and the Other Participants was not tied to or reflective of the amount of time and effort they

expended in providing tax, investment, legal or accounting services, but rather was tied to the amount of capital and/or ordinary losses each client, including Plaintiffs, would claim on their tax returns. Indeed, the Defendants and the Other Participants designed the Investment Strategies and agreed to provide a veneer of legitimacy to each other's opinions as to the lawfulness and tax consequences of the Investment Strategies by agreeing to the representations that would be made and to issue the allegedly "independent" opinions before potential clients, including Plaintiffs, were solicited. These "independent" opinions were prefabricated and canned opinions used for each and every client across the United States with basic factual information inserted depending upon the client.

210. The Defendants and the Other Participants aggressively put their scheme into action. The Defendants and the Other Participants solicited their own clients to enter into the Investment Strategies. The Defendants, directly and/or through the Other Participants, identified the Plaintiffs (and other successful individuals) as potential clients based on their knowledge of their finances. The clients became "targets". And in the end, the Plaintiffs, like so many other clients, became a "victim" of corporate greed.

211. The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' and the Other Participants' conduct; the provision of professional services to clients was merely an incidental byproduct of, not a motivating factor for, the Defendants' conduct alleged herein. Further, the Defendants' Arrangement gave each of the participating Defendants and the Other Participants a significant pecuniary interest in the advice and professional services they would render.

212.    The Defendants and the Other Participants had a financial, business and property interest in inducing the Plaintiffs, as well as other clients, to enter into the Investment Strategies, and to do so, promised, opined and assured that the Investment Strategies would provide the Plaintiffs with a reasonable opportunity to make a profit on the "investments" and at the same time legally reduce Plaintiffs' taxes.

213.    Based on information and belief, the Defendants and the Other Participants entered into the Defendants' Arrangement, whereby they agreed they would solicit each other's clients and split the fees to be charged clients that executed the Investment Strategies, including the Plaintiffs.

214.    Here, the Defendants and the Other Participants conspired to perpetrate a fraud on Plaintiffs. Each of the Defendants and the Other Participants had particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the respective Investment Strategies.[5] In addition, the Defendants and the Other Participants authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Defendants' and the Other Participants.

---

[5] Michael Kerekes and Adrian Dicker, high-level partners at BDO and members of BDO's Tax Solutions Group – the organization within BDO responsible for the design, marketing, sale and implementation of BDO's tax-reducing strategies – have admitted in their respective plea convictions that BDO was involved a conspiracy to perpetrate a fraud in connection with the design, marketing, sale, and implementation of BDO tax shelters. See Kerekes Plea Agreement at p. 2; See United States Department of Justice Release: "Former Accounting Firm Vice Chairman / Board Member Pleads Guilty to Tax Fraud Related to Tax Shelters."

## I.   RECENT PRONOUNCEMENTS REGARDING THE INVESTMENT STRATEGIES

215.   In June of 2003, the IRS formalized its position regarding the Notice 2000-44 transactions by issuing new regulations (the "Regulations") retroactive to October 18, 1999, and through Office of Chief Counsel Notice CC-2003-020 (the "OCC Notice"). According to the IRS, the Regulations invalidate the 2000 Digital Options Strategy and the OCC Notice explains the IRS' position why. For example, in the OCC Notice, the IRS stated that it is their position that:

(1)   For written options assumed by partnerships after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T of the Income Tax Regulations to reduce the outside basis in the partnership of the taxpayer from whom the written call option was assumed.

. . .

(3)   For an individual partner, the loss that a partner claims resulting from the artificial inflation of the partner's outside basis in a partnership used in a Son of Boss transaction may be disallowed under § 165(c)(2) because the partner lacked the requisite economic profit objective.

(4)   Under § 465(c)(4), taxpayers are not considered at risk for amounts invested in the economically offsetting option positions contributed to and assumed by a partnerships [sic] formed or availed of in connection with a Son of Boss transaction as such amounts are protected against loss.

216.   As was true with Notice 2000-44, although the IRS names these transactions as "Son of Boss" in reference to a name given by another promoter, the description of the transaction makes it clear that the 2000 Digital Options Strategy implemented by Plaintiffs is included.

217.    According to the IRS, the Regulations, retroactive to before the date of Plaintiffs' transactions, thus totally invalidate the 2000 Digital Options Strategy implemented by Plaintiffs.

218.    In the OCC Notice, the IRS has also indicated it will not be relying only upon the Regulations to invalidate the 2000 Digital Options Strategy, but will also be taking the position that the losses generated by such transactions may be disallowed under §§ 165(c)(2) and 465(c)(4) of the Code. In the OCC Notice, the IRS cautioned that:

> Losses claimed by individuals, other than casualty losses, are limited by § 165(c) to (1) losses incurred in a trade or business and (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business.

> The application of § 165(c) does not require a finding that the transaction lacks economic substance.

> If an individual invests in a Son of Boss transaction, any loss generated either through the disposition of the partnership interest or through the disposition of assets distributed to the individual in complete liquidation of the individual's partnership interest may be limited or denied under § 165(c)(2) because of the lack of an economic profit objective.

219.    Finally, the IRS also takes the position in the OCC Notice, again contrary to what Plaintiffs were told in the opinion letters provided by Sidley Austin, that the 2000 Digital Options Strategy may be set aside as violative of the partnership "anti-abuse" rules:

> Section 1.701-2(a), the partnership anti-abuse rule, provides in pertinent part that subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax.

> . . .

> ...Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the

present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Service can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even though the transaction may fall within the literal words of a particular statutory or regulatory provision, the Service can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K:

(1)   the purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners; (2) one or more of the purported partners of the partnership should not be treated as a partner; (3) the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income; (4) the partnership's items of income, gain, loss, deduction or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or modified.

. . .

. . . the requirement that each partnership transaction or series of related transactions be entered into with a substantial business purposes is not met . . . . Although establishment of substantial business purpose is a fact specific inquiry, the reasonably expected pre-tax profit from both the economically offsetting option positions and the investment transactions is minimal when compared to the purported reduction in tax liability achieved through the Son of Boss transaction.

In sum, the IRS has taken multiple positions in the OCC Notice, any one of which would thoroughly invalidate the 2000 Digital Options Strategy and cause disallowance of all losses created thereby.

## J.   THE IRS AUDITS PLAINTIFFS' TAX RETURNS AS A RESULT OF THE INVESTMENT STRATEGIES

220.   In early February 2004, BDO requested that Plaintiffs pay BDO Seidman the remainder of fees owed to BDO pursuant to the consulting agreements. Upon information and belief, BDO Seidman was aware that the IRS was going to audit

Plaintiffs' tax returns as a result of the Investment Strategies, and BDO wanted to receive its fees prior to Plaintiffs becoming aware of the impending audits. Plaintiffs paid BDO the remainder of the fees they owed to BDO after BDO offered a slight reduction in the outstanding amount. Just a few days later, on or about February 7, 2004, Plaintiffs each received a "Notice of Beginning of Administrative Proceeding" ("Notice of Audit") from the IRS with respect to their 2000 federal tax returns. Plaintiffs subsequently received Notices of Audit for their 2001, 2002, 2003, 2004, and 2005 tax returns as a result of the Investment Strategies. Upon receiving the audit notices, Plaintiffs contacted BDO. BDO assigned Greisman as the point person for the audits. Greisman and Shanbrom advised Plaintiffs that Plaintiffs should not worry about the audits because Plaintiffs would prevail in the IRS dispute since the Investment Strategies were completely legal and Plaintiffs had legal opinion letters that would convince the IRS of their legitimacy. For this reason, Plaintiffs continued to believe that Plaintiffs had engaged in completely legal tax-advantaged investment strategies.

221.   The IRS' audit of Plaintiffs' 2000-2005 federal tax returns is ongoing. Plaintiffs have not yet received an Auditor's Report or formal Notice of Deficiency with respect to any of their tax returns for 2000-2005. However, the IRS has indicated that it will assess Plaintiffs with substantial back-taxes, interest, and penalties with respect to Plaintiffs' 2000-2005 federal tax returns as a direct result of Plaintiffs' participation in the Investment Strategies.

222.   BDO Seidman represented and advised Plaintiffs with respect to the IRS' audit of Plaintiffs' 2000-2005 federal tax returns until approximately January 2008.

## K. BDO INSTRUCTS PLAINTIFFS TO NOT PARTICIPATE IN THE IRS SETTLEMENT INITIATIVE

223.   In May 2004, pursuant to Announcement 2004-46, the IRS offered a global settlement with taxpayers who had participated in transactions that were the same or substantially similar to transactions identified as illegal and abusive tax shelters in IRS Notice 2000-44 (i.e. the 2000 Digital Options Strategy).  Pursuant to the terms of the IRS settlement offer, taxpayers could settle with the IRS by paying to the IRS (a) all of the taxes avoided by use of these transactions, (b) all interest due, (c) a 10% penalty, and (d) a loss of 50% of the fees and other "out of pocket" costs deducted.  If taxpayers elected not to accept this offer, the IRS would immediately assess the taxpayer with back-taxes, interest, and a 40% penalty.  In addition, the taxpayer would lose all deductions.

224.   BDO advised Plaintiffs to not take part in the Announcement 2004-46 Settlement Initiative.  BDO advised Plaintiffs that the 2000 Digital Options Strategy was a legitimate and legal tax-reducing strategy and was not the type of transaction described in Notice 2000-44.  BDO once again strongly assured Plaintiffs that the Plaintiffs' Investment Strategies would withstand IRS scrutiny and Plaintiffs would prevail in the audits because the Plaintiffs' Investment Strategies were completely legal and Plaintiffs had legal opinions from Sidley Austin and DeCastro West that completely substantiated the propriety of the Investment Strategies.  Based on BDO's instructions, Plaintiffs' elected not to participate in the IRS settlement offer.

**VI.**

## DISCOVERY RULE DEFERRED ACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

225.    Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Plaintiffs repeat, reallege and incorporate each and every prior allegation in the preceding paragraphs as if fully set forth herein.

226.    The causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule deferred accrual of the respective statutes of limitation for such causes of action.

227.    Plaintiffs damages resulting from Defendants' conduct alleged herein were inherently undiscoverable and objectively verifiable.

228.    Plaintiffs did not discover the injuries caused by the wrongful acts of Defendants alleged herein until February 2009.

**VII.**

## TOLLING OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS DUE TO FRAUDULENT CONCEALMENT

229.    Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

230.    The causes of action asserted by Plaintiffs against Defendants are timely filed as Defendants fraudulently concealed the wrongful conduct alleged herein.

231.    According to the IRS, Defendants had actual knowledge of the wrongful conduct alleged herein.

232.    Defendants concealed the wrongful acts and omissions alleged herein by remaining silent and/or making misrepresentations about what the IRS describes as wrongful conduct despite having a duty to inform Plaintiffs of such wrongful acts and omissions.    Defendants' silence and misrepresentations prevented Plaintiffs from discovering Defendants' wrongful acts and omissions.

233.    Defendants had a fixed purpose to conceal the wrongful conduct.

234.    Plaintiffs reasonably relied on Defendants' silence and misrepresentations to the detriment of Plaintiffs.

## VIII.

## TOLLING OF STATUTE OF LIMITATIONS AS TO ALL DEFENDANTS DUE TO CONTINUOUS REPRESENTATION/CONTINUING TORT DOCTRINES

235.    Pursuant to Rule 58 of the Texas Rules of Civil Procedure, Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

236.    The causes of action asserted by Plaintiffs against Defendants are timely filed pursuant to the Continuous Representation/Continuing Tort Doctrines as Gramercy still represents the Plaintiffs and BDO Seidman represented the Plaintiffs until recently. In addition, the Defendants breached the fiduciary duties they owed to Plaintiffs because the Defendants  failed to disclose the wrongful conduct alleged herein and concealed such wrongful conduct.

## IX.

## CAUSES OF ACTION

237.    Plaintiffs assert each and every cause of action set forth below against BDO Seidman and Gramercy with respect to the 2000 Digital Options Strategy, the 2001

Distressed Debt Strategy, the 2002 Distressed Debt Strategy, the 2003 Distressed Debt Strategy, and the 2004 Distressed Debt Strategy. Plaintiffs assert each and every cause of action set forth below against Sidley Austin with respect to the 2000 Digital Options Strategy and the 2001 Distressed Debt Strategy. Plaintiffs assert each and every cause of action set forth below against De Castro West with respect to the 2002 Distressed Debt Strategy, the 2003 Distressed Debt Strategy, and the 2004 Distressed Debt Strategy. Plaintiffs assert each and every cause of action set forth below against Financial Strategy with respect to the 2002 Distressed Debt Strategy and the 2003 Distressed Debt Strategy.

## COUNT I – BREACH OF FIDUCIARY DUTY

238.    Plaintiffs repeat, reallege and incorporate each and every prior allegation in the preceding paragraphs as if fully set forth herein.

239.    The Defendants, as the Plaintiffs' accountants, financial and investment advisors, and attorneys, were Plaintiffs' fiduciaries, and thus owed Plaintiffs the duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility.

240.    Defendants breached their fiduciary duties to Plaintiffs by, among other things, advising Plaintiffs to engage in the Investment Strategies, failing to advise Plaintiffs that the legal opinions were not "independent", advising Plaintiffs that they could make a profit on the Digital Options Contracts and/or the investments in distressed debt, orchestrating the implementation of the Investment Strategies, providing the purported required legal opinion letters verifying the soundness of the Investment Strategies, and advising Plaintiffs to sign and file the tax returns in reliance on Defendants' advice, representations, recommendations, instructions, and opinions, which,

according to the IRS, Defendants knew or should have known were likely to be held by the IRS to be improper and illegal, for the purpose of generating huge fees for Defendants. Defendants each breached their fiduciary duties to Plaintiffs.

241. As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the digital options, options, and investments in distressed debt and made other investments to effectuate the Investment Strategies, (3) the IRS will likely assess Plaintiffs with substantial back-taxes, penalties, and interest, (4) they lost the opportunity to avail themselves to other legitimate tax-savings opportunities, (5) they failed to file qualified amended returns (6) they failed to take part in the Amnesty Program, (7) they failed to take part in the Announcement 2004-46 global settlement initiative, and (8) they have and will continue to incur substantial additional costs to rectify the situation.

242. As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT II –NEGLIGENCE/PROFESSIONAL MALPRACTICE

243. Plaintiffs repeat and reallege and incorporate each and every prior allegation in the preceding paragraphs as if fully set forth herein.

244. As Plaintiffs' lawyers, financial and investment advisers and accountants, Defendants owed Plaintiffs a duty to comply with the applicable standards of care and the applicable provisions of their codes of professional responsibility.

245.    Defendants failed to meet those applicable standards of care. Defendants' failure to meet the standard of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Petition.

246.    During the course of their representation of Plaintiffs, Defendants each negligently made numerous affirmative representations that were incorrect, improper and/or false, negligently made misleading omissions of material fact, and negligently gave numerous improper, incorrect, and wrong recommendations, advice, instructions, and opinions to Plaintiffs. Likewise, the Plaintiffs' Investment Strategies, which the Defendants designed, marketed, sold, and implemented, have been determined to be illegal and abusive tax shelters.

247.    Defendants either knew or reasonably should have known their representations, recommendations, advice, instructions, and opinions to be wrong or improper. The Defendants' rendering of such representations, recommendations, advice, instructions and opinions, as well as the Defendants' failure to advise Plaintiffs of the omissions set forth above, constitutes negligence.

248.    In addition, Defendants conduct rises to the level of gross neglect and/or malice as defined under Texas law. Accordingly, Plaintiffs seek punitive/exemplary damages against Defendants.

249.    In reasonable reliance on Defendants' advice regarding the Investment Strategies, the Digital Option Contracts, and investments in distressed debt, Plaintiffs paid millions of dollars to Defendants for investment, tax and legal advice, paid millions of dollars to execute the Investment Strategies, purchased the Digital Options Contracts and investments in distressed debt, filed federal tax returns that reflected deductions for

capital and/or ordinary losses resulting from the Investment Strategies, and did not take advantage of other legitimate tax savings opportunities.

250.    But for Defendants' negligence and gross neglect/malice, Plaintiffs would never have hired Defendants and the Other Participants for advice on the Investment Strategies, engaged in the Investment Strategies, filed Federal tax returns that reflected deductions for capital and/or ordinary losses resulting from the Investment Strategies or failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, failed to participate in the IRS Amnesty Offer, and/or failed to participate in the IRS' global settlement initiative.

251.    After discovering Defendants' negligence and gross neglect/malice, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

252.    Defendants' negligence and gross neglect/malice proximately caused injury and damages to Plaintiffs in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the digital options, options, and investments in distressed debt and made other investments to effectuate the Investment Strategies, (3) the IRS will likely assess Plaintiffs with substantial back-taxes, penalties, and interest, (4) they lost the opportunity to avail themselves to other legitimate tax-savings opportunities, (5) they failed to file qualified amended returns (6) they failed to take part in the Amnesty Program, (7) they failed to take part in the Announcement 2004-46 global settlement initiative, and (8) they have and will continue to incur substantial additional costs to rectify the situation.

253.    As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT III – NEGLIGENT MISREPRESENTATION

254.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

255.    During the course of their representation of Plaintiffs, Defendants each negligently made numerous affirmative representations that were incorrect, improper or false, negligently made numerous misleading omissions of material fact, and negligently gave numerous improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs.

256.    Defendants either knew or reasonably should have known their representations, recommendations, advice, instructions, and opinions to be improper, inaccurate, or wrong.

257.    In reasonable reliance on Defendants' advice regarding the Investment Strategies, Plaintiffs unnecessarily purchased the digital options, options, and investments in distressed debt and made other investments to effectuate the Investment Strategies, paid millions of dollars to Defendants and others for investment, tax and legal advice, paid millions of dollars to execute the Investment Strategies, did not avail themselves of legitimate tax savings opportunities, and filed federal tax returns that reflected deductions for capital and/or ordinary losses resulting from the Investment Strategies.

258.    But for Defendants' negligence and gross neglect/malice, Plaintiffs would never have hired Defendants and the Other Participants for advice on the Investment

Strategies, engaged in the Investment Strategies, filed Federal tax returns that reflected deductions for capital and/or ordinary losses resulting from the Investment Strategies or failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, failed to participate in the IRS Amnesty Offer, and/or failed to participate in the IRS' global settlement initiative or otherwise.

259.    After discovering Defendants' negligent misrepresentations and omissions, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

260.    Defendants' conduct set forth above proximately caused injury and damages to Plaintiffs in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the digital options, options, and investments in distressed debt and made other investments to effectuate the Investment Strategies, (3) the IRS will likely assess Plaintiffs with substantial back-taxes, penalties, and interest, (4) they lost the opportunity to avail themselves to other legitimate tax-savings opportunities, (5) they failed to file qualified amended returns (6) they failed to take part in the Amnesty Program, (7) they failed to take part in the Announcement 2004-46 global settlement initiative, and (8) they have and will continue to incur substantial additional costs to rectify the situation.

261.    As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

## COUNT IV - DISGORGEMENT

262.    Plaintiffs repeat, reallege and incorporate each and every prior allegation in the preceding paragraphs as if fully set forth herein.

263.    As a result of Defendants' breach of their fiduciary duty, they should be required to disgorge all payments received by each of them from Plaintiffs or from any entity for work performed in connection with the Investment Strategies.

264.    Additionally, regardless of the merits of the tax, legal and financial and investment advice and services Defendants rendered to Plaintiffs, the fees the Defendants charged and which Plaintiffs paid are unethically excessive and in violation of AICPA Rules of Professional Conduct and other applicable rules of professional conduct.

265.    Further, since Defendants did not disclose information that they were required to disclose - *i.e.,* the Defendants' pre-planned scheme; the Defendants conspired to design, market, sell, and implement the Investment Strategies; the IRS would likely contend that Sidley Austin and De Castro West were promoters of the Investment Strategies and were not "independent"; the opinion letters were not independent and could not be relied upon to protect Plaintiffs from penalties or for the required legal support regarding the propriety of the Investment Strategies; the Defendants had a significant pecuniary interest in the Investment Strategies; and the Defendants' representation of Plaintiffs and their arrangement with the other Defendants violated the applicable rules of professional conduct; and the Defendants' fee-splitting agreement - their agreements with Plaintiffs are not enforceable.

266.    Accordingly, the Defendants must disgorge their fees to Plaintiffs. In addition, Plaintiffs seek an award of attorneys' fees, interest, and costs.

## COUNT V – RESCISSION

267.    Plaintiffs reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

268.    Plaintiffs and certain Defendants entered into agreements, including but not limited to engagement agreements, fee agreements, investment management/advisory agreements, and consulting agreements ("Agreements").  In deciding to enter into the Agreements, Plaintiffs relied on numerous material knowingly false affirmative representations and intentional omissions of material fact that Defendants gave to Plaintiffs.  Had Defendants not made those misrepresentations or omissions, Plaintiffs would not have entered into the Agreements.  Defendants made those misrepresentations and omissions with the intent that Plaintiffs would rely on them.  Plaintiffs are not in breach of any of their obligations pursuant to the Agreements.

269.    Plaintiffs seek rescission of the Agreements.  In addition, Plaintiffs seek an award of attorneys' fees, interest, and costs.

## COUNT VI – DECLARATORY JUDGMENT

270.    Plaintiffs reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

271.    An actual, justiciable controversy exists between Plaintiffs on the one hand and the Defendants on the other with regard to the Agreements and the FX Contracts.

272.    Plaintiffs seek a declaration that the Agreements and FX Contracts entered into with Defendants and the Other Participants are unenforceable due to a lack of consideration, or in the alternative, a failure of consideration, in that the Defendants knew

or should have known that the transactions they proposed could not and would not yield the benefits to Plaintiffs that were promised by the Defendants and the Other Participants. As a result, all promises of the Defendants and the Other Participants under those contracts are merely "illusory" and, without those promises, the Agreements and the FX Contracts fail due to a lack of consideration.

273.    Further, as set forth above, the Agreements that Plaintiffs entered into with BDO Seidman, De Castro, Sidley Austin, and Gramercy were procured by fraud, and these Defendants fraudulently induced Plaintiffs to enter into these Agreements in furtherance of the conspiracy between and among the Defendants and the Other Participants to perpetrate fraud on Plaintiffs. For instance, according to the Criminal Information against Michael Kerekes, the BDO Consulting Agreements were deliberately broad and vague as to the fees paid by Plaintiffs in connection with the Investment Strategies.    Likewise, the BDO Consulting Agreements and the agreements with Gramercy did not disclose to Plaintiffs that BDO and Gramercy were sharing/splitting the fees that Plaintiffs paid to BDO. The De Castro and Sidley Austin Agreements did not disclose to Plaintiffs that De Castro West and Sidley Austin had agreed that BDO and Gramercy could promise Plaintiffs that De Castro West and Sidley Austin would issue opinion letters to Plaintiffs confirming the propriety of the Investment Strategies and protecting Plaintiffs from penalties or that De Castro West and Sidley Austin were not "independent". None of these Agreements disclosed to Plaintiffs that these Defendants were improperly conspiring together to market, sell, and implement an illegal, fraudulent, and abusive tax shelter, which the IRS would disallow and assess Plaintiffs with substantial penalty and interest.

274.    Additionally, the FX Contracts that Plaintiffs entered into with Lehman are unenforceable due to a lack of consideration, or in the alternative, a failure of consideration, in that Lehman retained virtually unlimited discretion to determine whether the FX Contracts would pay out and therefore, could ensure, if they so chose, that the FX Contracts would *not* pay out or limit the amount of any payout. As a result, all promises of Lehman under those contracts are merely "illusory" and, without those promises, the FX Contracts fail due to a lack of consideration.

275.    Had the Plaintiffs not been enticed to enter into the Agreements and the FX Contracts, they would not have paid fees to any of the Defendants and the Other Participants as well. Thus, Plaintiffs seek a declaration that, due to the foregoing lack of consideration, the Defendants and the Other Participants have been unjustly enriched and all fees paid to Defendants and the Other Participants should be returned to Plaintiffs.

276.    Plaintiffs seek a declaration that the Agreements, including but not limited to Plaintiffs' agreements with Gramercy, BDO, Sidley Austin, and De Castro and the FX Contracts, are null and void because these Agreements and FX Contracts were part of a criminal fraud and conspiracy[6] and because these Agreements violate public policy.

---

[6] As discussed above, Ruble was recently convicted on 10 counts of tax evasion in connection with his role in the design, marketing, sale and implementation of tax shelters that were, on information and belief, the same or substantially similar to the Investment Strategies at issue in this case.   Sidley Austin paid a "promoter penalty" of $39,400,000.00 to the IRS and issued a Statement of Responsibility in connection with its involvement in the design, promotion, sale and implementation of tax shelters. Michael Kerekes, a former principal at BDO Seidman, recently plead guilty to tax evasion and conspiracy to defraud the United States in connection with his role in the design, marketing, sale and implementation of tax shelters that were, on information and belief, the same or substantially similar to the Investment Strategies at issue in the case. Adrian Dicker, a former senior tax partner at BDO, also plead guilty to conspiracy to defraud the United States and tax evasion on March 17, 2009, in connection with his role in the

277.   Plaintiffs seek a declaration that any indemnity provisions or limitations of liability contained in any of the Agreements are also null and void for the reasons set forth above.

278.   Plaintiffs seek a declaration that any arbitration provision contained in any of the Agreements is also null and void for the reasons set forth above.

279.   Finally, Plaintiffs seek an award of costs and reasonable and necessary attorneys' fees as are equitable and just.

## COUNT VII – FRAUD

280.   Plaintiffs repeat, reallege and incorporate each and every prior allegation in the preceding paragraphs as if fully set forth herein.

281.   In order to induce the Plaintiffs to pay them substantial fees, the Defendants made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiffs.

282.   The intentional omissions of material fact and/or affirmative representations made by each Defendant were false when made and the Defendants knew these representations to be false when made with the intention that Plaintiffs rely upon them in entering into the Investment Strategies and pay them substantial fees. In addition, the affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by the Defendants with the intent to induce Plaintiffs to enter into the Investment Strategies and pay Defendants and the Other Participants substantial fees.

283.   In reasonable reliance on the Defendants' false affirmative representations and intentional omissions of material facts regarding the Investment Strategies, Plaintiffs

design, marketing, sale and implementation of tax shelters that were, on information and belief, the same or substantially similar to the Investment Strategies at issue in this case.

paid substantial fees to Defendants and the Other Participants, paid additional amounts to execute the Investment Strategies, unnecessarily purchased the digital options contracts, options, and/or investments in distressed debt and made other investments to effectuate the Investment Strategies, filed federal tax returns that reflected improper tax treatment resulting from the Investment Strategies, did not disclose the transaction on their federal tax returns as a tax shelter, did not file qualified amended returns, did not enter the Amnesty Program, did not participate in the IRS global settlement offer, and failed to take advantage of other legitimate tax savings opportunities.

284.    But for Defendants' intentional misrepresentations and material omissions of material facts described above, Plaintiffs would never have hired Defendants and the Other Participants for advice on the Investment Strategies, engaged in the Investment Strategies, utilized improper tax bases on their income tax returns, filed and signed their tax returns as prepared in reliance on the Defendants' advice and/or not disclosed the Investment Strategies on their tax returns as a tax shelter, failed to file qualified amended returns, failed to enter into the Amnesty Program, and failed to participate in the IRS settlement initiative.   After discovering the Defendants' fraud, Plaintiffs incurred and will continue to incur substantial additional costs to rectify the situation.

285.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to Defendants and the Other Participants, (2) they unnecessarily purchased the digital options, options, and/or investments in distressed debt and made other investments to effectuate the Investment Strategies, (3) the IRS will likely assess Plaintiffs with substantial back-taxes, interest, and penalties,  (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies, (5) they

failed to file qualified amended returns, (6) they failed to take part in the Amnesty Program, (7) they failed to take part in the Announcement 2004-46 global settlement initiative, and (8) they have and will continue to incur substantial additional costs to rectify the situation.

286.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fee, interest, and costs.

## COUNT VIII – CIVIL CONSPIRACY

287.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

288.   The Defendants and the Other Participants knowingly acted in concert to design, market, sell, and implement the Investment Strategies, which according to the IRS are fraudulent, illegal and abusive tax shelters. In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs. In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions that had economic substance from an investment standpoint, when the transactions in fact lacked those features (which were necessary for a successful tax strategy).

289.   The Defendants and the Other Participants acted in the respective roles according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs (*i.e.*, the Defendants' Arrangement), all for the purposes of obtaining professional fees from clients, including the Plaintiffs. The Defendants and the

Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of fact that each Defendants and/or Other Participant made to Plaintiffs.

290.   The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs.

291.   There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on Plaintiffs. The conspiracy to commit these unlawful and fraudulent acts proximately caused and continues to cause Plaintiffs' damages as previously set forth herein.

292.   As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the digital options, options, and investments in distressed debt and made other investments to effectuate the Investment Strategies, (3) the IRS will likely assess Plaintiffs with substantial back-taxes, interest, and penalties, (4) they lost the opportunity to avail themselves to other legitimate tax-savings opportunities, (5) they failed to file qualified amended returns (6) they failed to take part in the Amnesty Program, (7) they failed to take part in the Announcement 2004-46 global settlement initiative, and (8) they have and will continue to incur substantial additional costs to rectify the situation.

293.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT IX - BREACH OF CONTRACT

294.   Plaintiffs reallege each and every allegation set forth above and incorporate them by reference herein as if fully set forth.

295.   In the alternative and without waiving the foregoing, Plaintiffs entered into oral and/or written contracts with the Defendants to provide Plaintiffs with professionally competent, proper and accurate legal, investment, and tax advice and services and to sell and implement completely legal tax-advantaged investment strategies. The Defendants breached their oral and/or written contracts with the Plaintiffs.

296.   Plaintiffs fully performed their obligations to the Defendants under these contracts and thus did not contribute to the Defendants' breaches in any way.

297.   The Defendants breached their contracts with Plaintiffs.

298.   As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the digital options, options, and investments in distressed debt and made other investments to effectuate the Investment Strategies, (3) the IRS will likely assess Plaintiffs with substantial back-taxes, interest, and penalties, (4) they lost the opportunity to avail themselves to other legitimate tax-savings opportunities, (5) they failed to file qualified amended returns (6) they failed to take part in the Amnesty Program, (7) they failed to take part in the Announcement 2004-46 global settlement initiative, and (8) they have and will continue to incur substantial additional costs to rectify the situation.

299.   As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded all actual, consequential, and

incidental damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## X.

### PRAYER FOR RELIEF

300.   Based upon the foregoing, Plaintiffs request that Defendants be cited to appear and answer, and that on final hearing Plaintiffs have judgment against Defendants, jointly and severally for:

a.   Actual, consequential, and incidental damages;

b.   a declaratory judgment;

c.   pre- and post-judgment interest at the highest legal rate allowed by law;

d.   all attorneys' fees and costs in pursuing this matter;

e.   punitive damages in an amount to be determined at trial;

f.   such other and further relief, both at law and in equity, to which Plaintiffs may show themselves to be justly entitled.

Dated: May 19, 2009.

Respectfully submitted;

LOEWINSOHN FLEGLE DEARY, LLP

*[signature]*

DAVID R. DEARY
Texas Bar No. 05624900
CAROL E. FARQUHAR
Texas Bar No. 06828300
COREY WEINSTEIN
Texas Bar No. 24037685
J. DYLAN SNAPP
Texas Bar No. 24053484
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 - Telephone
(215) 571-1717 – Facsimile

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served as indicated below upon all parties or their counsel of record on the 19th day of May, 2009.

*Via E-mail and Certified Mail, RRR:*
Cary B. Samowitz
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020-1104
(212) 884-8459 (fax)

Jessie A. Amos
DLA Piper LLP
1000 Louisiana Street, Suite 2800
Houston, Texas 77002-5005
713-425-8401 – Facsimile

*Attorneys for BDO Seidman, L.L.P.*
*and Randy L. Moorman*

*Via E-mail and Certified Mail, RRR:*
David C. Mattka
Andrew S. Brwon
Munsch Hardt Kopf & Harr, P.C.
600 Congress Avenue, Suite 2900
Austin, Texas 78701
(512) 391-6149 (fax)

*Attorneys for Gramercy Advisors, LLC,*
*Gramercy Asset Management, LLC,*
*Gramercy Local Markets Recovery Fund*
*LLC, Gramercy Financial Services, LLC,*
*Steamboat Capital Management LLC and*
*Jay A. Johnston*

*Via E-mail and Certified Mail, RRR:*
R. Paul Yetter
Yetter, Warden & Coleman LLP
909 Fannin, Suite 3600
Houston, TX 77010
(713) 632-8002 (fax)

*Attorneys for DeCastro, West, Chodorow,*
*Glickfeld & Nass, Inc.*

*Via Certified Mail, RRR:*
Raymond J. Ruble
511 Grand Blvd
Boone, North Carolina 28607

*Via E-mail and Certified Mail, RRR:*
Bruce A. Abbott
Munger, Tolles & Olson LLP
355 South Grand Ave., 35th Floor
Los Angeles, CA 90071-1560
213.687.3702 (fax)

Michael Connelly
Allison J. Miller
Connelly Baker Wotring LLP
700 JP Morgan Chase Tower
600 Travis Street
Houston, Texas 77002
(713) 980-1702 (fax)

*Attorneys for Sidley Austin, LLP*

_____
Counsel for Plaintiffs

STATE OF TEXAS HARRIS
COUNTY OF HARRIS

I, Loren Jackson, District Clerk of Harris County, Texas, certify that
this is a true and correct copy of the original record filed and or recorded
in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this

MAY 2 1 2009

LOREN JACKSON, DISTRICT CLERK
HARRIS COUNTY, TEXAS

_____ Deputy

C

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS

| | | |
|---|---|---|
| SHAHID R. KHAN; ANN C. KHAN; UVIADO LLC; JONCTION LLC; AND LEMAN LLC | § § § § | |
| *Plaintiffs,* | § § § | CASE NO 09-L-139 |
| vs. | § § § | |
| BDO SEIDMAN, L.L.P.; PAUL SHANBROM; MICHAEL COLLINS; GRAMERCY ADVISORS, LLC; GRAMERCY ASSET MANAGEMENT LLC; GRAMERCY FINANCIAL SERVICES, LLC; TALL SHIPS CAPITAL MANAGEMENT, LLC; JAY A. JOHNSTON; MARC HELIE; DECASTRO, WEST, CHODOROW, GLICKFELD & NASS, INC.; AND FINANCIAL STRATEGY GROUP, PLC | § § § § § § § § § § § § § § | |
| *Defendants.* | § § | |

RECEIVED
AUG 0 6 2009
BY:_____

## SUMMONS

**TO THE DEFENDANT**: R. Grattan Brown, Jr., Financial Strategy Group, PLC, 1700 One Commerce Sq., Memphis, TN 38103-2566.

**YOU ARE SUMMONED** and required to file a written answer or other pleading in the office of the Clerk of this Court on the second floor of the Court House, Urbana, Illinois, within thirty (30) days after service of this Summons, not counting the day of service. **IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT**.

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so indorsed.

This Summons may not be served later than thirty (30) days after its date.

Witness: _____July 8_____, 2009.

(Seal of Court)

_____Linda S. Frank_____
(Clerk of Court)

J. Dylan Snapp
Loewinsohn Flegle Deary, LLP, Attys. for Plaintiff
12377 Merit Dr., Ste. 900
Dallas, TX 75251
Telephone: 214-572-1700
Date of Service: _____, 2009

(To be inserted by server on copy left with Defendant or other person.)

**EXHIBIT**
**C**

IN THE CIRCUIT COURT OF CHAMPAIGN COUNTY, ILLINOIS

SHAHID R. KHAN; ANN C. KHAN;
UVIADO LLC; JONCTION LLC; AND
LEMAN LLC

    *Plaintiffs,*

vs.

BDO SEIDMAN, L.L.P.; PAUL
SHANBROM; MICHAEL COLLINS;
GRAMERCY ADVISORS, LLC;
GRAMERCY ASSET MANAGEMENT
LLC; GRAMERCY FINANCIAL
SERVICES, LLC; TALL SHIPS
CAPITAL MANAGEMENT, LLC; JAY
A. JOHNSTON; MARC HELIE;
DECASTRO, WEST, CHODOROW,
GLICKFELD & NASS, INC.; AND
FINANCIAL STRATEGY GROUP, PLC

    *Defendants.*

§ § § § § § § § § § § § § § § § § § § § § § §

CASE NO 09- *L/39*

JURY DEMAND



**5**

**FILED**
SIXTH JUDICIAL CIRCUIT
JUL 0 6 2009

L——— S. F—————
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

## COMPLAINT AT LAW

Plaintiffs Shahid R. Khan, Ann C. Khan, UVIADO LLC, JONCTION LLC, and

LEMAN LLC ("Plaintiffs") assert claims against Defendants BDO Seidman, LLP, Paul

Shanbrom and Michael Collins (collectively "BDO" or "BDO Seidman"), Gramercy

Advisors, LLC, Gramercy Asset Management LLC, Gramercy Financial Services, LLC,

Tall Ships Capital Management, LLC, Jay A. Johnston, and Marc Helie (collectively

"Gramercy"), DeCastro, West, Chodorow, Glickfeld & Nass, Inc. ("DeCastro"), and

Financial Strategy Group, PLC ("Financial Strategy") (BDO, Gramercy, DeCastro, and

Financial Strategy are collectively referred to herein as the "Defendants") and state as

follows:

## I.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction under 735 ILCS 5/2-209 because the Defendants are present and transact business in this State and committed tortuous acts within this State, all as more fully described below.

2.     Venue is proper under 735 ILCS 5/2-101 because Champaign County is where a substantial part of the transactions occurred out of which Plaintiffs' causes of action arose.

3.     This Court has personal jurisdiction over each of the Defendants. Each of the Defendants has its principal place of business in the State of Illinois, and/or has committed a tort in whole or in part in Illinois, and/or has otherwise done business in Illinois, all as more fully described below.

## II.

## PARTIES

4.     Plaintiff Shahid R. Khan is an individual and a citizen of Illinois.  Mr. Khan resides in Champaign, Illinois.

5.     Plaintiff Ann C. Khan is an individual and a citizen of Illinois.  Mrs. Khan resides in Champaign, Illinois.

6.     Plaintiff UVIADO LLC is a Delaware limited liability company with its principal place of business in Houston, Texas.

7.     Plaintiff JONCTION LLC is a Delaware limited liability company with its principal place of business in Houston, Texas.

8.      Plaintiff LEMAN LLC is a Delaware limited liability company with its principal place of business in Houston, Texas.

9.      Defendant BDO Seidman, LLP is a limited liability partnership organized and existing under the laws of New York with its principal place of business at 233 Michigan Ave., Suite 2500, Chicago, IL 60602. This Defendant has been admitted to and registered to do business in Illinois.

10.     Defendant Paul Shanbrom is an individual and, on information and belief, a citizen of Michigan. Upon information and belief, Shanbrom resides at 7181 Deer Lake Ct., Clarkston, MI 48346. Mr. Shanbrom is or was during the relevant period an employee of BDO Seidman, LLP. This Court has personal jurisdiction over Mr. Shanbrom pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Mr. Shanbrom has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Mr. Shanbrom has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Mr. Shanbrom has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Mr. Shanbrom has purposefully availed himself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Mr. Shanbrom will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

11.     Defendant Michael Collins is an individual and, on information and belief, a citizen of Michigan.  Upon information and belief, Collins' principal place of business is at 755 W Big Beaver Rd., #1900, Troy, Michigan 48084-4906.  Mr. Collins is or was during the relevant period an employee of BDO Seidman, LLP.  This Court has personal jurisdiction over Mr. Collins pursuant to the constitution and laws of the United States and the State of Illinois.  At all relevant times, Mr. Collins has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, Mr. Collins has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois.  Additionally, Mr. Collins has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the brunt of the harm was felt.  Mr. Collins has purposefully availed himself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois.  This suit against Mr. Collins will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

12.     Defendant Gramercy Advisors, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut  06830.  This Court has personal jurisdiction over Gramercy Advisors, LLC pursuant to the constitution and laws of the United States and the State of Illinois.   At all relevant times, Gramercy Advisors, LLC has done and is doing business in the State of Illinois, but does not maintain a regular

place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Gramercy Advisors, LLC has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Gramercy Advisors, LLC has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Gramercy Advisors, LLC does business in the State of Illinois through its website on the Internet: www.gramercy.com. Gramercy Advisors, LLC's conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of Gramercy Advisors, LLC acting within the scope of their employment or agency. Gramercy Advisors, LLC has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Gramercy Advisors, LLC will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

13.    Defendant Gramercy Asset Management LLC is a limited liability company organized an existing under the laws of Delaware with its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut. This Court has personal jurisdiction over Gramercy Asset Management LLC pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Gramercy Asset Management LLC has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Gramercy Asset Management LLC has contracted with an Illinois resident, and either party was to perform the contract in

whole or in part in the State of Illinois. Additionally, Gramercy Asset Management LLC has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Gramercy Asset Management LLC's conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of Gramercy Asset Management LLC acting within the scope of their employment or agency. Gramercy Asset Management LLC has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Gramercy Asset Management LLC will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

14.     Defendant Gramercy Financial Services, LLC is a foreign limited liability company organized and existing under the laws of the State of Delaware with its principal place of business is at 20 Dayton Avenue, Greenwich, Connecticut 06830. This Court has personal jurisdiction over Gramercy Financial Services, LLC pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Gramercy Financial Services, LLC has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Gramercy Financial Services, LLC has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Gramercy Financial Services, LLC has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the

brunt of the harm was felt.  Gramercy Financial Services, LLC's conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of Gramercy Financial Services, LLC acting within the scope of their employment or agency. Gramercy Financial Services, LLC has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois.  This suit against Gramercy Financial Services, LLC will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

15.     Defendant Tall Ships Capital Management LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut  06830.  This Court has personal jurisdiction over Tall Ships Capital Management LLC pursuant to the constitution and laws of the United States and the State of Illinois.   At all relevant times, Tall Ships Capital Management LLC has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, Tall Ships Capital Management LLC has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois.  Additionally, Tall Ships Capital Management LLC has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the brunt of the harm was felt.  Tall Ships Capital Management LLC's conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of Tall Ships Capital Management LLC acting within the scope of their employment or agency.  Tall Ships

Capital Management LLC has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Tall Ships Capital Management LLC will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

16.     Defendant Jay A. Johnston is an individual and, on information and belief, a citizen of Connecticut. Upon information and belief, Johnston's principal place of business is at 124 Ritch Ave., W., Greenwich, CT 06830. This Court has personal jurisdiction over Mr. Johnston pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Mr. Johnston has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Mr. Johnston has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Mr. Johnston has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Mr. Johnston has purposefully availed himself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Mr. Johnston will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. Mr. Johnston is or was during the relevant period an employee of Gramercy Advisors, LLC.

17.     Defendant Marc Helie is an individual and, on information and belief, a citizen of New York.  Upon information and belief, Helie resides at 210 Lafayette St., Apt. 9B, New York, NY 10012-4042.  This Court has personal jurisdiction over Mr. Helie pursuant to the constitution and laws of the United States and the State of Illinois.  At all relevant times, Mr. Helie has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, Mr. Helie has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois.  Additionally, Mr. Helie has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the brunt of the harm was felt.  Mr. Helie has purposefully availed himself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois.  This suit against Mr. Helie will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  Mr. Helie is or was during the relevant period an employee of Gramercy Advisors, LLC.

18.     Defendant DeCastro, West, Chodorow, Glickfeld & Nass, Inc. is a corporation organized and existing under the laws of the State of California with its principal place of business at 10960 Wilshire Boulevard, Suite 1400, Los Angeles, California 90024.  This Court has personal jurisdiction over DeCastro pursuant to the constitution and laws of the United States and the State of Illinois.  At all relevant times, DeCastro has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in

this civil action.   As described hereafter, DeCastro has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois.  Additionally, DeCastro has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the brunt of the harm was felt.  DeCastro conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of DeCastro acting within the scope of their employment or agency.  DeCastro has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois.  This suit against DeCastro will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

19.    Defendant Financial Strategy Group PLC is a foreign corporation organized and existing under the laws of the State of Tennessee with its principal place of business at 700 Colonial Rd., Suite 120, Memphis, TN 38117.  This Court has personal jurisdiction over Financial Strategy pursuant to the constitution and laws of the United States and the State of Illinois.   At all relevant times, Financial Strategy has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, Financial Strategy has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois.  Additionally, Financial Strategy has committed torts, in whole or in part, in the State of Illinois, including intentional tortuous acts directed at a resident of the State of Illinois, where the brunt of the harm was felt.  Financial Strategy's conduct in the State of Illinois has been

committed by officers, directors, employees, and/or agents of Financial Strategy acting within the scope of their employment or agency. Financial Strategy has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Financial Strategy will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

## III.

## <u>NATURE OF THE CLAIMS</u>

### A. THE DISTRESSED DEBT STRATEGIES[1]

20.    Plaintiffs bring this action against Defendants seeking damages for breach of fiduciary duty, negligence, negligent misrepresentation, disgorgement, rescission, fraud, violations of the Illinois Consumer Fraud Act, breach of contract, civil conspiracy and declaratory judgment. Plaintiffs seek compensatory damages against their professional advisors for damages arising from a series of tax-advantaged investment strategies using investments in distressed debt that Plaintiffs executed in 2002 and 2003 and utilized on their federal and state tax returns for the 2002 and 2003 tax years ("Distressed Debt Strategies"). The Defendants and the Other Participants jointly and in concert developed, promoted, sold, and implemented the Distressed Debt Strategies.

---

[1] Plaintiffs engaged in a Distressed Debt Strategy in 2002. BDO, Gramercy, DeCastro and Financial Strategy were the Defendants involved in the 2002 Distressed Debt Strategy and the Other Participants included Refco Capital Markets, Ltd and Mathew Hoff ("Refco"). Plaintiffs engaged in a Distressed Debt Strategy in 2003. BDO, Gramercy, DeCastro and Financial Strategy were the Defendants involved in the 2003 Distressed Debt Strategy.

Plaintiffs further pray for a declaratory judgment seeking, among other things, a declaration that certain purported fee agreements are void and unenforceable.

21.     The Distressed Debt Strategies are set forth in detail below.   The Defendants and the Other Participants, acting pursuant to an elaborate and carefully devised common scheme, counseled and advised Plaintiffs to undertake the Distressed Debt Strategies, claiming the Distressed Debt Strategies would yield a substantial profit and, at the same time, legally minimize Plaintiffs' state and federal tax liability.  At the time Defendants marketed and sold the Distressed Debt Strategies to Plaintiffs, Defendants knew or should have known that the Distressed Debt Strategies would not yield the investment results or tax treatment claimed.  Importantly, Defendants' primary motive in their pre-planned scheme was to exact significant fees and commissions from Plaintiffs.

22.     Defendants knew, at the time they promoted and sold the Distressed Debt Strategies to Plaintiffs, that federal authorities were involved in ongoing investigations of transactions that were the same or substantially similar to the Distressed Debt Strategies and had concluded that these transactions were illegal and abusive tax shelters.  Despite this knowledge, Defendants did not so inform Plaintiffs.  The IRS ultimately disallowed Plaintiffs' Distressed Debt Strategies and determined that Plaintiffs owed substantial back taxes, interest, and penalties.

23.     Plaintiffs are and were unknowledgeable and unsophisticated about tax matters, including tax law and tax-advantaged investment strategies.   Plaintiffs detrimentally relied on their trusted legal, accounting, tax, financial, and investment advisors at BDO Seidman, Gramercy, DeCastro, and Financial Strategy for

**PLAINTIFFS' COMPLAINT AT LAW**                                              Page 12

comprehensive legal, accounting, financial, investment, and tax advice and planning, and upon Defendants' repeated unequivocal representations that the Distressed Debt Strategies were completely legal and valid.

24. Unbeknownst to Plaintiffs, Defendants entered into undisclosed (and possibly illegal) business arrangements with each other and the Other Participants. Through these arrangements, BDO Seidman systematically identified potential or existing clients who had substantial capital gains or ordinary income in a particular tax year. Then, playing on its position of trust, confidence, and prestige with its clients, BDO Seidman – in accordance with the Defendants' pre-planned scheme - steered clients such as Plaintiffs to BDO's Tax Solutions Group (an internal group within BDO responsible for designing, marketing, selling and implementing tax strategies), Gramercy, DeCastro, Financial Strategy and the Other Participants for legal, accounting, investment, and tax advice and services in connection with the Distressed Debt Strategies.

25. Why were firms like BDO Seidman, Gramercy, DeCastro, and Financial Strategy eager to participate and "rope in" their clients in this way? As BDO Seidman itself put it: **"One word sums up the strategy of the Tax Business Line. MONEY!"**[2] Defendants and the Other Participants entered into an arrangement where each would receive a certain portion of the fee for each Distressed Debt Strategy sold. The fee was not based on an hourly rate or time spent working on the deal; rather, the fee was based

---

[2] Quote from p. 3 of the BDO Seidman 2000 "Imagine the Possibilities" Business Line Strategy publication, pushing its "Tax Solutions" (*i.e.*, tax shelters) services, suggesting they all work together to **"change BDO into a green ocean"** (*id*. at 1) and that they should all **Think Green. Green is good!"** *Id*. at 3. Apparently, BDO's group in charge of these efforts was known as the "Wolfpack." Accordingly, this publication, Government Exhibit 26 in an Appendix filed in *United States v. BDO Seidman*, No. 02-C-4822 N. D. Ill., will be herein referred to as the "Wolfpack Manual."

solely on "the size" of the Distressed Debt Strategy. In other words, the bigger the deal, the larger the fee shared by Defendants and the Other Participants. And where was the money? Again, according to BDO Seidman: "**Where is the real money? SHOW ME THE MONEY – It's right in front of our faces. Our clients have the money.**"[3] Thus, BDO Seidman had a motive to sell as many Distressed Debt Strategies as possible, as large as possible. Not surprisingly, the Tax Solutions Group at BDO Seidman grew from $2.2 million in profits by 1998 to $14.8 million in profits in 1999,[4] and to in excess of $77 million of revenues in 2000.[5]

26.   BDO Seidman advised its clients, including Plaintiffs, that its tax professionals – and in particular BDO's tax professionals who had special expertise with transactions like the Distressed Debt Strategies - had designed proprietary tax-advantaged investment strategies that would provide an above average rate of return and at the same time minimize tax obligations resulting from substantial capital gains and/or ordinary income. Defendants knew or should have known that the Distressed Debt Strategies were, in reality, likely to be held by the IRS as nothing more than illegal and abusive tax shelters. To profit from their scheme, Defendants counted on their ability to conceal the true nature of the Distressed Debt Strategies from tax authorities and Plaintiffs.[6]

---

[3] Wolfpack Manual at 6.

[4] Wolfpack Manual at 7.

[5] Government Exhibit 27 in an Appendix filed in *United States v. BDO Seidman*, No. 02-C-4822 (N. D. Ill).

[6] Michael Kerekes, a former principal at BDO, recently plead guilty to conspiracy to defraud the United States and tax evasion on February 13, 2009. According to his plea agreement, the charges were based on Kerekes' "involvement, between in or about 1998 and 2003, in a conspiracy to defraud the United States, commit tax evasion, aid and assist in the preparation of false and fraudulent income tax returns, and obstruct and impede

27.     The Defendants and the Other Participants jointly conspired to design the Distressed Debt Strategies before the Defendants, with the assistance of the Other Participants, executed their plan to promote and sell the Distressed Debt Strategies to their own clients – such as Plaintiffs.  As part of this scheme, DeCastro agreed that BDO Seidman could promise prospective clients, such as Plaintiffs, that they would receive legal opinions certifying the soundness and legality of the Distressed Debt Strategies that Defendants convinced the clients to execute.  For a substantial fee, DeCastro issued legal opinions to Plaintiffs that purported to substantiate the bona fides of the Distressed Debt Strategies and provide absolute penalty protection.

28.     According to the Criminal Information filed by the United States against Michael Kerekes (a former principal at BDO Seidman and member of the Tax Solutions

---

due administration of the internal revenue laws, all in connection with the design, marketing, and implementation of tax shelter transactions while acting as a principal of BDO Seidman LLP."

Adrian Dicker, another former partner at BDO, also recently pled guilty to conspiracy to defraud the United States and tax evasion on March 17, 2009.  According to the United States Department of Justice, Dicker's guilty plea resulted from his involvement in the design, marketing, sale and implementation of tax shelter transactions for BDO's clients.

Charles Bee, another former partner at BDO, also recently plead guilty to conspiracy to defraud the United States and tax evasion on June 3, 2009.  According to the United States Department of Justice, Bee's guilty plea resulted from his involvement in the design, marketing, sale and implementation of tax shelter transactions for BDO's clients.

The United States recently filed criminal indictments against Robert Greisman and Dennis Field, former partners at BDO, on June 9, 2009, in connection with their involvement in the design, marketing, sale, and implementation of fraudulent tax shelters.  Field was the head of National Tax at BDO and a former Chairman and CEO of BDO.

Kerekes, Dicker, Bee, Greisman, and Field were members of BDO's Tax Solutions Group – the group within BDO Seidman responsible for the design, promotion, sale and implementation of BDO tax-reducing strategies, including Distressed Debt Strategies.

Group), BDO Seidman, in furtherance of the conspiracy, developed a template consulting agreement for use in the tax shelter transactions. See *U.S. v. Kerekes*, Information at p. 11, 16. This consulting agreement was deliberately broad and vague and did not specifically refer to the tax shelter transactions (e.g., the Distressed Debt Strategies). *Id.* The purpose of the consulting agreement was to conceal from the IRS the fact that the transaction was in fact a tax shelter and to conceal from the IRS the actual fees paid to BDO in connection with the tax shelter transactions so that only a portion of the fees would be considered if and when the IRS conducted a profitability analysis of the tax shelter transaction. *Id.* Of course, Plaintiffs were unaware of these facts and BDO's motive. Plaintiffs were fraudulently induced to enter into these consulting agreements with BDO in connection with the Distressed Debt Strategies.[7]

29.     Despite Defendants' knowledge that the IRS would likely disallow the Distressed Debt Strategies, BDO Seidman and Financial Strategy[8] assisted Plaintiffs with the preparation of their federal and state tax returns utilizing the losses generated by the Distressed Debt Strategies. BDO and/or Financial Strategy then signed the tax returns and advised Plaintiffs to sign and file the tax returns. Even after Defendants learned that the IRS had begun to audit and disallow the losses generated by tax-advantaged investment strategies that were the same or substantially similar to Plaintiffs' Distressed Debt Strategies, Defendants continued to advise Plaintiffs to execute the Distressed Debt

---

[7] Likewise, Gramercy fraudulently induced Plaintiffs into entering into an "investment" agreement. Plaintiffs were unaware that Gramercy and BDO were "in cahoots", were in no way independent of one another, and were sharing/splitting fees that Plaintiffs paid to BDO.

[8] BDO and Financial Strategy prepared certain of the Plaintiffs' tax returns for the 2002 and 2003 tax years.

**PLAINTIFFS' COMPLAINT AT LAW**

Strategies and use the losses generated from the Distressed Debt Strategies to offset income and/or capital gains on their tax returns.

30.     After BDO Seidman convinced their clients, including the Plaintiffs, to execute the Distressed Debt Strategies, Gramercy stepped in, and with the assistance of BDO, worked with Plaintiffs to execute the "investment" component of the Distressed Debt Strategies.  The efforts of DeCastro culminated in their prefabricated and canned legal opinions confirming the propriety of the respective Distressed Debt Strategies.  At no point in time did Defendants or any of the Other Participants ever disclose to Plaintiffs that they had conspired to design, promote, sell, and implement the Distressed Debt Strategies.

31.     At all times alleged herein, Defendants knew that Plaintiffs placed tremendous trust and faith in Defendants as Plaintiffs' legal, accounting, tax, financial, and investment advisors with respect to all aspects of the Distressed Debt Strategies. Further, because of BDO Seidman's unique relationship with Plaintiffs – and the trust and confidence this relationship created - BDO Seidman knew that if BDO Seidman recommended the Distressed Debt Strategies to Plaintiffs, Plaintiffs were likely to follow their recommendation and participate in the Distressed Debt Strategies.

32.     Based on Defendants' advice and recommendations, Plaintiffs paid a significant amount of fees to Defendants and the Other Participants to implement the Distressed Debt Strategies.[9]  Ultimately, as a direct result of Defendants' improper advice

---

[9] Unbeknownst to Plaintiffs, BDO Seidman "kickbacked" to Gramercy part of the fee Plaintiffs' paid to BDO Seidman.  Neither BDO nor Gramercy disclosed to Plaintiffs that BDO had an agreement with Gramercy that required BDO to kick-back to Gramercy part of the fee that Plaintiffs paid to BDO.  Moreover, the purported agreements Plaintiffs were required to execute with BDO and Gramercy failed to disclose this fee kick-back.

**PLAINTIFFS' COMPLAINT AT LAW**

and conduct, the IRS disallowed Plaintiffs' Distressed Debt Strategies and determined that Plaintiffs owed substantial back-taxes, interest, and penalties.

**B.    THE 2002 DISTRESSED DEBT STRATEGY**

**1.    About Distressed Debt**

33.    The term "distressed debt" as used herein in the context of tax strategies typically refers to debt instruments that can be purchased at a significant discount from the face value of such debt instruments.  Thus, these debt instruments have a significant "built-in" loss.  This discount on the debt instruments can be attributable to a number of factors, including the prevailing economic conditions of the country in which the borrowers reside, the credit worthiness of the borrowers, and the lack of suitable collection efforts.

**2.    The Distressed Debt Strategy**

34.    The Distressed Debt Strategy was presented to Mr. Khan as a tax-advantaged investment designed to provide tax and non-tax benefits through investments in a distressed debt fund.  The tax component involves the contribution of distressed debts (generally assets trading substantially below their face value) from a foreign contributor to a U.S. partnership.  That partnership subsequently contributes the distressed debts to lower-tier partnerships.  The foreign partner then sells its interest in the lower-tier partnership to a U.S. taxpayer who contributes other assets to the partnership.  The tax benefit is realized when the partnership sells or exchanges the contributed distressed assets for cash or other assests.

3.    **Defendants "Pitch" the 2002 Distressed Debt Strategy to Plaintiffs[10]**

35.    Beginning in approximately 1993, BDO performed audit services for Chromecraft, a company owned in part by Plaintiff Shahid Khan. Mike Collins was the BDO partner in charge of the audit services for Chromecraft. By 1999, Collins had been one of Khan's trusted accountants and advisors for approximately six years.

36.    In 1999, Khan was involved in negotiations to purchase a Canadian company that manufactured plastic automobile bumpers. Japanese investors owned the company, and these Japanese investors requested to be paid with Japanese Yen in connection with the sale of the company.

37.    Khan needed to acquire a substantial amount of Japanese Yen in order to purchase the company, but he had no experience whatsoever in dealing in foreign currency trading. Accordingly, Khan requested that his partner in Chromecraft ask Collins if he could recommend any potential advisors with foreign currency trading experience.

38.    In the Summer of 1999, Collins (who no doubt recognized Khan as potential "target" for BDO's Tax Solutions Group) referred Plaintiffs to Paul Shanbrom (a tax partner at BDO and member of BDO's Tax Solutions Group). Shanbrom introduced Khan to a tax-advantaged investment strategy involving the purchase and sale of digital options on foreign currency. BDO subsequently implemented tax-advantaged

---

[10] With respect to the 2002 Distressed Debt Strategy, the term "Plaintiffs" means Shahid R. Khan, Ann C. Khan, PBANAN LLC, CFURDR LLC, and UVIADO LLC.

**PLAINTIFFS' COMPLAINT AT LAW**

investment strategies involving digital options on foreign currency for Plaintiffs for the 1999, 2000 and 2001 tax years.[11]

39.     In the Spring of 2002, Shanbrom advised Khan that BDO had developed a new investment strategy that was completely different than the tax-advantaged investment strategies involving the purchase and sale of digital options on foreign currency.   Shanbrom then introduced a tax-advantaged investment strategy using investments in distressed debt (the "2002 Distressed Debt Strategy") to Khan.

40.     Shanbrom advised Khan that the 2002 Distressed Debt Strategy would provide Plaintiffs with an above-average return on their investment and, at the same time, legally minimize Plaintiffs' taxes.  Shanbrom stressed to Khan that the 2002 Distressed Debt Strategy was completely legal.  Shanbrom advised Khan that the 2002 Distressed Debt Strategy was a highly-confidential propriety investment strategy designed by BDO. Shanbrom discussed the steps of the 2002 Distressed Debt Strategy with Khan and recommended that Khan execute the 2002 Distressed Debt Strategy.  Shanbrom told Khan that Gramercy had a limited amount of distressed debt and that the 2002 Distressed Debt Strategy could not be replicated.

41.     Shanbrom explained that Gramercy was the "expert" in foreign distressed debt investments and that Gramercy had a track record of making higher-than-average returns on their distressed debt investments. Shanbrom also told Khan that Gramercy and BDO had experience working together on the Distressed Debt Strategy for other BDO

---

[11] Plaintiffs have filed a separate lawsuit against BDO, Gramercy and others with respect to the tax-reducing investment strategies that Plaintiffs entered into for the 1999, 2000 and 2001 tax years.

clients. Shanbrom "touted" Gramercy's reputation and expertise with foreign distressed debt investments.

42.     Shanbrom recommended that Khan engage De Castro to issue the legal opinion for the 2002 Distressed Debt Strategy.  In fact, Shanbrom told Khan that De Castro was the only law firm that had the special qualifications and expertise to issue a legal opinion for the 2002 Distressed Debt Strategy.  Khan subsequently visited De Castro's offices in California.  Menasche Nass, the attorney at De Castro who authored the opinion letters, met with Khan and further explained the 2002 Distressed Debt Strategy and why it was a legal tax-advantaged investment strategy.  Nass assured Khan that the 2002 Distressed Debt Strategy was completely legal.  Nass also met with Khan in Champaign, Illinois on two occasions to discuss the 2002 Distressed Debt Strategy and to promote DeCastro for additional work for Khan.

43.     Khan also had discussions with Jay Johnston of Gramercy regarding the 2002 Distressed Debt Strategy.  Johnston discussed Gramercy's expertise with distressed debt investments and Gramercy's long history of achieving high rates of return on the distressed debt investments.  Johnston told Khan that Gramercy could achieve results for him that few, if any, other investment firms could get for Khan because of Gramercy's expertise in this area of investments.  Johnston advised Khan that BDO and Gramercy had a history of working with one another on the Distressed Debt Strategy for other BDO clients and that the 2002 Distressed Debt was a completely legal way to make a higher-than-average investment return and at the same time achieve substantial tax benefits.

44.     Khan eventually visited Gramercy's offices in Connecticut.  Khan met with Johnston and several other principals at Gramercy during these visits.

**PLAINTIFFS' COMPLAINT AT LAW**

45.    BDO, Gramercy, DeCastro and Financial Strategy (collectively the "2002 Strategy Defendants") and the Other Participants, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the purchase and sale of the 2002 Distressed Debt Strategy pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs.   Further, the 2002 Strategy Defendants and the Other Participants made various false statements of material fact and omitted to state material facts that made the statements misleading to Plaintiffs.   The purpose and effect of the 2002 Strategy Defendants' and Other Participants' plan, transaction, and course of conduct was to generate fees by promoting an alleged tax-savings strategy.

46.    The 2002 Strategy Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and/or disclose the true facts, even though such facts were available to them.

47.    As a result of and in reliance on these misrepresentations and/or omissions, the Plaintiffs engaged in the 2002 Distressed Debt Strategy.   Had Plaintiffs known of the material adverse information that the 2002 Strategy Defendants did not disclose, they would not have entered into the 2002 Distressed Debt Strategy.

48.    The 2002 Strategy Defendants intended to deceive the Plaintiffs.   The combination of the relatively short time the Plaintiffs were given to consider the transaction, the manner in which the transaction was marketed, and the transaction's

**PLAINTIFFS' COMPLAINT AT LAW**

failure to achieve its intended purpose lead to the conclusion that there is no possible explanation for the 2002 Strategy Defendants' behavior other than intentional deceit.

49.     The fee to each of the 2002 Strategy Defendants and the Other Participants in the 2002 Distressed Debt Strategy was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction.  The bigger the deal, the larger the fee shared by the 2002 Strategy Defendants and Other Participants.

### 4.     The Features of the 2002 Distressed Debt Strategy

50.     The features of the 2002 Distressed Debt Strategy, as outlined by the 2002 Strategy Defendants and their co-conspirators – the Other Participants, were as follows:

> a.     First, entities organized and existing under the laws of a foreign country contribute high-basis, low-value assets (distressed debt) to a newly created LLC (taxed as a partnership);

> b.     Second, the newly created LLC contributes the distressed debt to another newly formed LLC;

> c.     Third, Plaintiffs purchase an interest in the LLC from the foreign entity/entities and contribute other assets to the LLC;

> d.     Fourth, the LLC sells the distressed debt at fair-market value and Plaintiffs claim a loss based on the difference between the face value of the distressed debt and amount received upon the sale of the distressed debt.

### 5.     Plaintiffs Engage in the 2002 Distressed Debt Strategy

### a.     The "Distressed Debt" is Contributed to the LLC's

51.     HSS Indústria e Comércio Ltda. and Zhara Calcados Ltda. are entities organized under the laws of Brazil.  On February 11, 2002, these entities contributed

PLAINTIFFS' COMPLAINT AT LAW

certain emerging market receivables ("Notes") to PBANAN LLC in exchange for membership interests in PBANAN.

52.    Comércio de Tecidos e Confecções Helensi Ltda., Guy Baday Ltda., and Mile Confecções Ltda. are also entities organized under the laws of Brazil.  On February 11, 2002, these entities contributed emerging market receivables to JAKEND LLC in exchange for membership interests therein.

53.    Distribuidora de Alimentos Quality Cacapaba, SP and Luciano Puccetta Emidio are also entities organized and existing under the laws of Brazil.  On February 11, 2002, these entities contributed emerging market receivables to CFURDR LLC in exchange for membership interests.

54.    PBANAN LLC, JAKEND LLC and CFURDR LLC are referred to in this section as the ("Contributor LLCs").  Gramercy Advisors, LLC served as the managing member of each of these Contributor LLC's.

### b.    The Contributor LLCs Contribute the Distressed Debt

55.    On September 16, 2002, Tall Ships Capital Management, LLC (an affiliate of Gramercy), and each of the Contributor LLCs entered into an operating agreement for a recently formed Delaware limited liability company – UVIADO LLC.  On September 16, 2002, the Contributor LLCs contributed the distressed debt to UVIADO LLC for membership interests therein.

### c.    Khan Purchases Option Positions

56.    On November 18, 2002, Khan purchased and sold options on the Japanese Yen.  Khan executed these options with Refco Capital Markets, Ltd (the "FX Contracts").  Khan purchased a put option on the Japanese Yen with a notional amount of JPY

1,291,548,356,475 for a premium of $70,000,000. The option strike price was 133.3280000 Yen/Dollar and the expiration date was September 26, 2003. Khan also sold a put option on the Japanese Yen with a notional amount of JPY 1,291,548,356,475 for a premium of $69,500,000. The option strike price was 133.3555350 Yen/Dollar and the expiration date was September 26, 2003. Khan paid a total premium of $500,000 to Refco which represents the difference between the $70,000,000 paid for the option purchased and the $69,500,000 received for the option sold.

### d.  Khan Purchases an Interest in UVIADO LLC and Contribute the Option Positions

57.   On November 18, 2002, Khan purchased interests in UVIADO LLC from each of the Contributor LLCs. Khan also contributed the option positions, cash, and other assets to UVIADO LLC.

### e.  The Distressed Debt is Exchanged

58.   On December 26, 2002, UVIADO LLC exchanged the distressed debt with an unrelated third party.

### 6.  The DeCastro Opinion Letter for the 2002 Distressed Debt Strategy

59.   In August 2003, Shanbrom contacted Khan to tell him that the De Castro legal opinion letter was ready. Shanbrom told Khan that he had reviewed the legal opinion letter and made certain revisions to it. Shanbrom instructed Khan to send a check to DeCastro in order to receive the legal opinion letter. On August 29, 2003, DeCastro issued a legal opinion letter to Khan regarding the propriety of the 2002 Distressed Debt Strategy. The Plaintiffs were still under the mistaken belief that the opinion letter set forth "independent" opinions of an "independent" law firm on the propriety of the 2002 Distressed Debt Strategy.

60.    The opinion letter was authored and prepared based, in part, on representations made by the 2002 Strategy Defendants.  The opinion letter advised the Plaintiffs that, among other things, it was more likely than not that:

A.    PBANAN LLC, JAKEND LLC, and CFURDR LLC and UVIADO LLC will be classified as a partnership, and each member in each PBANAN LLC, JAKEND LLC, and CFURDR LLC and UVIADO LLC will be treated as a partner of the partnership.

B.    UVIADO LLC's tax basis in the Notes contributed to it by PBANAN LLC, JAKEND LLC, and CFURDR LLC is equal to such Contributor LLC's tax basis in the Notes immediately before their contribution to UVIADO LLC, increased by any gain recognized by such PBANAN LLC, JAKEND LLC, and/or CFURDR LLC on the contribution.

C.    Plaintiff Shahid R. Khan's tax basis in the Spread Option is equal to the premium paid to acquire the Purchased Option.

D.    Plaintiff does not recognize gain or loss on the contribution of the Spread Option to UVIADO LLC.

E.    Plaintiff's initial tax basis in Plaintiff's membership interest in UVIADO LLC is equal to the aggregate amount paid by Investor to PBANAN LLC, JAKEND LLC, and CFURDR LLC to acquire an interest in UVIADO LLC, increased by the amount of cash and the tax basis of other assets contributed by Plaintiff to UVIADO LLC, reduced by the amount of liabilities, if any, assumed by UVIADO LLC (but without diminution for the contribution of the Sold Option to UVIADO LLC), and increased by gain, if any, recognized on the contribution of the Spread Option.

F.    UVIADO LLC recognized a loss on the disposition of the Notes equal to the difference between UVIADO LLC's tax basis in the Notes immediately prior to the disposition and the proceeds of the disposition of the Notes.

G.    Under Section 724 of the Code, 100% of the loss recognized by UVIADO LLC on the disposition of the Notes is ordinary. Alternatively, under Section 988: (i) 62.80% of the loss recognized by UVIADO LLC on disposition of the Notes is ordinary and 37.20% of such loss is capital.

H.    Under Section 704(c), (i) 89.85% of the loss recognized by UVIADO LLC on its disposition of the HSS Notes and the Zhara Notes is

properly allocable to Plaintiffs as transferee and holder of a portion of PBANAN LLC's interest in UVIADO LLC for the year in which the disposition occurred, (ii) 80.35% of the loss recognized by UVIADO LLC on its disposition of the Helensia Notes, Baday Notes and Mile Notes is properly allocable to Plaintiff as transferee and holder of a portion of JAKEND LLC's interest in UVIADO LLC for the year in which the disposition occurred and (iii) 89.85% of the loss recognized by UVIADO LLC on its disposition of the Distribuidora Notes and Luciano Notes is properly allocable to Plaintiff as transferee and holder of a portion of CFURDR LLC's interest in UVIADO LLC for the year in which the disposition occurred.

I.   With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Plaintiff in connection with the Investment Transaction:

1.   The step transaction doctrine will not apply to the Investment Transactions;

2.   The requisite profit motive exists to support Plaintiff's deduction of any loss from the Investment Transactions under Section 165(c)(2);

3.   The sham transaction doctrine will not apply and the Investment Transactions will have the requisite business purpose and economic substance;

4.   The IRS will be unsuccessful if it asserts that UVIADO LLC should be disregarded;

5.   The IRS will be unsuccessful if it asserts under Treasury Regulations Section 1.701-2 that the Investment Transactions are inconsistent with the intent of Subchapter K;

6.   Any loss that Plaintiff incurs from the Investment Transactions will not be subject to the limitations under Section 469;

7.   Any loss that Plaintiff incurs from the Investment Transactions will not be limited by the Section 465 "at risk" rules;

8.   Section 482 will not be applicable to the Investment Transactions; and

9.   Section 1092 will not apply to limit losses incurred by Plaintiff from the investment in UVIADO LLC.

10.     IRS Notices and Field Service Advice will not apply to disallow Plaintiff's losses from the Investment Transactions.

J.     Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Investment Transactions as described herein will be upheld if challenged by the IRS.

K.     Plaintiff *will not* be subject to accuracy-related penalties as a result of reporting the income tax consequences of the Investment Transactions in a manner consistent with this opinion.

61.     Based on information and belief, in accordance with their pre-planned scheme, the 2002 Strategy Defendants were aware of the existence and effect of the applicable portions of the Internal Revenue Code, established case law, common law doctrines, IRS notices, regulations, and IRS authorities that indicated that the IRS would conclude that the 2002 Distressed Debt Strategy was not a legal tax-advantaged investment strategy, but intentionally failed to fully analyze and discuss the effect of these authorities on the 2002 Distressed Debt Strategy with Plaintiffs.

62.     The 2002 Strategy Defendants advised the Plaintiffs that as a result of the 2002 Distressed Debt Strategy, the Plaintiffs could properly and legally claim losses on their tax returns for 2002.

63.     Relying on the 2002 Strategy Defendants' representations, Plaintiffs included the losses generated by the 2002 Distressed Debt Strategy on their federal and state tax returns for 2002.

## 7.     The BDO Opinion Letter for the 2002 Distressed Debt Strategy

64.     On October 9, 2003, BDO issued an opinion letter to Plaintiffs regarding the propriety of the 2002 Distressed Debt Strategy (the "2003 BDO opinion letter").

65.     BDO authored and prepared the opinion letter based, in part, on representations made by the 2002 Strategy Defendants. Not surprisingly, the 2003 BDO

opinion letter reached the same conclusions as the 2003 DeCastro opinion letter and advised the Plaintiffs that, among other things, it was more likely than not that:

1.   UVIADO LLC will be classified as a partnership and the Plaintiff, PBANAN LLC, JAKEND LLC, and CFURDR LLC, and Tall Ships Capital Management LLC will be treated as partners of UVIADO LLC. PBANAN LLC, JAKEND LLC, and CFURDR LLC will be classified as partnerships and the Foreigners and the Manager will be treated as partners of the respective Contributors of which they were members.

2.   The Plaintiff's tax basis in the Purchased Option transferred to UVIADO LLC will equal the premium paid with respect thereto and any other costs associated with acquiring such Option. The Plaintiff's tax basis in the UMS Option transferred to UVIADO LLC will equal the premium paid with respect thereto and any other costs associated with acquiring such UMS Option.

3.   The Sold Option will not constitute a "liability" under Code § 752.

4.   With respect to determining the Plaintiff's basis in UVIADO following his capital contribution:

   a.   The Purchased and Sold Options will not be integrated into a single instrument.

   b.   The Options will not be subject to the "mark-to-market" rules of Code § 1256.

   c.   The investment partnership rules of Code §§ 351 and 721 will not apply to require the Plaintiff to recognize any precontribution gain in the Options and other property contributed by the Plaintiff to UVIADO LLC.

   d.   Plaintiff will not be treated under the assignment of income doctrine as the taxable recipient of premium on the Sold Option.

   e.   Plaintiff will not be treated as UVIADO LLC's agent in acquiring the Options.

   f.   Code § 358(h) and Treas. Reg. § 1.752-6T will not apply with respect to the contribution of the Options by the Plaintiff to UVIADO LLC.

5.   UVIADO LLC has a tax basis in the Options equal to that same tax basis in the hands of Plaintiff immediately prior to their contribution to UVIADO LLC.

6.   UVIADO LLC has a tax basis in the Notes equal to that same tax basis in the hands of the Foreigners immediately prior to their contribution to PBANAN LLC, JAKEND LLC, and CFURDR LLC.

7.   Plaintiff will initially have a tax basis in its membership interest in UVIADO LLC equal to (i) the amount of money, (ii) the adjusted basis of other property contributed to UVIADO LLC, (iii) the amount of gain, if any, recognized by Plaintiff on the contribution under Code § 721(b) and (iv) its purchase price for its interest.

8.   PBANAN LLC, JAKEND LLC, and CFURDR LLC will initially have tax bases in their UVIADO LLC membership interests equal to there tax bases in the Notes they contributed to UVIADO LLC, increased by (i) the amount of money, (ii) the adjusted basis of other property contributed to UVIADO LLC, and (iii) the amount of gain, if any, recognized by each PBANAN LLC, JAKEND LLC, and CFURDR LLC on the contribution under Code § 721(b).

9.   UVIADO LLC will recognize a loss on the disposition of the Notes it sold on December 26, 2002 equal to the difference between its tax basis in those Notes and the amount of cash received from the disposition of such Notes.  Such loss will be ordinary in character.

10.   Under Code § 704(c), 85.63% of the loss described in item 9, above, will be allocated by UVIADO LLC to Plaintiff as an acquirer and holder of a portion of the PBANAN LLC, JAKEND LLC, and CFURDR LLC's Interests for the year in which the disposition occurs.

11.   Plaintiff will have sufficient tax basis in its membership interest in UVIADO LLC in order to pass through and deduct its allocation of the losses described in Item 9 above.  Code § 704(d) will not limit those deductions.

12.   With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Plaintiff in connection with the Transactions:

a.   The sham transaction doctrine will not apply and, based on the representations provided to us, the Transactions will have the requisite business purpose and economic substance;

PLAINTIFFS' COMPLAINT AT LAW

b.     Based on the representations furnished to us, the requisite profit motive exists to support the deduction of any loss from the Transactions under Code § 165(c)(2);

c.     PBANAN LLC, JAKEND LLC, and CFURDR LLC's ownership of their interests in UVIADO LLC will be respected, notwithstanding the brief periods of ownership of parts of the interests;

d.     The step transaction doctrine will not apply to the Transactions;

e.     The Service will be unsuccessful were it either to assert (i) under Reg. § 1.701-2 that the Transactions are inconsistent with the intent of subchapter K or (ii) that UVIADO LLC should be disregarded entirely under Reg. § 1.701-2 or under common law principles;

f.     Any loss that Plaintiff incurs from the Transactions will not be limited by the Code § 465 "at risk" rules;

g.     Any loss that Plaintiff incurs from the Transactions will not be subject to the limitations under Code § 469;

h.     Code § 482 will not be applicable to the Transactions; and

i.     Code § 446 will not apply to require an allocation of loss inconsistent with Code § 704(c).

13.    There is a greater than fifty percent (50%) likelihood that the tax treatment of the Transactions will be upheld if challenged by the Service.

14.    Plaintiff *should not* be subject to a penalty under Code § 6662(e)(1)(A), governing gross valuation misstatements, for positions taken on Plaintiff's U.S. Federal income tax return with respect to the Transactions.

15.    Plaintiff *should not* be subject, under Code § 6662(b)(2) or (3), to accuracy-related penalties for positions taken on the Investor's U.S. Federal income tax return with respect to the Transactions.

66.    Pursuant to their pre-planned scheme, the 2002 Strategy Defendants were aware of the existence and effect of the applicable portions of the Internal Revenue Code, established case law, common law doctrines, IRS notices, regulations, and IRS

authorities that indicated that the IRS would conclude that the 2002 Distressed Debt Strategy was not a legal tax-advantaged investment strategy, but intentionally failed to fully and properly analyze and/or discuss the effect of these authorities on the 2002 Distressed Debt Strategy with Plaintiffs.

67.     The 2002 Strategy Defendants advised the Plaintiffs that as a result of the 2002 Distressed Debt Strategy, the Plaintiffs could properly and legally claim losses on their tax returns for 2002.

68.     Relying on the 2002 Strategy Defendants' representations, Plaintiffs included the losses generated by the 2002 Distressed Debt Strategy on their federal and state tax returns for 2002.

**8.     Plaintiffs File Tax Returns Based on the 2002 Strategy Defendants' Advice and Instructions**

69.     Financial Strategy prepared and signed the 2002 federal tax return for UVIADO, LLC and provided Plaintiffs with a copy of this tax return. Financial Strategy, who had an undisclosed fee arrangement with Gramercy and/or BDO, was aware that and in fact intended on Plaintiffs using and relying on this tax return to prepare Plaintiffs' individual tax returns. BDO prepared and signed the 2002 individual federal tax return for the Plaintiffs on approximately October 10, 2003. This tax return contained the losses purportedly generated by the 2002 Distressed Debt Strategy. The 2002 Strategy Defendants advised the Plaintiffs that their tax returns were properly prepared in accordance with professional standards. In addition, the 2002 Strategy Defendants advised Plaintiffs that they could legally use the losses generated from the 2002 Distressed Debt Strategy on their tax returns. Based on these assurances, the DeCastro and BDO opinion letters, the 2002 Strategy Defendants' representations and instructions

during all phases of the promotion, sale, and implementation of the 2002 Distressed Debt Strategy, and the 2002 federal tax return for UVIADO, LLC, the Plaintiffs signed and filed their federal and state tax returns for the 2002 tax year. The filing of these tax returns was the final step of the 2002 Distressed Debt Strategy.

### 9.    Defendants Fail to Give Plaintiffs Full Disclosure

70.    At no time prior to or subsequent to Plaintiffs' implementation of the 2002 Distressed Debt Strategy did the 2002 Strategy Defendants inform the Plaintiffs that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the 2002 Strategy Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2002 Distressed Debt Strategy to the Plaintiffs. At this time, the 2002 Strategy Defendants knew or should have known that the IRS would conclude that the 2002 Distressed Debt Strategy was an illegal and abusive tax shelter and violated, among other things, the partnership anti-abuse rules under Treas. Reg. § 1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the economic substance doctrine, and the business purpose doctrine, as well as numerous other established authorities. The 2002 Strategy Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary to Plaintiffs' detriment.

71.    Between the time the 2002 Strategy Defendants advised, recommended, and instructed the Plaintiffs to enter into the 2002 Distressed Debt Strategy and the time the Plaintiffs' tax returns were prepared, signed and filed, the 2002 Strategy Defendants never fully and properly disclosed to Plaintiffs the significance and existence of the published case law, common law doctrines, applicable portions of the Internal Revenue

Code, IRS notices, regulations and other applicable authorities that clearly indicated that the IRS would conclude that the 2002 Distressed Debt Strategy was an illegal and abusive tax shelter.  The 2002 Strategy Defendants failed to advise Plaintiffs that the IRS would conclude that the 2002 Distressed Debt Strategy lacked the required business purpose and economic substance and, in fact, advised Plaintiffs to the contrary to Plaintiffs' detriment.  The 2002 Strategy Defendants intentionally failed to disclose this material information to the Plaintiffs.

72.    The 2002 Strategy Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the 2002 Distressed Debt Strategy.

### 10.    The Cost of the 2002 Distressed Debt Strategy

73.    The Plaintiffs lost a significant amount of money in carrying out the 2002 Distressed Debt Strategy.  For the 2002 Distressed Debt Strategy and tax returns in connection therewith, the Plaintiffs paid significant fees to the 2002 Strategy Defendants and the Other Participants.

74.    Further, in 2008, the IRS disallowed Plaintiffs' 2002 Distressed Debt Strategy and determined that Plaintiffs owed substantial back-taxes, interest, and penalties as a direct result of their participation in the 2002 Distressed Debt Strategy.

## C.    THE 2003 DISTRESSED DEBT STRATEGY

### 1.    Defendants "Pitch" the 2003 Distressed Debt Strategy to Plaintiffs[12]

75.    In the Spring of 2003, Shanbrom met with Khan and informed him that BDO had improved the Distressed Debt Strategy.  According to Shanbrom, BDO and

---

[12] With respect to the 2003 Distressed Debt Strategy, the term "Plaintiffs" means Shahid R. Khan, Ann C. Khan, ANGLAISE LLC and JONCTION LLC.

Gramercy had re-designed the 2003 Distressed Debt Strategy to give clients like Khan a much greater chance of making even more money on the distressed debt investments. In addition, Shanbrom advised Khan that the 2003 Distressed Debt Strategy had the same tax benefits found in the 2002 Distressed Debt Strategy. Shanbrom told Khan that DeCastro had analyzed the 2003 Distressed Debt Strategy, concluded the 2003 Distressed Debt Strategy was legal, and agreed to issue another legal opinion for Khan if Khan executed the 2003 Distressed Debt Strategy.

76.    BDO, Gramercy, DeCastro and Financial Strategy (collectively the "2003 Strategy Defendants") singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the design, promotion, sale, and implementation of the 2003 Distressed Debt Strategy pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs. Further, the 2003 Strategy Defendants made various false statements of material fact and omitted to state material facts that made the statements misleading to Plaintiffs. The purpose and effect of the 2003 Strategy Defendants' plan, transaction, and course of conduct was to generate fees by promoting an alleged tax-advantaged investment strategy.

77.    The 2003 Strategy Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and/or disclose the true facts, even though such facts were available to them.

78.    As a result of and in reliance on these misrepresentations and omissions, the Plaintiffs engaged in the 2003 Distressed Debt Strategy. Had Plaintiffs known of the

material adverse information that the 2003 Strategy Defendants did not disclose, they would not have entered into the 2003 Distressed Debt Strategy.

79.     The 2003 Strategy Defendants intended to deceive the Plaintiffs.   The combination of the relatively short time the Plaintiffs were given to consider the transaction, the manner in which the transaction was marketed, and the transaction's failure to achieve its intended purpose lead to the conclusion that there is no possible explanation for the 2003 Strategy Defendants' behavior other than intentional deceit.

80.     Just as with the 2002 Distressed Debt Strategy, the fee to each of the 2003 Strategy Defendants in the 2003 Distressed Debt Strategy was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction.   The bigger the deal, the larger the fee shared by the 2003 Strategy Defendants.

### 2.     The Features of the 2003 Distressed Debt Strategy

81.     The features of the 2003 Distressed Debt Strategy, as designed, marketed, sold and implemented by the 2003 Strategy Defendants, were as follows:

> a.     First, entities organized and existing under the laws of a foreign country contribute high-basis, low-value assets (distressed debt) to a newly created LLC (taxed as a partnership);
>
> b.     Second, the newly created LLC contributes the distressed debt to another newly formed LLC;
>
> c.     Third, Plaintiffs purchase an interest in the LLC from the foreign entity/entities and contribute other assets to the LLC;
>
> d.     Fourth, the LLC sells the distressed debt at fair-market value and the taxpayer claims a loss based on the difference between the face value of the distressed debt and amount received upon the sale of the distressed debt.

3. **Plaintiffs Engage in the 2003 Distressed Debt Strategy**

    a.     **The "Distressed Debt" is Contributed to the LLC**

82.     JC Comércio Ind. Representação de Materiais de Construção Ltda. is an entity organized and existing under the laws of Brazil.  On March 25, 2003, this entity contributed certain emerging market receivables ("Notes") to ANGLAISE LLC in exchange for a membership interest in ANGLAISE.

83.     Blocon Ind. Comércio de Materiais de Construção Ltda. is also an entity organized and existing under the laws of Brazil.  On March 25, 2003, this entity contributed emerging market receivables to ANGLAISE LLC in exchange for a membership interest therein.

84.     Metalúrgica Xavante Ltda. is also an entity organized and existing under the laws of Brazil.  On March 25, 2003, this entity contributed emerging market receivables to ANGLAISE LLC in exchange for membership interests.

85.     Gramercy Asset Management, LLC served as the managing member of ANGLAISE LLC.

    b.     **ANGLAISE LLC Contributes the Distressed Debt to JONCTION LLC**

86.     On April 15, 2003, Gramercy Asset Management, LLC and ANGLAISE entered into an Operating Agreement for a recently formed Delaware limited liability company – JONCTION LLC.  On April 15, 2003, ANGLAISE LLC contributed the distressed debt to JONCTION LLC for a membership interest therein.

### c.       Plaintiffs Purchase an Interest in UVIADO LLC

87.     On May 21, 2003, Plaintiffs purchased an interest in JONCTION LLC from AINGLAISE LLC.

### d.       JONCTION LLC Contributes Distressed Debt to LEMAN LLC

88.     On May 21, 2003, ANGLAISE LLC contributed the distressed debt to LEMAN LLC in exchange for an interest in LEMAN LLC.   ANGLAISE LLC and Gramercy Asset Management, LLC contributed additional capital to ANGLAISE LLC.

### e.       LEMAN LLC Exchanges the Distressed Debt

89.     On December 26, 2003, LEMAN LLC exchanged the distressed debt for other distressed debt held by Gramercy Financial Services.

### 3.   The DeCastro Opinion Letter for the 2003 Distressed Debt Strategy

90.     In August 2003, Shanbrom contacted Khan to tell him that the De Castro legal opinion letter was ready.   Shanbrom told Khan that he had reviewed the legal opinion letter and made certain revisions to it.   Shanbrom instructed Khan to send a check to DeCastro in order to receive the legal opinion letter.   On January 15, 2004, DeCastro issued a legal opinion letter to Plaintiffs regarding the propriety of the 2003 Distressed Debt Strategy (the "2004 DeCastro opinion letter").   The Plaintiffs were still under the mistaken belief that the legal opinion letter set forth "independent" opinions of an "independent" law firm on the propriety of the 2003 Distressed Debt Strategy.

91.     The legal opinion letter was authored and prepared based, in part, on representations made by the 2003 Strategy Defendants.   The opinion letter advised the Plaintiffs that, among other things, it was more likely than not that:

A.    ANGLAISE LLC, JONCTION LLC, and LEMAN LLC will each be classified as a partnership, and each member of these LLCs will be treated as a partner of the partnership.

B.    JONCTION LLC's tax basis in the Notes was equal to ANGLAISE LLC's tax basis in the Notes immediately before its contribution to JONCTION LLC, increased by any gain recognized by ANGLAISE LLC on the contribution.

C.    Plaintiff's initial tax basis in Plaintiff's membership interest in JONCTION LLC is equal to the aggregate amount paid by Plaintiff to ANGLAISE LLC to acquire its interest in JONCTION LLC, increased by the amount of cash and the tax basis of other assets contributed by Plaintiff to JONCTION LLC, reduced by the amount of liabilities, if any, assumed by JONCTION LLC and increased by gain, if any, recognized on the contribution of the assets.

D.    JONCTION LLC's initial tax basis in its membership interest in LEMAN LLC is equal to the amount of cash and the tax basis of the Notes contributed by JONCTION LLC to LEMAN LLC, and LEMAN LLC's tax basis in the Notes is equal to JONCTION LLC's tax basis in the Notes immediately before their contribution to LEMAN LLC.

E.    LEMAN LLC recognized a loss on the disposition of the Notes equal to the difference between LEMAN LLC's tax basis in the Notes immediately prior to the disposition and the proceeds of the sale of the Notes.

F.    Under Section 724 of the Code, 100% of the loss realized by LEMAN LLC on its disposition of the Notes is ordinary.  Alternatively, under Section 988, 65.5% of the loss recognized by LEMAN LLC on the disposition of the Notes is ordinary and 34.5% of the loss recognized by LEMAN LLC on the disposition of the Notes is capital.

G.    Under Section 704(c), (i) 100% of the loss recognized by LEMAN LLC on its disposition of the Notes is properly allocable to JONCTION LLC and (ii) 90% of the loss so allocated to JONCTION LLC is properly allocable to Plaintiff as transferee and holder of a portion of ANGLAISE LLC's interest in JONCTION LLC for the year in which the disposition occurred.

H.    With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Plaintiff in connection with the Transactions:

1.    The step transaction doctrine will not apply to the Transactions;

2.    The requisite profit motive exists to support Plaintiff's deduction of any loss from the Transactions under Section 165(c)(2);

3.    The sham transaction doctrine will not apply and the Transactions will have the requisite business purpose and economic substance;

4.    The IRS will be unsuccessful if it asserts that the ANGLAISE LLC, JONCTION LLC and/or LEMAN LLC should be disregarded;

5.    The IRS will be unsuccessful if it asserts under Treasury Regulations Section 1.701-2 that the Transactions are inconsistent with the intent of Subchapter K;

6.    Any loss that Plaintiff incurs from the Transactions will not be subject to the limitations under Section 469;

7.    Any loss that Plaintiff incurs from the Transactions will not be limited by the Section 465 "at risk" rules; and

8.    Section 482 will not be applicable to the Transactions;

I.    Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions as described herein will be upheld if challenged by the IRS.

J.    Plaintiff *will not* be subject to accuracy-related penalties as a result of reporting the income tax consequences of the Transactions in a manner consistent with this opinion.

92.    The 2004 DeCastro legal opinion letter intentionally failed to fully and properly analyze and discuss the effect of the applicable portions of the tax code, published case law, common law doctrines, IRS notices, regulations and other applicable authorities impacting the validity and legality of the 2003 Distressed Debt Strategy.

93.   The 2003 Strategy Defendants advised the Plaintiffs that as a result of the 2003 Distressed Debt Strategy, the Plaintiffs could properly claim losses on their tax returns for 2003.

94.   Relying on the 2003 Strategy Defendants' representations and instructions, the Plaintiffs included the losses generated by the 2003 Distressed Debt Strategy on their federal and state tax returns for 2003.

### 5.   The BDO Opinion Letter for the 2003 Distressed Debt Strategy

95.   On February 6, 2004, BDO issued an opinion letter to Plaintiffs regarding the propriety of the 2003 Distressed Debt Strategy (the "2004 BDO opinion letter").

96.   The 2004 BDO opinion letter was authored and prepared based, in part, on representations made by the 2003 Strategy Defendants. Not surprisingly, the 2004 BDO opinion letter reached the same conclusions as the 2004 DeCastro opinion letter and advised the Plaintiffs that, among other things, it was more likely than not that:

1.   JONCTION LLC will be classified as a partnership and Plaintiff, ANGLAISE LLC, and Gramercy Asset Management LLC will be treated as partners of JONCTION LLC. ANGLAISE LLC will be classified as a partnership and the Contributors of the Notes and the Gramercy Asset Management LLC will be treated as partners of ANGLAISE LLC.

2.   LEMAN LLC has a tax basis in the Notes equal to that same tax basis in the hands of each of the Contributors of the Notes immediately prior to those Notes' contribution to ANGLAISE LLC.

3.   Plaintiff will initially have a tax basis in its membership interest in JONCTION LLC equal to (i) the amount of money, (ii) the adjusted basis of the other property contributed to JONCTION LLC, (iii) the amount of gain, if any, recognized by Plaintiff on the contribution under Code § 721(b) and (iv) its purchase price for its interest.

4.   LEMAN LLC will be classified as a partnership and JONCTION LLC would be treated as a partner of LEMAN LLC.

5.  ANGLAISE LLC will initially have a tax basis in its JONCTION LLC membership interest equal to its tax basis in the Notes contributed to JONCTION LLC, increased by (i) the amount of money, (ii) the adjusted basis of other property contributed to JONCTION LLC, and (iii) the amount of gain, if any, recognized by ANGLAISE LLC on the contribution under Code § 721 (b).  JONCTION LLC will initially have a tax basis in its LEMAN LLC membership interest equal to its tax basis in the Notes contributed to LEMAN LLC, increased by (i) the amount of money, (ii) the adjusted basis of other property contributed to LEMAN LLC, and (iii) the amount of gain, if any, recognized by JONCTION LLC on the contribution under Code § 721 (b).

6.  LEMAN LLC will recognize a loss on the disposition of the Notes equal to the difference between its tax basis in those Notes and the amount of cash received from the disposition of such Notes.  Such loss will be ordinary in character.

7.  Under Code § 704(c), the loss described in item 6, above, will be allocated by LEMAN LLC to JONCTION LLC, and ninety percent (90%) of that loss will then be allocated by JONCTION LLC to the Plaintiff as an acquirer and holder of a portion of ANGLAISE LLC's Interest for the year in which the disposition occurs.

8.  JONCTION LLC will have sufficient tax basis in its membership interest in LEMAN LLC to pass through and deduct its allocation of losses described in item 6, above, and Plaintiff will have sufficient tax basis in its membership interest in JONCTION LLC in order to pass through and deduct its allocation of those losses.  Code § 704(d) would not limit those deductions.

9.  With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by the Plaintiff in connection with the Transactions:

   a.  The sham transaction doctrine will not apply and, based on the representations provided to us, the Transactions will have the requisite business purpose and economic substance;

   b.  Based on the representations furnished to us, the requisite profit motive exists to support the deduction of any loss from the Transaction under Code § 165(c)(2);

   c.  ANGLAISE LLC's ownership of its interest in JONCTION LLC will be respected, notwithstanding the brief period of ownership of part of the interest;

d.      The step transaction doctrine will not apply to the Transactions;

e.      The Service will be unsuccessful were it either to assert (i) under Reg. § 1.701-2 that the Transactions are inconsistent with the intent of subchapter K or (ii) that JONCTION LLC should be disregarded entirely under Reg. § 1.701-2 or under common law principles;

f.      Any loss Plaintiff incurs from the Transactions will not be limited by the Code § 465 "at risk" rules;

g.      Any loss that Plaintiff incurs from the Transactions will not be subject to the limitations under Code § 469;

h.      Code § 482 will not be applicable to the Transactions; and

i.      Code § 446 would not apply to require an allocation of loss inconsistent with Code § 704(c).

10.     There is a greater than fifty percent (50%) likelihood that the tax treatment of the Transactions will be upheld if challenged by the Service.

11.     Plaintiff *should not* be subject to a penalty under Code § 6662(e)(1)(A), governing gross valuation misstatements, for positions taken on the Plaintiffs' U.S. Federal income tax return with respect to the Transactions.

12.     Plaintiff *should not* be subject, under Code § 6662(b)(2) or (3), to accuracy-related penalties for positions taken on the Plaintiffs' U.S. Federal income tax return with respect to Transactions.

97.     The 2004 BDO opinion letter failed to properly analyze and discuss the applicable portions of the tax code, published case law, common law doctrines, IRS notices, regulations and other applicable authorities that clearly indicated that the IRS would conclude that the 2003 Distressed Debt Strategy was an illegal and abusive tax shelter. The 2003 Strategy Defendants were aware of the existence and effect of the tax code, case law, common law doctrines, IRS notices, regulations and other applicable

authorities regarding the validity of the 2003 Distressed Debt Strategy, but intentionally failed to fully analyze and discuss their effect on the 2003 Distressed Debt Strategy.

98.     The 2003 Strategy Defendants advised the Plaintiffs that as a result of the 2003 Distressed Debt Strategy, the Plaintiffs could properly claim losses on their tax returns for 2003.

99.     Relying on the 2003 Strategy Defendants' representations and instructions, the Plaintiffs included the losses generated by the 2003 Distressed Debt Strategy on their federal and state tax returns in 2003.

### 6.     Plaintiffs File Tax Returns Based on the 2003 Strategy Defendants' Advice and Instructions

100.    Financial Strategy prepared the 2003 federal tax return for LEMAN LLC and provided Plaintiffs with a copy of this tax return. Financial Strategy, who had an undisclosed fee arrangement with Gramercy and/or BDO, was aware that and in fact intended on Plaintiffs using and relying on this tax return to prepare Plaintiffs' individual tax returns. BDO prepared the 2003 individual federal tax return for the Plaintiffs. BDO signed Plaintiffs' 2003 individual federal tax return on October 11, 2004. BDO also prepared the 2003 federal tax return for JONCTION LLC. BDO signed the 2003 federal tax return for JONCTION LLC on September 30, 2004. These tax returns contained the losses purportedly generated by the 2003 Distressed Debt Strategy. The 2003 Strategy Defendants advised the Plaintiffs that the tax returns were properly prepared in accordance with professional standards. The 2003 Strategy Defendants advised Plaintiffs that the losses generated from the 2003 Distressed Debt Strategy could be legally used on Plaintiffs' tax returns. Based on these assurances, the 2004 DeCastro and 2004 BDO opinion letters, the 2003 Strategy Defendants' representations during all phases of the

promotion, sale, and implementation of the 2003 Distressed Debt Strategy, and the tax returns for JONCTION LLC and LEMAN LLC, the Plaintiffs signed and filed their federal tax returns for the year 2003. Plaintiffs' filing of these tax returns using the 2003 Distressed Debt Strategy was the final step of the 2003 Distressed Debt Strategy.

### 7.   The 2003 Strategy Defendants Fail to Give Plaintiffs Full Disclosure

101.   At no time prior to or subsequent to Plaintiffs' implementation of the 2003 Distressed Debt Strategy did the 2003 Strategy Defendants inform Plaintiffs that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the 2003 Strategy Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2003 Distressed Debt Strategy to the Plaintiffs. At this time, the 2003 Strategy Defendants knew or should have known that the IRS would conclude that the 2003 Distressed Debt Strategy was an illegal and abusive tax shelter and violated the partnership anti-abuse rules under Treas. Reg. § 1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the economic substance doctrine, and the business purpose doctrine, as well as numerous other established authorities. The 2003 Strategy Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary to Plaintiffs' detriment.

102.   Between the time the 2003 Strategy Defendants advised, recommended, and instructed the Plaintiffs to enter into the 2003 Distressed Debt Strategy and the time the Plaintiffs' respective tax returns were prepared, signed and filed, the 2003 Strategy Defendants never disclosed to Plaintiffs that the IRS would conclude that the 2003 Distressed Debt Strategy lacked the required business purpose and economic substance

and, in fact, advised Plaintiffs to the contrary to Plaintiffs' detriment. The 2003 Strategy Defendants intentionally failed to disclose this material information to the Plaintiffs.

103.    The 2003 Strategy Defendants knew or should have known, before they induced Plaintiffs to enter into the 2003 Distressed Debt Strategy, before they assisted Plaintiffs in the implementation of the 2003 Distressed Debt Strategy, before DeCastro and BDO issued the opinion letters, and before Plaintiffs filed their tax returns in reliance on the 2003 Strategy Defendants' representations, instructions, and assurances, that the IRS would conclude that the purported losses arising from the 2003 Distressed Debt Strategy were not properly allowable for federal or state income tax purposes. However, the 2003 Strategy Defendants intentionally failed to inform Plaintiffs of this and, indeed, informed them to the contrary to Plaintiffs' detriment.

104.    The 2003 Strategy Defendants failed to retract, modify, or qualify in any way their advice, instructions, and opinions expressed to the Plaintiffs confirming the propriety of the 2003 Distressed Debt Strategy.

**8.    The Cost of the 2003 Distressed Debt Strategy**

105.    The Plaintiffs lost a significant amount of money in carrying out the 2003 Distressed Debt Strategy. For the 2003 Distressed Debt Strategy and tax returns in connection therewith, the Plaintiffs paid significant fees to the 2003 Strategy Defendants and the Other Participants.

106.    Further, in 2008, the IRS disallowed the Plaintiffs' 2003 Distressed Debt Strategy and determined that Plaintiffs owed substantial back-taxes, interest, and penalties as a direct result of their participation in the 2003 Distressed Debt Strategy.

## D.   CONSPIRACY AMONG THE DEFENDANTS

107.   Each of the Defendants and the Other Participants involved in the Distressed Debt Strategies executed by Plaintiffs conspired with one another to design, promote, sell, and implement the Distressed Debt Strategies for the purpose of receiving and splitting substantial fees (the "Defendants' Arrangement"). The receipt of those fees was the primary, if not sole, motive in the development and execution of the Distressed Debt Strategies. Further, the amount of fees earned by the Defendants and the Other Participants was not tied to or reflective of the amount of time and effort they expended in providing tax, investment, legal or accounting services, but rather was tied to the amount of capital and/or ordinary losses each client, including Plaintiffs, would claim on their tax returns. Indeed, the Defendants and the Other Participants designed the Distressed Debt Strategies and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the Distressed Debt Strategies by agreeing to the representations that would be made and to issue the allegedly "independent" opinions before potential clients, including Plaintiffs, were solicited.

108.   The Defendants and the Other Participants aggressively put their scheme into action. The Defendants and the Other Participants solicited their own clients to enter into the Distressed Debt Strategies. The Defendants identified the Plaintiffs (and other successful individuals) as potential clients based on their knowledge of their finances. The clients became "targets". And in the end, the Plaintiffs, like so many other clients, became a "victim" of corporate greed.

109.   The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' and the Other Participants' conduct; the provision of

professional services to clients was merely an incidental byproduct of, not a motivating factor for, the Defendants' conduct alleged herein. Further, the Defendants' Arrangement gave each of the participating Defendants and the Other Participants a significant pecuniary interest in the advice and professional services they would render.

110.    The Defendants and the Other Participants had a financial, business and property interest in inducing the Plaintiffs, as well as other clients, to enter into the Distressed Debt Strategies, and to do so, promised, opined and assured that the Distressed Debt Strategies would provide the Plaintiffs with a reasonable opportunity to make a profit on the "investments" and at the same time legally reduce Plaintiffs' taxes.

111.    The Defendants and the Other Participants entered into the Defendants' Arrangement, whereby they agreed they would solicit each other's clients and split the fees to be charged clients that executed the Distressed Debt Strategies, including the Plaintiffs.

112.    Here, the Defendants and the Other Participants conspired to perpetrate a fraud on Plaintiffs.[13] Each of the Defendants and the Other Participants had particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the Distressed Debt Strategies. In addition, the Defendants and the Other Participants authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Defendants and the Other Participants.

---

[13] As previously noted, Michael Kerekes, Adrian Dicker and Charles Bee, high-level partners at BDO and members of BDO's Tax Solutions Group – the organization within BDO responsible for the design, marketing, sale and implementation of BDO's tax-reducing strategies – have admitted in their respective plea convictions that BDO was involved a conspiracy to perpetrate a fraud in connection with the design, marketing, sale, and implementation of BDO tax shelters. See Kerekes Plea Agreement at p. 2; See United States Department of Justice Release: "Former Accounting Firm Vice Chairman / Board Member Pleads Guilty to Tax Fraud Related to Tax Shelters."

PLAINTIFFS' COMPLAINT AT LAW

E.     **THE IRS AUDITS PLAINTIFFS' TAX RETURNS AS A RESULT OF THE DISTRESSED DEBT STRATEGIES**

113.    Plaintiffs received Notices of Audit (Notice of Beginning of Administrative Proceeding) for their 2002 and 2003 tax returns in 2005 and 2006, respectively.  In 2008, Plaintiffs received certain Notices of Adjustment from the IRS indicating that the IRS intended to disallow the Distressed Debt Strategies. Also in 2008, Plaintiffs received Notices of Deficiency with respect to the IRS's disallowance of the Distressed Debt Strategies.  As a result of Defendants' conduct set forth above, the IRS determined in 2008 that Plaintiffs owed substantial back-taxes, penalties and interest as a direct result of the Distressed Debt Strategies.

## IV.

## DISCOVERY RULE DEFERRED ACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

114.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

115.    The causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule deferred accrual of the respective statutes of limitation for such causes of action.

## V.

## ACCRUAL OF STATUTE OF REPOSE AS TO PLAINTIFFS' ACCOUNTING MALPRACTICE CLAIM

116.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

117.   Plaintiffs' cause of action for negligence/professional malpractice asserted against BDO Seidman herein is timely filed as the respective statute of repose for such cause of action did not begin to accrue until recently at the earliest because BDO continued to commit negligence/professional malpractice and make numerous misrepresentations and omissions of material fact in connection with the Distressed Debt Strategies during this time period.

118.   Further, BDO and Financial Strategy prepared certain of the tax returns for Plaintiffs utilizing the losses purportedly generated by the Distressed Debt Strategies. Thus, the exception to the statute of repose set forth in 735 ILCS 5/13-214.2 is applicable to BDO and Financial Strategy.

## VI.

### TOLLING OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS DUE TO FRAUDULENT CONCEALMENT

119.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

120.   The causes of action asserted by Plaintiffs against Defendants are timely filed as Defendants fraudulently concealed the wrongful conduct alleged herein.

121.   Defendants had actual knowledge of the wrongful conduct alleged herein.

122.   Defendants fraudulently concealed the wrongful acts and omissions alleged herein by remaining silent and making misrepresentations about wrongful conduct despite having a duty to inform Plaintiffs of such wrongful acts and omissions. Defendants' silence and misrepresentations prevented Plaintiffs from discovering Defendants' wrongful acts and omissions.

123.   Defendants had a fixed purpose to conceal the wrongful conduct.

**PLAINTIFFS' COMPLAINT AT LAW**

124.    Plaintiffs reasonably relied on Defendants' silence and misrepresentations to the detriment of Plaintiffs.

## VII.

## CAUSES OF ACTION

## COUNT I – BREACH OF FIDUCIARY DUTY

125.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

126.    The Defendants, as the Plaintiffs' attorneys, accountants, and tax, financial and investment advisors were Plaintiffs' fiduciaries.  Plaintiffs placed their trust and confidence in Defendants, and Defendants had influence and superiority over the Plaintiffs.  Thus, Defendants owed Plaintiffs the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.

127.    Defendants breached their fiduciary duties to Plaintiffs by, among other ways:

   (a)       advising Plaintiffs to engage in the Distressed Debt Strategies;

   (b)       failing to advise Plaintiffs that the legal opinions were not "independent" and as a result could not provide the required legal support or penalty protection;

   (c)       advising Plaintiffs that they could make a profit on the FX Contracts and the investments in distressed debt;

   (d)       orchestrating the implementation of the Distressed Debt Strategies;

   (e)       providing the purported required legal opinion letters verifying the soundness of the Distressed Debt Strategies;

(f)     failing to advise Plaintiffs that certain Defendants had undisclosed fee splitting or sharing arrangements; and

(g)     advising Plaintiffs to sign and file the tax returns in reliance on Defendants' advice, representations, recommendations, instructions, and opinions, which, according to the IRS, Defendants knew or should have known the IRS would conclude were improper and illegal, for the purpose of generating huge fees for Defendants.

128.   As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

129.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT II – NEGLIGENCE/PROFESSIONAL MALPRACTICE

130.   Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

131.   As Plaintiffs' attorneys, accountants, and tax, financial and investment advisors, Defendants owed Plaintiffs a duty to comply with the applicable standards of care.

132.     Defendants failed to meet those applicable standards of care.  Defendants' failure to meet the standard of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

133.     Defendants' failure to meet the applicable standard of care constitutes negligence.

134.     In addition, Defendants' actions rise to the level of gross negligence. Accordingly, Plaintiffs seek punitive/exemplary damages against Defendants.

135.     The Defendants' negligence/gross negligence was a proximate cause of Plaintiffs' damages.   In reasonable reliance on Defendants' advice regarding the Distressed Debt Strategies, Plaintiffs participated in the Distressed Debt Strategies and paid significant fees to the Defendants and the Other Participants for investment, tax and legal advice in connection with the implementation of the Distressed Debt Strategies, filed federal and state tax returns that reflected losses generated from the Distressed Debt Strategies, and did not take advantage of other legitimate tax savings opportunities.

136.     But for Defendants' negligence/gross negligence, Plaintiffs would not have hired Defendants and the Other Participants for advice on the Distressed Debt Strategies, would not have engaged in the Distressed Debt Strategies, would not have filed federal and state tax returns that utilized losses generated from the Distressed Debt Strategies, and would not have failed to avail themselves of other legitimate tax savings opportunities.

137.     Defendants' negligence/gross negligence proximately caused damages to Plaintiffs in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt

and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

138.   As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT III – NEGLIGENT MISREPRESENTATION

139.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

140.   During the course of their representation of Plaintiffs, Defendants made numerous negligently affirmative representations that were improper and false and negligently misleading omissions of material fact to Plaintiffs.

141.   Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong.  Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs was improper and wrong and would mislead Plaintiffs.

142.   The Defendants' negligent misrepresentations were a proximate cause of Plaintiffs' damages.  In reasonable reliance on Defendants' negligent misrepresentations regarding the Distressed Debt Strategies, Plaintiffs participated in the Distressed Debt Strategies and paid significant fees to the Defendants and the Other Participants for investment, tax and legal advice in connection with the implementation of the Distressed Debt Strategies, filed federal and state tax returns that reflected losses generated from the

**PLAINTIFFS' COMPLAINT AT LAW**

Distressed Debt Strategies, and did not take advantage of other legitimate tax savings opportunities.

143. But for Defendants' negligent misrepresentations and material omissions described above, Plaintiffs would not have (a) hired Defendants and the Other Participants for advice on the Distressed Debt Strategies, (b) engaged in the Distressed Debt Strategies, (c) filed federal and state tax returns that utilized losses generated from the Distressed Debt Strategies, and (d) failed to avail themselves of other legitimate tax savings opportunities.

144. The Defendants' conduct set forth herein proximately caused Plaintiffs to suffer injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

145. As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

## COUNT IV - DISGORGEMENT

146. Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

147.   As a result of Defendants' breach of their fiduciary duty, they should be required to disgorge all payments received by them from Plaintiffs or from any entity for work performed in connection with the Distressed Debt Strategies.

148.   Additionally, regardless of the merits of the tax, legal, financial and investment advice and services Defendants rendered to Plaintiffs, the fees the Defendants charged and which Plaintiffs paid are unethically excessive and in violation the applicable rules of professional conduct.

149.   Further, since Defendants did not disclose information that they were required to disclose - *i.e.,* the Defendants' pre-planned scheme: the fact that Defendants conspired to design, market, sell, and implement the Distressed Debt Strategies; the opinion letters were not independent and could not provide the required legal support for the propriety of the Distressed Debt Strategies and could not provide penalty protection; the Defendants had a significant pecuniary interest in the Distressed Debt Strategies; and the Defendants' representation of Plaintiffs and their arrangement with the Defendants and the Other Participants violated the applicable rules of professional conduct - their fee agreements with Plaintiffs are not enforceable.

150.   Accordingly, the Defendants must disgorge their fees to Plaintiffs.   In addition, Plaintiffs seek an award of attorneys' fees, interest, and costs.

## COUNT V – RESCISSION

151.   Plaintiffs reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

152.   Plaintiffs and Defendants entered into investment management agreements, engagement agreements, consulting agreements, and other agreements in

PLAINTIFFS' COMPLAINT AT LAW

connection with the Distressed Debt Strategies ("Engagement Agreements"). In deciding to enter into the Engagement Agreements, Plaintiffs relied on numerous material knowingly false affirmative representations and intentional omissions of material fact Defendants made to Plaintiffs. Had Defendants not made those misrepresentations or omissions, Plaintiffs would not have entered into the Engagement Agreements. Defendants made those misrepresentations and omissions with the intent that Plaintiffs would rely on them. Plaintiffs are not in breach of any of their obligations pursuant to the Engagement Agreements.

153.   Further, as set forth above, the Engagement Agreements that Plaintiffs entered into with Defendants were procured by fraud, and Defendants fraudulently induced Plaintiffs to enter into these Engagement Agreements in furtherance of the conspiracy between and among the Defendants and the Other Participants. For instance, with respect to BDO, according to the Criminal Information against Michael Kerekes, the BDO Engagement Agreements were deliberately broad and vague as to the services BDO rendered and the fees paid by Plaintiffs in connection with the Distressed Debt Strategies.

154.   Plaintiffs seek rescission of the Engagement Agreements. In addition, Plaintiffs seek an award of attorneys' fees, interest, and costs.

## COUNT VI – DECLARATORY JUDGMENT

155.   Plaintiffs reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

156.   An actual, justiciable controversy exists between Plaintiffs on the one hand and the Defendants on the other with regard to the Engagement Agreements and the FX Contracts.

PLAINTIFFS' COMPLAINT AT LAW

157.    Plaintiffs seek a declaration that the Engagement Agreements entered into with Defendants are unenforceable due to a lack of consideration, or in the alternative, a failure of consideration, in that the Defendants knew or should have known that the transactions they proposed would not yield the benefits to Plaintiffs that were promised by the Defendants.  As a result, all promises of the Defendants under those contracts are merely "illusory" and, without those promises, the Engagement Agreements fail due to a lack of consideration.

158.    Further, as set forth above, the Engagement Agreements that Plaintiffs entered into with Defendants were procured by fraud, and Defendants fraudulently induced Plaintiffs to enter into these consulting agreements in furtherance of the conspiracy between and among the Defendants and the Other Participants.  For instance, with respect to BDO, according to the Criminal Information against Michael Kerekes, these Engagement Agreements were deliberately broad and vague as to BDO services and the fees paid by Plaintiffs in connection with the Distressed Debt Strategies.

159.    The FX Contracts that Plaintiffs entered into with Refco are unenforceable due to a lack of consideration, or in the alternative, a failure of consideration, in that Refco retained virtually unlimited discretion to determine whether the FX Contracts would pay out and therefore, could ensure, if they so chose, that the FX Contracts would *not* pay out or limit the amount of any payout. As a result, all promises of Refco under those contracts are merely "illusory" and, without those promises, the FX Contracts fail due to a lack of consideration.

160.    Had the Defendants not enticed Plaintiffs to enter into the Engagement Agreements and FX Contracts, they would not have paid fees to the Defendants and the

**PLAINTIFFS' COMPLAINT AT LAW**

Other Participants either. Thus, Plaintiffs seek a declaration that, due to the foregoing lack of consideration, the Defendants have been unjustly enriched and all fees paid to Defendants and the Other Participants should be returned to Plaintiffs.

## COUNT VII – FRAUD

161.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

162.   In order to induce the Plaintiffs to pay them substantial fees, the Defendants – directly and indirectly through the Other Participants - made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs, including but not limited to:

(1)   Advising and recommending that Plaintiffs engage in illegal and abusive tax shelters, the Distressed Debt Strategies;

(2)   Charging and collecting unreasonable, excessive, and unethical fees;

(3)   Failing to disclose the actual roles and relationships of Defendants and the Other Participants (e.g., the conspiracy) in the Distressed Debt Strategies;

(4)   Failing to disclose that the Defendants and Other Participants were splitting and/or sharing fees;

(5)   Representing to Plaintiffs that the tax savings of the Distressed Debt Strategies to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(6)   Representing to Plaintiffs that the tax benefits of the Distressed Debt Strategies far outweighed any potential loss that might be incurred on the FX Contracts and the investments in distressed debt;

**PLAINTIFFS' COMPLAINT AT LAW**

(7)     Advising Plaintiffs that the De Castro opinion letters were "independent" legal opinions from "independent" law firms;

(8)     Failing to advise Plaintiffs that the De Castro opinion letters were not "independent" legal opinions from "independent" law firms;

(9)     Advising Plaintiffs that the De Castro opinion letters could be relied upon by Plaintiffs to protect Plaintiffs from incurring penalties if audited;

(10)    Failing to advise Plaintiffs that the De Castro opinion letters could not be relied upon by Plaintiffs to protect Plaintiffs from incurring penalties if audited;

(11)    Advising Plaintiffs that the De Castro opinion letters could be relied upon to satisfy the IRS as to the propriety of the Distressed Debt Strategies if audited;

(12)    Failing to advise Plaintiffs that the De Castro opinion letters could not be relied upon to satisfy the IRS as to the propriety of the Distressed Debt Strategies if audited;

(13)    Advising Plaintiffs that the Distressed Debt Strategies would more likely than not be upheld as legal tax advantaged investment strategies if audited;

(14)    Failing to advise Plaintiffs that the IRS would more likely than not conclude the Distressed Debt Strategies are illegal and abusive tax shelters if Plaintiffs are audited;

(15)    Advising Plaintiffs that there was a reasonable likelihood of making a profit on the "investment" component of the Distressed Debt Strategies;

**PLAINTIFFS' COMPLAINT AT LAW**

(16) Designing, marketing, selling, and implementing illegal and abusive tax shelters that are disallowed and prohibited by the IRS;

(17) Failing to advise Plaintiffs that DeCastro had already prepared "form" opinion letters approving the respective Distressed Debt Strategies and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters;

(18) Illegally promoting unregistered tax shelters by marketing the Distressed Debt Strategies to Plaintiffs;

(19) Failing to disclose to Plaintiffs that if they filed tax returns based on the Distressed Debt Strategies they could and/or would likely be liable for penalties and interest;

(20) Advising Plaintiffs that if they filed tax returns based on the Distressed Debt Strategies they could not and would not be liable for penalties and/or interest;

(21) Advising Plaintiffs that the bases created by the Distressed Debt Strategies were legitimate, proper, and in accordance with all applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(22) Recommending, advising, instructing, and/or assisting Plaintiffs in implementing and carrying out all phases of the illegal and abusive tax shelters, the Distressed Debt Strategies;

(23) Advising Plaintiffs that the Distressed Debt Strategies had the required business purpose and economic substance;

(24)    Making and endorsing the statements and representations in the opinion letters authored and signed by De Castro;

(25)    Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral advice, instructions, and recommendations;

(26)    Advising Plaintiffs that each of the Defendants and the Other Participants were "independent" of one another when in fact these Defendants and Other Participants were involved in a conspiracy to market, sell, and implement the Distressed Debt Strategies;

(27)    Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the Distressed Debt Strategies;

(28)    Advising, instructing, and assisting Plaintiffs in the purchase and execution of the FX Contracts and the investments in distressed debt;

(29)    Advising Plaintiffs that they had an opportunity of making a profit on the investments in distressed debt when, in fact, it was virtually impossible to make a profit taking into account the fees and costs of the Distressed Debt Strategies;

(30)    Advising, instructing, and assisting in the preparation of Plaintiffs' tax returns, which utilized the losses generated by an illegal and abusive tax shelters, the Distressed Debt Strategies;

(31)    Signing Plaintiffs' tax returns and advising Plaintiffs to sign and file the tax returns;

(32)    Failing to advise Plaintiffs not to use the losses generated from the

**PLAINTIFFS' COMPLAINT AT LAW**

Distressed Debt Strategies on the Plaintiffs' tax returns;

(33) Advising, confirming, and/or ratifying that the De Castro opinion letters were accurate and correct;

(34) Advising Plaintiffs that their tax returns, which utilized the reduction in taxes generated by the Distressed Debt Strategies, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(35) Failing to disclose existing published authority that indicated that the purported tax consequences for transactions such as the Distressed Debt Strategies were improper and not allowable for Federal income tax purposes;

(36) Failing to advise Plaintiffs that the Distressed Debt Strategies the Defendants and the Other Participants advised Plaintiffs to execute did not comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(37) Advising Plaintiffs that the Distressed Debt Strategies the Defendants and the Other Participants advised Plaintiffs to execute complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(38) Knowingly engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(39) Advising the Plaintiffs that the step transaction, sham transaction, business purpose and economic substance doctrines and the partnership anti-abuse

regulations would not apply to disallow the results of the Distressed Debt Strategies;

(40)   Advising the Plaintiffs that Treasury Regulation Section 1.701-2 would not apply to the Distressed Debt Strategies;

(41)   Failing to advise Plaintiffs that Treasury Regulation Section 1.701-2 would apply the Distressed Debt Strategies;

(42)   Advising, instructing, and assisting Plaintiffs in entering into transactions in which Defendants advised Plaintiffs that the step transaction, sham transaction, business purpose and/or economic substance doctrines and the partnership anti-abuse regulations did not apply to disallow the results of the Distressed Debt Strategies;

(43)   Advising Plaintiffs that each of the various steps of the Distressed Debt Strategies were meaningful and imbued with the requisite non-tax considerations;

(44)   Informing the Plaintiffs that the Distressed Debt Strategies were not "sham transactions" that would be ignored or disallowed by the IRS for tax purposes;

(45)   Informing the Plaintiffs that the De Castro opinion letters would confirm that the Distressed Debt Strategies were not "sham transactions" that would be ignored or disallowed by the IRS for tax purposes;

(46)   Recommending, instructing, and advising Plaintiffs to enter into the FX Contracts and the investments in distressed debt as an investment and/or part of a tax strategy;

(47)    Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, were, according to the IRS, illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked the required economic substance and business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines and the partnership anti-abuse regulations;

(48)    Advising Plaintiffs that the purchase and sale of the distressed debt investments were actual, bona-fide investments and/or the purchase and sale of these investments were arms-length transactions;

(49)    Advising Plaintiffs to execute the Defendants' respective Engagement Agreements and agree to the arbitration provision therein, attempting to intentionally and knowingly limit or eliminate Plaintiffs' ability to recover from Defendants, when Defendants knew that the Distressed Debt Strategies were likely to be disallowed as illegal and abusive tax shelters and Plaintiffs would sustain substantial damages due to Defendants' conspiracy to perpetrate a fraud; and

(50)    Advising Plaintiffs that they would prevail in litigation with the IRS over the merits of the Distressed Debt Strategies.

163.    The above intentional omissions of material fact and/or affirmative misrepresentations made by each Defendant were false when made and the Defendants knew these representations to be false when made with the intention that Plaintiffs rely upon them in entering into the Distressed Debt Strategies and pay them substantial fees.

In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by the Defendants with the intent to induce Plaintiffs to enter into the Distressed Debt Strategies and pay Defendants and the Other Participants substantial fees.

164.   In reasonable reliance on the Defendants' false affirmative representations and intentional omissions of material facts regarding the Distressed Debt Strategies, Plaintiffs paid substantial fees to Defendants and the Other Participants, paid additional amounts to execute the Distressed Debt Strategies, unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, filed federal and state tax returns that reflected improper tax treatment resulting from the Distressed Debt Strategies, did not disclose the transaction on their federal and state tax returns as a tax shelter, and did not avail themselves of other legitimate tax savings opportunities.

165.   But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs would never have hired Defendants and the Other Participants for advice on the Distressed Debt Strategies, engaged in the Distressed Debt Strategies, utilized an improper tax bases on their income tax returns, filed and signed their tax returns as prepared in reliance on the Defendants' advice and/or not disclose the Distressed Debt Strategies on their tax returns as tax shelters.   After discovering the Defendants' fraud, Plaintiffs incurred and will continue to incur substantial additional costs to rectify the situation.

166.   As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2)

they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

167.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fee, interest, and costs.

### COUNT VIII – VIOLATIONS OF ILLINOIS CONSUMER FRAUD ACT

168.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

169.   In order to induce the Plaintiffs to pay them substantial fees, the Defendants used and employed deception, fraud, false promises, misrepresentations and concealed, suppressed and omitted numerous material facts, including but not limited to:

(1)   Advising and recommending that Plaintiffs engage in illegal and abusive tax shelters, the Distressed Debt Strategies;

(2)   Charging and collecting unreasonable, excessive, and unethical fees;

(3)   Failing to disclose the actual roles and relationships of Defendants and the Other Participants (e.g., the conspiracy) in the Distressed Debt Strategies;

(4)   Failing to disclose that the Defendants and Other Participants were splitting and/or sharing fees;

(5)   Representing to Plaintiffs that the tax savings of the Distressed Debt Strategies to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(6)     Representing to Plaintiffs that the tax benefits of the Distressed Debt Strategies far outweighed any potential loss that might be incurred on the FX Contracts and the investments in distressed debt;

(7)     Advising Plaintiffs that the De Castro opinion letters were "independent" legal opinions from "independent" law firms;

(8)     Failing to advise Plaintiffs that the De Castro opinion letters were not "independent" legal opinions from "independent" law firms;

(9)     Advising Plaintiffs that the De Castro opinion letters could be relied upon by Plaintiffs to protect Plaintiffs from incurring penalties if audited;

(10)    Failing to advise Plaintiffs that the De Castro opinion letters could not be relied upon by Plaintiffs to protect Plaintiffs from incurring penalties if audited;

(11)    Advising Plaintiffs that the De Castro opinion letters could be relied upon to satisfy the IRS as to the propriety of the Distressed Debt Strategies if audited;

(12)    Failing to advise Plaintiffs that the De Castro opinion letters could not be relied upon to satisfy the IRS as to the propriety of the Distressed Debt Strategies if audited;

(13)    Advising Plaintiffs that the Distressed Debt Strategies would more likely than not be upheld as legal tax advantaged investment strategies if audited;

(14)    Failing to advise Plaintiffs that the IRS would more likely than not conclude the Distressed Debt Strategies are illegal and abusive tax shelters if Plaintiffs are audited;

(15)   Advising Plaintiffs that there was a reasonable likelihood of making a profit on the "investment" component of the Distressed Debt Strategies;

(16)   Designing, marketing, selling, and implementing illegal and abusive tax shelters that are disallowed and prohibited by the IRS;

(17)   Failing to advise Plaintiffs that DeCastro had already prepared "form" opinion letters approving the respective Distressed Debt Strategies;

(18)   Illegally promoting unregistered tax shelters by marketing the Distressed Debt Strategies to Plaintiffs;

(19)   Failing to disclose to Plaintiffs that if they filed tax returns based on the Distressed Debt Strategies they could and/or would likely be liable for penalties and interest;

(20)   Advising Plaintiffs that if they filed tax returns based on the Distressed Debt Strategies they could not and would not be liable for penalties and/or interest;

(21)   Advising Plaintiffs that the bases created by the Distressed Debt Strategies were legitimate, proper, and in accordance with all applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(22)   Recommending, advising, instructing, and/or assisting Plaintiffs in implementing and carrying out all phases of the illegal and abusive tax shelters, the Distressed Debt Strategies;

(23)   Advising Plaintiffs that the Distressed Debt Strategies had the required business purpose and economic substance;

(24)   Making and endorsing the statements and representations in the opinion letters authored and signed by De Castro;

(25)   Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral advice, instructions, and recommendations;

(26)   Advising Plaintiffs that each of the Defendants and the Other Participants were "independent" of one another when in fact these Defendants and Other Participants were involved in a conspiracy to market, sell, and implement the Distressed Debt Strategies;

(27)   Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the Distressed Debt Strategies;

(28)   Advising, instructing, and assisting Plaintiffs in the purchase and execution of the FX Contracts and the investments in distressed debt;

(29)   Advising Plaintiffs that they had an opportunity of making a profit on the investments in distressed debt;

(30)   Advising, instructing, and assisting in the preparation of Plaintiffs' tax returns, which utilized the losses generated by, according to the IRS, illegal and abusive tax shelters, the Distressed Debt Strategies;

(31)   Signing Plaintiffs' tax returns and advising Plaintiffs to sign and file the tax returns;

(32)   Failing to advise Plaintiffs not to use the losses generated from the Distressed Debt Strategies on the Plaintiffs' tax returns;

(33)   Advising, confirming, and/or ratifying that the De Castro opinion letters

were accurate and correct;

(34)   Advising Plaintiffs that their tax returns, which utilized the reduction in taxes generated by the Distressed Debt Strategies, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(35)   Failing to disclose existing published authority that, according the IRS, indicated that the purported tax consequences for transactions such as the Distressed Debt Strategies were improper and not allowable for Federal income tax purposes;

(36)   Failing to advise Plaintiffs that the Distressed Debt Strategies the Defendants and the Other Participants advised Plaintiffs to execute did not, according to the IRS, comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(37)   Advising Plaintiffs that the Distressed Debt Strategies the Defendants and the Other Participants advised Plaintiffs to execute complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(38)   Knowingly engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(39)   Advising the Plaintiffs that the step transaction, sham transaction, business purpose and economic substance doctrines and the partnership anti-abuse regulations would not apply to disallow the results of the Distressed Debt Strategies;

in connection with Plaintiffs' execution of the 2004 Distressed Debt Strategy pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs. Further, the 2004 Strategy Defendants made numerous false statements of material fact and omitted to state material facts that made the statements misleading to Plaintiffs. The purpose and effect of the 2004 Strategy Defendants' plan, transaction, and course of conduct was to generate fees by promoting an alleged completely legal investment/tax-savings strategy.

186.    The 2004 Strategy Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and/or disclose the true facts, even though such facts were available to them.

187.    As a result of and in reliance on these misrepresentations and/or omissions, the Plaintiffs engaged in the 2004 Distressed Debt Strategy. Had Plaintiffs known of the material adverse information that the 2004 Strategy Defendants did not disclose, they would not have entered into the 2004 Distressed Debt Strategy. Without doubt, the 2004 Strategy Defendants intended to deceive the Plaintiffs.

188.    Just as with the 2000 Digital Options Strategy, the 2001 Distressed Debt Strategy, the 2002 Distressed Debt Strategy, and the 2003 Distressed Debt Strategy, the fee to each of the 2004 Strategy Defendants from the 2004 Distressed Debt Strategy was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction. The bigger the deal, the larger the fee shared by the 2004 Strategy Defendants.

(40)   Advising the Plaintiffs that Treasury Regulation Section 1.701-2 would not apply to the Distressed Debt Strategies;

(41)   Failing to advise Plaintiffs that Treasury Regulation Section 1.701-2 would, according to the IRS, apply to the Distressed Debt Strategies;

(42)   Advising, instructing, and assisting Plaintiffs in entering into transactions in which Defendants advised Plaintiffs that the step transaction, sham transaction, business purpose and/or economic substance doctrines and the partnership anti-abuse regulations did not apply to disallow the results of the Distressed Debt Strategies;

(43)   Advising Plaintiffs that each of the various aspects of the Distressed Debt Strategies were meaningful and imbued with the requisite non-tax considerations;

(44)   Informing the Plaintiffs that the Distressed Debt Strategies were not "sham transactions" that would be ignored or disallowed by the IRS for tax purposes;

(45)   Informing the Plaintiffs that the De Castro opinion letters would confirm that the Distressed Debt Strategies were not "sham transactions" that would be ignored or disallowed for tax purposes;

(46)   Recommending, instructing, and advising Plaintiffs to enter into the FX Contracts and the investments in distressed debt as an investment and/or part of a tax strategy;

(47)   Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, the IRS claimed were

illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked the required economic substance and business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines and the partnership anti-abuse regulations;

(48)     Advising Plaintiffs that the purchase and sale of the distressed debt investments were actual, bona-fide investments and/or the purchase and sale of these investments were arms-length transactions;

(49)     Advising Plaintiffs to execute the Defendants' respective Engagement Agreements and agree to the arbitration provision therein, attempting to intentionally and knowingly limit or eliminate Plaintiffs' ability to recover from Defendants, when Defendants knew that the Distressed Debt Strategies were likely to be disallowed as illegal and abusive tax shelters and Plaintiffs would sustain substantial damages due to Defendants' conspiracy to perpetrate a fraud; and

(50)     Advising Plaintiffs that they would prevail in litigation with the IRS over the merits of the Distressed Debt Strategies.

170.     The above deception, fraud, false promises, misrepresentations and concealment, suppression and omissions of numerous material facts were made by each Defendant and were false when made and the Defendants knew them to be false when made with the intention that Plaintiffs rely upon them in entering into the Distressed Debt Strategies and pay them substantial fees. The deception, fraud, false promises, misrepresentations and concealment, suppression and omissions of material facts were

made in the conduct of trade and/or commerce as defined by the Illinois Consumer Fraud Act.

171.    In reasonable reliance on the Defendants' violations of the Illinois Consumer Fraud Act, Plaintiffs paid substantial fees to Defendants and the Other Participants, paid additional amounts to execute the Distressed Debt Strategies, unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, filed tax returns that reflected improper tax treatment resulting from the Distressed Debt Strategies, did not disclose the Distressed Debt Strategies on their tax returns as tax shelters, and failed to avail themselves of other legitimate tax savings opportunities.

172.    But for Defendants' violations of the Illinois Consumer Fraud Act described above, Plaintiffs would never have hired Defendants and the Other Participants for advice on the Distressed Debt Strategies, engaged in the Distressed Debt Strategies, utilized improper tax bases on their income tax returns, signed and filed their tax returns as prepared in reliance on the Defendants and the Other Participants' advice, failed to disclose the Distressed Debt Strategies on their tax returns as tax shelters, and failed to participate in other legitimate tax savings opportunities.

173.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

174.    As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

## COUNT IX – BREACH OF CONTRACT

175.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

176.    In the alternative to Count V and VI, Plaintiffs entered into oral and/or written contracts with the Defendants to provide Plaintiffs with professionally competent legal, accounting, and tax advice and services, tax preparation services, and investment advice and services.  In addition, Defendants represented to Plaintiffs that Plaintiffs purchased legal tax-advantaged investment strategies that the Plaintiffs could legally use on their tax returns, that the IRS would allow, and that Plaintiffs would never have to pay a penalty or interest to the IRS.

177.    Plaintiffs fully performed their obligations to the Defendants under these contracts and thus did not contribute to these Defendants' breaches in any way.

178.    These Defendants breached their obligations under the oral and/or written contracts with the Plaintiffs, which caused damages to the Plaintiffs.  For instance, Defendants marketed and sold the illegal and abusive tax shelters to Plaintiffs.  The Defendants then implemented these illegal and abusive tax shelters for Plaintiffs.  The Distressed Debt Strategies were not legal tax-advantaged investments strategies as Defendants promised Plaintiffs they would receive and which Plaintiffs bargained for. Certain of Defendants assisted in the preparation of Plaintiffs' tax returns, signed

Plaintiffs' tax returns and advised the Plaintiffs to sign and file the tax returns using the losses generated by these illegal and abusive tax shelters.

179.   As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

180.   As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded all actual, consequential, and incidental damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT X – CIVIL CONSPIRACY

181.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

182.   As described more fully above, the Defendants and the Other Participants knowingly acted in concert to design, market, sell, and implement tax strategies that the IRS has concluded are fraudulent, illegal and abusive tax shelters – the Distressed Debt Strategies.  In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs.  In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions that had economic substance from an investment standpoint, when

the transaction in fact lacked those features (which were necessary for a successful tax strategy).

183.    The Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs (*i.e.*, the Defendants' Arrangement), all for the purposes of obtaining professional fees from consumers, including the Plaintiffs. The Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Plaintiffs.

184.    The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs.

185.    There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on Plaintiffs. The conspiracy to commit these unlawful and fraudulent acts proximately caused and continue to cause Plaintiffs' damages as previously set forth herein.

186.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

187.    Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## VIII.

## <u>PRAYER FOR RELIEF</u>

188.    Based upon the foregoing, Plaintiffs request that Defendants be cited to appear and answer, and that on final hearing Plaintiffs have judgment against Defendants, jointly and severally for:

    a.      actual damages;

    b.      pre- and post-judgment interest at the highest legal rate allowed by law;

    c.      all attorneys' fees and costs in pursuing this matter;

    d.      punitive, consequential, incidental, and treble damages in an amount to be determined at trial;

    e.      such other and further relief, both at law and in equity, to which Plaintiffs may show themselves to be justly entitled.

Dated: July  6  , 2009.

Respectfully submitted,

*Richard R. Harden*

THOMAS, MAMER & HAUGHEY, LLP
PO Box 560
Champaign, IL  61820
PH: 217-351-1500
FAX: 217-351-2017
LOCAL COUNSEL FOR PLAINTIFFS

FOOTE, MEYERS, MIELKE &
FLOWERS, LLC
CRAIG S. MIELKE
416 South Second Street
Geneva, Illinois  60134
(630) 232-6333
(630) 845-8982 (fax)

LOEWINSOHN FLEGLE DEARY, LLP
DAVID R. DEARY
Texas Bar No. 05624900
CAROL E. FARQUHAR
Texas Bar No. 06828300
COREY WEINSTEIN
Texas Bar No. 24037685
J. DYLAN SNAPP
Texas Bar No. 24053484
12377 Merit Drive, Suite 900
Dallas, Texas  75251
(214) 572-1700 - Telephone
(214) 572-1717 – Facsimile

ATTORNEYS FOR PLAINTIFFS

D



333 S. Wabash Ave., 39 South, Chicago, Illinois 60604

**Andrew F. Tyzenhaus**
**Claims Consultant**
**Accountants E&O Program**
**Professional Liability Group**
Telephone:  (312) 822-7614
Facsimile:    (866) 419-6276

August 31, 2009

**VIA CERTIFIED MAIL**

Mr. J. Clifton Paessler
Financial Strategy Group, PLC
700 Colonial Road, Suite 120
Memphis, TN 38117

Re:   Insured:       Financial Strategy Group, PLC
      Claimant:      LMC Recovery Fund, LLC/Shahid R. Khan, et al.
      Policy No.:    APL-188103279
      Claim No.:     AL117708
      Carrier:       Continental Casualty Company

Dear Mr. Paessler:

This correspondence will confirm our recent discussions regarding the interrelated complaints
filed against Financial Strategy Group, PLC in Texas and in Illinois.

Continental Casualty Company provides Financial Strategy Group, PLC with Accountants
Professional Liability Insurance under claims made policy APL-188103279 for the effective
period of 09/17/08 to 09/17/09.  The limits of liability under this policy are $1,000,000 per claim
and $1,000,000 in the aggregate.  Claim expenses are included within and will erode the limits of
liability as they are incurred.  A $50,000 deductible exists which applies to damages and claim
expenses.  A prior acts date limitation of 09/17/99 is associated with your policy of insurance.
Any acts committed prior to 09/17/99 are not covered under this policy of insurance.

The IL complaint's allegations were almost identical to those in the prior TX complaint against
Financial Strategy Group, PLC.  Accordingly, and as we previously advised, we are addressing
both complaints as interrelated claims as defined in your policy of insurance.

The allegations in the TX complaint as well as those in the IL complaint relate to Financial
Strategy Group, PLC's preparation of tax returns for entities that were meant to incur ordinary
losses for tax purposes under a Investment Strategy/Distressed Debt Strategy.  There are no
allegations that the returns were prepared negligently, but only that they were prepared to take
advantage of the Investment Strategy/Distressed Debt Strategy, which the IRS has deemed as an
abusive tax shelter.



**EXHIBIT**

**D**

As such, a coverage issue exist. I refer you to the preamble of your policy of insurance, which reads as follows:

> YOUR ACCOUNTANTS PROFESSIONAL LIABILITY INSURANCE IS WRITTEN ON A "CLAIMS-MADE" BASIS. IT PROVIDES COVERAGE FOR THOSE CLAIMS WHICH ARE BOTH FIRST MADE AGAINST YOU AND REPORTED TO US IN WRITING DURING THE POLICY PERIOD.

Please refer to the portion of your policy entitled Section II. **COVERAGE AGREEMENTS,** which states:

II.    COVERAGE AGREEMENTS

A.    We will pay on **your** behalf all sums in excess of the deductible, up to our limits of liability, that **you** become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against **you** and reported in writing to us during the **policy period** by reason of an act or omission in the performance of **professional services** by **you** or by any person for whom **you** are legally liable provided that:

2.    prior to the effective date of this Policy, none of **you** had a basis to believe that any such act or omission, or **interrelated act or omission**, might reasonably be expected to be the basis of a **claim**;

Next, please refer to Endorsement No. 18. (GSL3276XX), entitled **EXCLUSIONARY ENDORSEMENT FOR TAX SHELTER LOSSES**, which states:

EXCLUSIONARY ENDORSEMENT FOR TAX SHELTER LOSSES

In consideration of the premium paid for this Policy, it is understood and agreed that Section V. EXCLUSIONS, is amended to include the following new Exclusion:

V. EXCLUSIONS

This Policy does not apply to any **claim**:

·    based on, arising out of or in connection with the design, recommendation, referral, sale or promotion of any transactions which:

a.    are determined by the IRS or state tax authorities to be a tax avoidance transaction or is substantially similar to abusive tax shelters or listed transactions or are identified as such by notice, regulation, or other guidance under the tax law; or

b.    any tax transaction that is considered to be a reportable transaction under
Treasury Regulation §1.6011-4(b) or any superseding law or regulation.

Based on the above language in the **EXCLUSIONARY ENDORSEMENT FOR TAX
SHELTER LOSSES**, we must advise you that coverage for this matter is being denied as the tax
returns completed by Financial Strategy Group, PLC in this matter arise out of and were
completed in connection with a purported abusive tax shelter. Accordingly, Continental Casualty
Company has no duty to defend or indemnify Financial Strategy Group, PLC for this matter.

Additionally, as the plaintiff returns were under audit by 2004 and as there were several news
articles and press releases regarding such Son of Boss tax shelters, Financial Strategy Group,
PLC may have had a basis to believe that their completion of the related tax returns could
reasonably be expected to be the basis of a claim in advance of the policy's 09/17/08 inception
date. If such prior knowledge existed, coverage would not exist.

As outlined above in the **Coverage Agreements** Section II. A.2, coverage does not exist if prior
to the inception date of the Policy, 09/17/08, you had a basis to believe that an act or omission
might reasonably be expected to be the basis of a claim. Under such circumstances, this matter
should have been reported to us in advance of 09/17/08.

As discussed, please forward any amended complaints that may be filed for our review in order
that we may evaluate whether or not coverage is triggered. Also, as we will not be providing a
defense, you have indicated that you have selected Mr. Weinberg and Mr. Sullivan to continue
defending Financial Strategy Group, PLC in this matter.

Should you have any questions, feel free to respond in writing or to contact me at your
convenience.

Sincerely,

Andrew F. Tyzenhaus
Claims Consultant
Accountants E&O Program
Professional Liability Group

CNA

333 South Wabash 395
Chicago IL 60604

7056 1240 0003 8704 1620

Mr. J. Clifton Paessler
Financial Strategy Group, PLC
700 Colonial Road, Suite 120
Memphis, TN 38117

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

FINANCIAL STRATEGY GROUP, PLC,

       Plaintiff,

v.                                                             Case No. CH-14-0164-1

CONTINENTAL CASUALTY COMPANY,                  JURY DEMANDED

       Defendant.

---

## AFFIDAVIT OF CHARLES W. HILL

STATE OF TENNESSEE

COUNTY OF SHELBY

    COMES NOW, Charles W. Hill, being first duly sworn, deposes and states as follows:

1.    I am an adult resident of Shelby County, Tennessee.

2.    I am the attorney of record for Financial Strategy Group, PLC, in the above-captioned matter.

3.    To the best of my knowledge and belief the last known address of Continental Casualty Company, which is to be served through the Tennessee Commissioner of Insurance as agent for service of process pursuant to TENN. CODE ANN. § 56-2-504, is CNA Plaza, Chicago, Illinois 60685.

    FURTHER AFFIANT SAITH NOT.

Executed this 31st day of January, 2014.

_____
CHARLES W. HILL


SWORN TO AND SUBSCRIBED before me on this 31st day of January, 2014.

_____
NOTARY PUBLIC

My Commission Expires:

May 12, 2016

2